**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

IN RE:

EX PARTE APPLICATION OF
IRAQ TELECOM LIMITED FOR AN
ORDER TO OBTAIN DISCOVERY FOR
USE IN FOREIGN PROCEEDINGS
PURSUANT TO 28 U.S.C. § 1782

Case No. _____

**MEMORANDUM OF LAW IN SUPPORT OF IRAQ TELECOM LIMITED'S *EX PARTE*
APPLICATION PURSUANT TO 28 U.S.C. § 1782 FOR AN ORDER TO TAKE
DISCOVERY FROM *DECHERT LLP* FOR USE IN FOREIGN PROCEEDINGS**

**TABLE OF CONTENTS**

Page

INTRODUCTION AND SUMMARY STATEMENT ..................................................................1

    I.      Iraq Telecom's Investment in Iraq .........................................................................3

    II.     The Call Option.......................................................................................................3

    III.    Iraq Telecom's Investigation Reveals the Corrupt Scheme between Messrs. Barzani and Rahmeh and the CMC Officials .............................................4

    IV.    The Role Of Dechert ...............................................................................................5

    V.     The Requested Discovery is For Use in the Foreign Proceedings...........................6

    VI.    The Application Meets the Section 1782 Statutory and Discretionary Factors ....................................................................................................................7

FACTUAL BASIS FOR APPLICATION ............................................................................8

    I.      Korek .......................................................................................................................8

    II.     Investments by Agility and Orange into Korek ......................................................9

          A.     Agility and Orange Form a Joint Venture and Invest More than USD 800 Million into Korek ...................................................................9

          B.     The CMC Consented to the Investment By Agility and Orange .................9

    III.    Investment Transaction ..........................................................................................10

          A.     Overview......................................................................................................10

          B.     Corporate Governance .................................................................................12

          C.     The Call Option...........................................................................................13

    IV.    Korek Thrives Between 2011 and 2013...................................................................13

    V.     CMC Hostility Towards Agility and Orange..........................................................14

    VI.    CMC Declared the Investment Transaction Null, Void and Invalid ......................14

    VII.   CMC Colludes with the Iraqi Shareholders ...........................................................15

          A.     Overview......................................................................................................15

          B.     Associates of Mr. Rahmeh Purchase Property Used By CMC Officials......................................................................................................16

               1.     Barn Hill Property..........................................................................16

               2.     Higher Drive Property....................................................................17

    VIII.  Role of Dechert......................................................................................................17

## TABLE OF CONTENTS

**Page**

FOREIGN PROCEEDINGS ...................................................................................19

    I.      ICC Proceeding ...............................................................................19

            A.     Procedural History ............................................................19

            B.     Relevant Allegations ........................................................19

    II.     UK Proceeding ...............................................................................20

REQUESTED DISCOVERY ...............................................................................20

ARGUMENT ........................................................................................................21

    I.      Granting Iraq Telecom's Application *Ex Parte* is Appropriate and Fair Under Section 1782 ...................................................................22

    II.     Iraq Telecom's Application Meets the Statutory Requirements of Section 1782 ............................................................................................22

            A.     Dechert "Resides" or is "Found" in This District ..........................23

            B.     The Requested Discovery is "For Use" in a "Foreign Proceeding" ..........23

                  1.     ICC Proceeding is a Foreign Proceeding .................................24

                  2.     UK Proceeding is a Foreign Proceeding ..................................25

                  3.     The Requested Discovery is "For Use" in the ICC and UK Proceedings ................................................................27

            C.     Iraq Telecom Is an "Interested Person" ........................................28

    III.    Discretionary Factors Weigh in Favor of Iraq Telecom's Application ................28

            A.     Dechert is Not a Participant in the ICC or UK Proceedings ...................29

             B.     The Foreign Tribunals are Receptive to U.S. Judicial Assistance ............29

                   1.     ICC Proceeding ............................................................30

                    2.     UK Proceeding ............................................................30

             C.     The Application Does Not Circumvent the Rules of the Foreign Tribunals ................................................................................31

                  1.     ICC Proceeding ............................................................31

                  2.     UK Proceeding ............................................................32

              D.     The Application is Narrowly Tailored to Avoid Unnecessary Burdens in Accordance with the Federal Rules Of Civil Procedure ..........32

CONCLUSION ........................................................................................................33

# TABLE OF AUTHORITIES

Page

## Cases

*Application of Consorcio Ecuatoriano de Telecomunicaciones S.A. v. JAS Forwarding (USA), Inc.*,
   747 F.3d 1262 (11th Cir. 2014) ............................................................... 26, 27

*Haines v. Liggett Grp. Inc.*,
   975 F.2d 81 (3d Cir. 1992)............................................................................ 32

*In re Accent Delight Int'l Ltd.*,
   No. 16-MC-125(JMF), 2018 WL 2849724 (S.D.N.Y. June 11, 2018)................... 31

*In re Application to Obtain Discovery for Use in Foreign Proceedings*,
   No. 19-5315, 2019 WL 4509287 (6th Cir. Aug. 8, 2019) ....................................... 24

*In re Babcock Borsig AG*,
   583 F. Supp. 2d 233 (D. Mass. 2008)............................................................. 25

*In re Biomet Orthopaedics Switzerland GmBh*,
   742 F. App'x 690 (3d. Cir. 2018) ................................................................. 23

*In re Chevron Corp.*, Misc. Action Nos. 10-MC-208, 10-MC-209, 2010 WL 5173279, at
   *4 (E.D. Pa. Dec. 20, 2010), *rev'd on other grounds sub nom, In re Chevron Corp.*,
   650 F.3d 276 (3d Cir. 2011).............................................................. 24, 29, 30

*In re Ex Parte Application of Iraq Telecom Ltd.*,
   No. 18-mc-00458-LGS-OTW (S.D.N.Y. Aug. 13, 2019) ................................... 7, 30

*In re Ex Parte Application of Iraq Telecom Ltd.*,
   No. 18-mc-00458-LGS-OTW (S.D.N.Y. Oct. 5, 2018) ........................................... 7

*In re Ex Parte Application of Kleimar N.V.*,
   220 F. Supp. 517 (S.D.N.Y. 2016)................................................................ 24

*In re Ex Parte Application of Société d'Etude de Réalisation et d'Exploitation Pour le Traitement du Mais*,
   No. 13-mc-0266, 2013 WL 6164435 (E.D. Pa. Nov. 22, 2013) ...................... *passim*

*In re Ex Parte Global Energy Horizons Corp.*,
   647 F. App'x 83 (3d Cir. 2016) ..................................................................... 32

*In re Grand Jury*,
   705 F.3d 133 (3d Cir. 2012)......................................................................... 32

*In re Grand Jury Investigation*,
   445 F.3d 266 (3d Cir. 2006)......................................................................... 32

*In re Hallmark Capital Corp.*,
   534 F. Supp. 2d 951 (D. Minn. 2007)........................................................... 24

*In re Hansainvest Hanseatische Investment-GmbH*,
   364 F. Supp. 3d 243 (S.D.N.Y. 2018)............................................................ 26

## **TABLE OF AUTHORITIES (cont'd)**

**Page**

### **Cases**

*In re Hornbeam Corp.*,
    722 F. App'x 7 (2d Cir. 2018) ............................................................... 25, 27

*In re Letter of Request from Crown Prosecution Serv. Of the United Kingdom*,
    870 F.2d 686 (D.C. Cir. 1989) ............................................................... 25, 28

*In re O'Keeffe*,
    646 F. App'x 263 (3d Cir. 2016) ...................................................... 23, 29, 31

*In re Roz Trading Ltd.*,
    469 F. Supp. 2d 1221 (N.D. Ga. 2006) ......................................................... 24

*Intel Corp. v. Advanced Micro Devices, Inc.*,
    542 U.S. 241 (2004) ..................................................................... *passim*

*Kulzer v. Esschem, Inc.*,
    390 F. App'x 88 (3d Cir. 2010) .................................................................. 29

*Mees v. Buiter*,
    793 F.3d 291 (2d Cir. 2015) ...................................................................... 31

*Republic of Kazakhstan v. Biedermann Int'l*,
    168 F.3d 880 (5th Cir. 1999) ..................................................................... 24

*Sandra Holding Ltd. v. Al Saleh*,
    No. 18-mc-91406-PBS, 2019 WL 3072197 (D. Mass. July 15, 2019) .................. 26

*United States v. Zolin*,
    491 U.S. 554 (1989) ............................................................................... 32

### **Statutory Authorities**

15 U.S.C. § 78dd-1, *et. seq.* ...................................................................... 8

28 U.S.C. § 1782 ............................................................................. *passim*

### **Additional Authorities**

Organisation for Economic Co-operation (OECD), Convention on Combating of Foreign
    Public Officials in International Business Transactions,
    art. 2, Dec. 17, 1997, S. Treaty Doc. No. 105-43 (1998) ................................ 8

*South Carolina Ins. Co. v. Assurantie Maatschappij "De Zeven Provincien" N.V.*, [1987] 1 App.
Cas. 24 .............................................................................................. 31

## INTRODUCTION AND SUMMARY STATEMENT

Gathering evidence to prove fraud and government corruption is inherently difficult because the nature of the wrongdoing is founded in deceit and concealment. This application involves both. That task is made doubly difficult when, as here, the fraud and corruption span international borders and the government involved, in this instance Iraq, does not have a well-established tradition and system to enforce the rule of law and combat corruption.

Iraq Telecom Limited ("**Iraq Telecom**" or the "**Applicant**") respectfully seeks this Court's assistance in gathering the evidence needed to further expose and remedy massive fraud and blatant corruption involving the Iraqi telecommunications system. Specifically, the Applicant files this *ex parte*[1] application (the "**Application**") for judicial assistance pursuant to 28 U.S.C. § 1782 ("**Section 1782**") authorizing Iraq Telecom to take non-party discovery (the "**Requested Discovery**") from Philadelphia-based Dechert LLP ("**Dechert**") for use in (1) a pending arbitration administered by the International Chamber of Commerce the ("**ICC**") (the "**ICC Proceeding**")[2]; and (2) a contemplated proceeding in the United Kingdom (the "**UK Proceeding**") (collectively, the "**Foreign Proceedings**"). As discussed more fully below, Dechert acted as counsel for the buyer(s) in two UK real estate transactions which are relevant to Iraq Telecom's claims of fraud and corruption in the Foreign Proceedings.

---

[1]      As discussed *infra* at 22, at this stage, a Section 1782 application is often and properly heard *ex parte* in full compliance with due process. Once the requested subpoenas are issued pursuant to the application and served upon the responding party, the responding party then has the opportunity to move to quash the subpoenas and object to their scope and/or burden.

[2]      The ICC is an international business organization which, among other things, facilitates dispute resolution through the ICC Court of International Arbitration (the "**ICC Court**"). *See* Declaration of Cyrus Benson ("**Benson Decl.**"), annexed hereto as Appendix A at ¶¶ 11-12. The ICC Court administers arbitrations conducted under the ICC Rules of Arbitration (the "**ICC Rules**"). *See* Benson Decl. at ¶ 12.

Specifically, in the Foreign Proceedings, Iraq Telecom asserts (or will assert) that its former business partners in the Iraqi telecommunications market bribed Iraqi government officials at the Iraqi Communications and Media Commission (the "**CMC**")[3] to take regulatory actions specifically *and corruptly* designed to strip Iraq Telecom of its investment in Iraq and unlawfully redistribute it to Iraq Telecom's former partners.  While Iraq Telecom has already collected evidence of the corruption, *see infra* at 4-5, the Requested Discovery, which is narrowly tailored and limited in scope, is important to the success of the Foreign Proceedings as it would provide further evidence that the Iraqi government officials received bribes in exchange for harming Iraq Telecom.

The requested relief (i.e., discovery from non-party Dechert for use in the Foreign Proceedings by Iraq Telecom against Iraqi government officials and its former business partners) is fully justified under and supported by Section 1782.  But, even more is at stake here than the claims advanced by Iraq Telecom in the Foreign Proceedings, because the corruption of Iraqi officials is corrosive to the public's trust in government and its institutions and can stifle the flow of international investment capital critical to worldwide economic development.  Given the nature of the corruption allegations underlying the Foreign Proceedings, and the significant resources expended by the United States to bring democracy to Iraq, granting this Application in order to shed light on Iraqi corruption, among other things, is very much in the best interests of the United States, international comity and the Iraqi people.

---

[3]     The CMC is the Iraqi government agency responsible for mobile telephone regulation and licensing, somewhat akin to the Federal Communications Commission in the United States.

## I.      Iraq Telecom's Investment in Iraq

In 2011, Iraq Telecom invested over USD 800 million in Korek Telecom Company LLC ("**Korek**" or the "**Company**"), an Iraqi telecommunications company.   The original Iraqi shareholders of Korek—Sirwan Saber Mustafa Barzani ("**Mr. Barzani**"), Jawshin Hassan Jawshin Barazany ("**Mr. Barazany**"), and Jiqsy Hamo Mustafa ("**Mr. Hamo Mustafa**") (together the "**Iraqi Shareholders**")—sought Iraq Telecom's investment in Korek to keep the Company afloat. But then, in 2013 and 2014, as the Company began to thrive, Mr. Barzani and his henchman, Raymond Rahmeh ("**Mr. Rahmeh**")—a purportedly independent member of the Korek Supervisory Committee[4] who in actuality acts on behalf of Mr. Barzani—decided to retain control over Korek and steal Iraq Telecom's investment.  To effectuate this scheme, Messrs. Barzani and Rahmeh began bribing certain officials of the CMC (referred to hereinafter as the "**CMC Officials**") to take regulatory actions against Korek which were specifically designed to harm Iraq Telecom.

## II.     The Call Option

In 2011, when the Applicant first invested in Korek, Iraq Telecom and the Iraqi Shareholders agreed to a "call option" (the "**Call Option**"), through which Iraq Telecom could acquire further shares in Korek and thereby obtain majority control over the Company.

In late 2013 and early 2014, just as Korek began to thrive and, *not coincidentally*, near the date upon which the Call Option could first be exercised (i.e., January 2014), the CMC suddenly and inexplicably grew hostile towards Iraq Telecom and began sending a series of increasingly aggressive letters to Korek.  Based on its investigation to date, Iraq Telecom believes that these

---

[4]       The Korek Supervisory Committee is a seven-member body responsible for the overall direction and management of Korek.  *See* Declaration of Ehab Fekri Aziz Bassilios, a director of Iraq Telecom ("**Aziz Decl.**"), annexed hereto as Appendix B, at ¶ 19.

3

letters were part of a scheme between the CMC Officials and Messrs. Barzani and Rahmeh to (1) prevent Iraq Telecom from taking majority control of Korek; and (2) defraud Iraq Telecom and steal its investment.

In June 2014, after Orange S.A. ("**Orange**"), formerly France Télécom S.A., a French multinational telecommunications corporation, and Agility Public Warehousing Company KSCP's ("**Agility['s]**") joint venture partner in Iraq Telecom, declared its intent to exercise the Call Option, the CMC sent a letter to Korek alleging that control of Korek had been assigned to a foreign partner and claiming that it was no longer an Iraqi company (the "**June 10, 2014 Letter**"). In the June 10, 2014 Letter, the CMC further demanded that Korek pay more than USD 43 million because of an increased regulatory fee based on Korek's supposed foreign ownership.  On July 2, 2014, the CMC sent another letter to Korek purporting to render Iraq Telecom's investment in Korek "void, null and invalid" and ordering Korek to "reinstate the status as it was on 13 March 2011" and, among other things, return all of Korek's shares to the Iraqi Shareholders (the "**CMC Order**").  In other words, through the CMC Order, the CMC effectively sought to strip Iraq Telecom of its shares in Korek and unlawfully redistributed Iraq Telecom's significant investment in the Company to the Iraqi Shareholders.  *See infra* at 14-15.

### III.    Iraq Telecom's Investigation Reveals the Corrupt Scheme between Messrs. Barzani and Rahmeh and the CMC Officials

After unsuccessfully attempting to challenge the CMC Order and stop the CMC's attempts to return Korek to the Iraqi Shareholders, Iraq Telecom and its shareholders were left with no choice but to take legal action.  In connection therewith, Iraq Telecom, through one of its shareholders, engaged Raedas Consulting Limited ("**Raedas**"), a London-based international

private investigations firm, to conduct an investigation (the "**Raedas Investigation**").[5]  *See* Declaration of Nicholas Bortman ("**Raedas Decl.**"), annexed hereto as Appendix C, at ¶ 2. Through the Raedas Investigation, Iraq Telecom has obtained evidence that certain CMC Officials solicited and accepted payments and gifts from the Iraqi Shareholders in exchange for taking adverse actions against Iraq Telecom, including by issuing the CMC Order.[6]  *See* Raedas Decl. at ¶ 9.  As relevant to the instant Application, Raedas has uncovered evidence that two business associates of Mr. Rahmeh—Pierre Gergi Boutros Youssef ("**Mr. Youssef**") and Mansour Farid Succar ("**Mr. Succar**")—are listed as the buyers of two properties in the United Kingdom (the "**UK Properties**"), purchased in 2014 and 2016 respectively, in which the CMC Officials and their families—but not Messrs. Youssef and Succar—lived.[7]

In other words, Iraq Telecom has uncovered evidence that Mr. Rahmeh, acting on behalf of his co-director and business associate, Mr. Barzani, and through his own long-time employees and business associates, Messrs. Youssef and Succar, purchased properties for the CMC Officials in exchange for their adverse actions against Iraq Telecom.

## IV.   The Role Of Dechert

Raedas has also learned that (1) Dechert represented the *purported* buyer(s) of both UK Properties; (2) the Dechert client reference-number listed on the sale documents for the UK

---

[5]    As discussed *infra* at n.10, these acts of self-dealing and fraud are the subject of multiple pending foreign proceedings, including the ICC Proceeding.  However, the Requested Discovery in the instant Application does not relate to these acts of self-dealing and fraud.  Therefore, the Application will not cover such acts and events in detail.

[6]    The Raedas Investigation included, among other things, interviews with current and former Korek employees, former Iraqi government officials and members of the Kurdish and Iraqi telecommunications and corporate community.  All of the interviewees who provided information did so under the condition that they would remain anonymous, citing a direct threat to their physical safety if their cooperation was discovered.  In addition to interviews, Raedas gathered numerous publicly available documents in various jurisdictions relating to, among other things, the illicit purchases of real estate by Messrs. Rahmeh and Barzani on behalf of the CMC Officials.  *See* Raedas Decl. at ¶ 3.

[7]    The evidence supporting the above is set forth in great detail *infra* at 16-17 and in the Raedas Declaration at ¶¶ 29-34.

Properties is the *same*—plainly indicating that despite the separate names placed on the property titles, the ultimate purchaser of the UK Properties is the same; and (3) Dechert has previously represented both Messrs. Barzani and Rahmeh in connection with matters relating to Korek as well as other unrelated matters.  *See* Raedas Decl. at ¶¶ 35-45.

This and other evidence is highly indicative of the following:  (1) Mr. Rahmeh (or one of his business associates or companies) is the *true* purchaser of the UK Properties; and (2) Mr. Rahmeh purchased the UK Properties for the CMC Officials as a corrupt *quid pro quo* for them issuing the CMC Order.[8]

## V.   The Requested Discovery is For Use in the Foreign Proceedings

In the Foreign Proceedings, Iraq Telecom alleges, or will allege, that Messrs. Barzani and Rahmeh colluded with the CMC Officials to prevent Iraq Telecom from taking majority control of Korek and stealing Iraq Telecom's investment by, among other things, arranging for the purchase of the UK Properties for the CMC Officials as compensation for their actions against Iraq Telecom.

While Iraq Telecom already has evidence of collusion between the CMC Officials and Messrs. Barzani and Rahmeh,[9] it seeks additional evidence to further support and corroborate its claims in the Foreign Proceedings, which, based on its investigation to date, suggests that Dechert possesses, controls and/or can access.

As alleged by Iraq Telecom in pending proceedings throughout the world, Messrs. Barzani and Rahmeh, as well as others, have engaged in an active campaign of deceit and concealment

---

[8]    To be clear, Iraq Telecom is not asserting that Dechert, a Philadelphia-based global law firm, knowingly assisted in the bribery of the CMC Officials.  Indeed, such knowledge is wholly unnecessary for this Application.  The Application simply seeks from Dechert information and records relating to the UK Properties, including the identity of their true purchaser(s).

[9]    *See*, *e.g*., Benson Decl. at Ex. 2; Raedas Decl. at ¶¶ 8-10.

designed to obfuscate and cover up their profuse misdeeds.[10]  As a result, Iraq Telecom has been substantially hamstrung in its to efforts to obtain evidence to support its claims, including as to Iraq Telecom's claims in the ICC Proceeding and those it intends to bring in the UK Proceeding. Therefore, it is critical for Iraq Telecom to obtain discovery from non-party sources such as Dechert.

Through its proposed subpoenas (*see* Declaration of Kristin N. Tahler ("**Tahler Decl.**"), annexed hereto as Appendix D, at Exhibits 2 & 3), Iraq Telecom seeks the Requested Discovery— specific and discrete information, documents and testimony from Dechert relating to the purchase of the UK Properties, including but not limited to (1) the identity of the individual(s) who engaged Dechert to purchase the UK Properties, including but not limited to the identity of the true buyer; (2) the date upon which that individual and/or the true buyers engaged Dechert; and (3) the source of funds used to purchase the UK Properties—which is described further below.  *See infra* at 20-21; *see also* Tahler Decl. at Exs. 2 & 3.

## VI.    The Application Meets the Section 1782 Statutory and Discretionary Factors

Per the Supreme Court in *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 264-65 (2004), in determining whether to grant an application under Section 1782, this Court must consider both statutory *and* discretionary factors.  As demonstrated in detail below, Iraq Telecom

---

[10]     Specifically, Iraq Telecom has brought several legal proceedings against Messrs. Barzani and Rahmeh and others alleging self-dealing, fraud and other misconduct, including (i) a litigation in the Dubai International Financial Centre ("**DIFC**") courts; and (ii) an arbitration administered by the Lebanese Arbitration and Mediation Centre of the Chamber of Commerce, Industry and Agriculture of Beirut and Mount-Lebanon.  In connection with these proceedings, on October 5, 2018, Iraq Telecom filed a Section 1782 application in the Southern District of New York seeking discovery from five third-party banks (the "**SDNY 1782 Application**").  *See* Application, *In re Ex Parte Application of Iraq Telecom Ltd.*, No. 18-mc-00458-LGS-OTW (S.D.N.Y. Oct. 5, 2018).  The SDNY 1782 Application, which was granted on August 13, 2019, differs from the instant Application in that it seeks different information (e.g., banking records vs. client information) from different entities (e.g., banks vs. Dechert).  *See* Opinion & Order, *In re Ex Parte Application of Iraq Telecom Ltd.*, No. 18-mc-00458-LGS-OTW (S.D.N.Y. Aug. 13, 2019) (order granting application).  In the interest of efficiency, Iraq Telecom has not provided a detailed description of the SDNY 1782 Application or the underlying facts of the foreign proceedings.

amply meets each of the statutory factors and the discretionary factors weigh in favor of granting the Application.

In addition, both the United States and Great Britain are members of the Convention on Combating Bribery of Foreign Public Officials in International Business Transactions, which provides that "[e]ach Party [including the United States] shall take such measures as may be necessary, in accordance with its legal principles, to establish the liability of legal persons for the bribery of a foreign public official."[11]  While that provision is a statement of governmental policy, not directly an effectuating law, statutes like the Foreign Corrupt Practices Act, 15 U.S.C. §§ 78dd-1, et seq., *and* Section 1782 are direct manifestations of the strong U.S. public policy of combatting commercial bribery of foreign officials.  Allowing this discovery is therefore not only specifically contemplated and authorized by Section 1782, but it also furthers U.S. anti-corruption efforts and is entirely in keeping with U.S. policy and the norms of international commerce.

## FACTUAL BASIS FOR APPLICATION

### I.  Korek

Korek was established in order to provide mobile telecommunications services in Iraq.  *See* Declaration of Ehab Fekri Aziz Bassilios, a director of Iraq Telecom ("**Aziz Decl.**"), annexed hereto as Appendix B, at ¶ 6.  Korek commenced operations in 2000 and initially held a regional mobile telephone license for Kurdistan.  *See id.*  In 2007, the CMC awarded Korek a nationwide mobile telecommunications license (the "**License Agreement**").  Aziz Decl. at ¶ 7.  The License

---

[11]     Organisation for Economic Co-operation (OECD), Convention on Combating of Foreign Public Officials in International Business Transactions, art. 2, Dec. 17, 1997, S. Treaty Doc. No. 105-43 (1998), http://www.oecd.org/daf/anti-bribery/ConvCombatBribery_ENG.pdf.  The commentary to that section also makes clear that "[m]ember countries should ensure that, in accordance with Article 1 of the OECD Anti Bribery Convention, and the principle of functional equivalence in Commentary 2 to the OECD Anti-Bribery Convention, a legal person cannot avoid responsibility by using intermediaries, including related legal persons, to offer, promise or give a bribe to a foreign public official on its behalf." *Id.* at Annex I.C.

Agreement required Korek to pay the Iraqi government a fee of over USD 1.2 billion, payable in several installments, together with interest on any unpaid amounts (the "**License Fee**").  Aziz Decl. at ¶ 9.  The License Agreement also contained a change-of-control provision requiring the CMC's consent for any direct or indirect change in the control of 10 percent or more of Korek's shareholding.  Aziz Decl. at ¶ 10.

## II.     Investments by Agility and Orange into Korek

### A.     Agility and Orange Form a Joint Venture and Invest More than USD 800 Million into Korek

Korek did not have sufficient funds to pay the second installment of the License Fee.  Therefore, it sought external funding.  Aziz Decl. at ¶ 11.  In September 2007, Agility invested USD 250 million in Korek through a convertible senior loan note,[12] guaranteed by the Kurdistan Regional Government of Iraq.  *Id*.

In late 2009, Korek required even more financial support as well as technical expertise to expand its mobile network beyond Kurdistan.  *See* Aziz Decl. at ¶ 12.  Agility identified Orange as a suitable investor.  *Id*.  In 2011, Agility and Orange formed Iraq Telecom and, through Iraq Telecom, invested over USD 800 million into Korek in exchange for an indirect share of 44 percent of Korek (the "**Investment Transaction**").  Aziz Decl. at ¶¶ 12-13.

### B.     The CMC Consented to the Investment By Agility and Orange

Pursuant to the change-in-control provision in the License Agreement, Korek sought and ultimately obtained the CMC's consent to the proposed investment by Agility and Orange into Korek.  Aziz Decl. at ¶¶ 10, 15.  Thus, critically *the CMC approved* the badly needed cash infusion

---

[12]     Convertible senior loan notes take priority over other debt securities issued by the same organization and provide the creditor with an option to convert the note into a predefined amount of the issuer's shares.

into Korek by Iraq Telecom (i.e., Agility and Orange) that provided Korek with funds for the License Agreement.

### III. Investment Transaction

#### A. Overview

In July 2011, after obtaining the CMC's consent to the change in control of Korek, Agility, Orange and the Iraqi Shareholders implemented the Investment Transaction. Specifically, the parties transferred Korek's entire shareholding to International Holdings Limited ("**IHL**"), a holding company organized under the laws of the DIFC, which is an independent free zone in Dubai with its own independent laws and regulations. Aziz Decl. at ¶ 13. Following the implementation of the Investment Transaction, Iraq Telecom held 44 percent of the shares in IHL (and thereby an indirect 44 percent shareholding in Korek). *Id.* CS Ltd, which was established by the Iraqi Shareholders, held the remaining 56 percent of the shares in IHL. *Id.* Mr. Barzani is Korek's single largest indirect shareholder (and holds 75 percent of CS Ltd). Aziz Decl. at ¶ 13 n.7.

Figure 1 on the following page details the group structure following the Investment Transaction:[13]

---

[13]     Aziz Decl. at ¶ 13. Pursuant to a decree issued in March 2019, discussed further *infra* at 15, IHL's shareholding appears to have been de-registered. *See* Aziz. Decl. at ¶ 13 n.6.

**FIGURE: 1**



(A)     Agility's interest is held indirectly via several holding entities, including among others Alcazar Capital Partners (*Cayman Islands*).  *See* Aziz Decl. at ¶ 12 n.5.

(B)     Orange's interest is held indirectly via several holding entities, including among others Atlas Services Nederland B.V. (*the Netherlands*).  *See* Aziz Decl. at ¶ 12 n.5.

(C)     It is understood that on or around the time of the Investment Transaction, Aso Ali ("**Mr. Ali**") acquired an interest in CS Ltd and that CS Ltd is jointly owned by the Iraqi Shareholders and Mr. Ali.  *See* Aziz Decl. at ¶ 13 n.7.

B.     **Corporate Governance**

1.   **IHL**

Pursuant to the March 10, 2011 shareholders' agreement among IHL, Korek, Mr. Barzani, CS Ltd and Iraq Telecom (the "**IHL Shareholders' Agreement**") and IHL's Articles of Association, the board of directors of IHL (the "**IHL Board**") consists of seven members, namely: (1) three directors nominated by Iraq Telecom; (2) three directors nominated by CS Ltd; and (3) one independent director also nominated by CS Ltd.  Aziz Decl. at ¶ 17.

At the time, the three CS Ltd directors included Mr. Barzani, Abdulhameed Abdullah Mohammed Salih Aqrawi ("**Mr. Aqrawi**") and Nozad Hussein Jundi ("**Mr. Jundi**").  *Id*.  Mr. Barzani is also the Chairman of the IHL Board.  Aziz Decl. at ¶ 17.  Mr. Rahmeh—a very close ally of Mr. Barzani and a central figure in the fraud—was the supposedly "independent" director nominated by CS Ltd.  *Id*.  Mr. Rahmeh was not genuinely independent and is in fact closely affiliated with CS Ltd and Mr. Barzani, having consistently represented their interests on the IHL Board, including in IHL Board meetings, and otherwise (e.g., dispute resolution proceedings between Iraq Telecom, CS Ltd and Mr. Barzani).  Aziz Decl. at ¶ 17, n.11.

2.   **Korek**

As an Iraqi LLC, Korek does not have a board of directors but is managed by the sole director or "Statutory Manager."  Aziz Decl. at ¶ 18.  IHL (in its capacity as Korek's sole shareholder) appointed Mr. Barzani as the Statutory Manager following the Investment Transaction.  *Id*.

### C.    The Call Option

As described above, through the Call Option, Iraq Telecom could obtain majority control over Korek beginning in 2014.[14]   Aziz Decl. at ¶ 20.   Given Agility's and Orange's significant financial contributions in Korek, the ability to obtain majority control over Korek was essential to them as it meant that they could direct the future of their substantial investment.   *See* Declaration of Cyrus Benson ("**Benson Decl.**"), annexed hereto as Appendix A at Ex. 2, ICC Statement of Claim (Aug. 28, 2019) ("**ICC Statement of Claim**") at ¶ 26.   The Call Option provided Iraq Telecom two windows to exercise the option with the purchase price differing depending on the window:  (1) January 1, 2014 to June 30, 2014; and (2) July 1, 2014 to December 31, 2014.  Aziz Decl. at ¶ 21.

Pursuant to the terms of the License Agreement, which only required the CMC's consent for a direct (or indirect) change in the control of 10 percent or more of Korek's shareholding, no additional CMC consent should have been required for Iraq Telecom to exercise the Call Option. *See* Aziz Decl. at ¶ 22.

## IV.   Korek Thrives Between 2011 and 2013

With the benefit of Agility's and Orange's over USD 800 million investment and contribution of know-how and telecommunications expertise, Korek began to thrive, including by expanding its network, doubling its number of base stations from 1,000 to 2,000 and more than doubling the number of its subscribers with an additional 2.7 million new subscribers over the relevant period.  Aziz Decl. at ¶ 23.  As a result, Korek's revenues increased from USD 351 million (in 2010) to approximately USD 692 million (in 2013).  Aziz Decl. at ¶ 24.

---

[14]      If Iraq Telecom exercised the Call Option, the change in control would have been seven percent (or less than 10 percent).

Despite Korek's success, however, the relationship between Iraq Telecom and the Iraqi Shareholders deteriorated as Mr. Barzani and his associate, Mr. Rahmeh, misappropriated and mismanaged Korek's assets and actively concealed information about Korek to which Iraq Telecom was entitled as a shareholder, all of which caused Iraq Telecom great economic loss and is the subject of legal proceedings throughout the world.

## V.   CMC Hostility Towards Agility and Orange

On May 29, 2014, Orange publicly declared its intention to exercise the Call Option.  Aziz Decl. at ¶ 26.  Less than two weeks later, the CMC sent Korek the June 10, 2014 Letter claiming that Korek was no longer an Iraqi company and demanding an increased regulatory fee of USD 43 million.  Aziz Decl. at ¶ 27.[15]  The CMC did not send the June 10, 2014 Letter to either Agility or Orange.  Aziz Decl. at ¶ 30.  Shortly thereafter, on June 19, 2014, Dr. Safa Aldin Rabee ("**Dr. Rabee**"), the CMC Director General at the time, sent a memorandum to the CMC Board of Commissioners proposing "to revoke the principle of partnership between Korek and France Telecom [Orange]/Agility."  Aziz Decl. at ¶ 31.

## VI.   CMC Declared the Investment Transaction Null, Void and Invalid

On July 2, 2014, the CMC sent Korek the CMC Order which, as described above, sought, among other things, to strip Agility and Orange of their shares in Korek and return them to the Iraqi Shareholders.  *Id.*  The CMC Order notwithstanding, on November 5, 2014, Iraq Telecom exercised the Call Option.  Aziz Decl. at ¶ 32.  Just five days later, Mr. Barzani caused Korek to enter into an addendum to the License Agreement with the CMC, which introduced new stringent change of control provisions into the License Agreement.  *Id.* CS Ltd has since sought to rely on

---

[15]     In support of this contention, the CMC claimed that (i) the ultimate beneficial ownership of Korek was not held at 51 percent or more by Iraqi citizens (although 56 percent of its shares were, in fact, held by the Iraqi Shareholders); and (ii) Korek's management had been assigned to Agility and Orange (even though the day-to-day control of Korek's business was retained by the Iraqi Shareholders and Mr. Barzani in particular).  Aziz Decl. at ¶ 28.

this addendum to the License Agreement to resist completion of the Call Option.  In April 2019, Agility and Orange learned of Decree 4961, which purported to give effect to the CMC Order by de-registering IHL's shareholding in Korek, and re-registering Korek's shares to the Iraqi Shareholders, but did not, among other things, return all funds invested directly and indirectly by Agility and Orange into Korek as would be required to reestablish the situation as it was on March 13, 2011.  *See* Aziz Decl. at ¶¶ 33-35.  In other words, the CMC has effectively allowed the Iraqi Shareholders to unlawfully retain Iraq Telecom's more than USD 800 million investment—the only capital investment by any party in the Korek joint venture.

## VII.   **CMC Colludes with the Iraqi Shareholders**

### A.   **Overview**

Through the Raedas Investigation, Iraq Telecom has uncovered evidence that the CMC Officials colluded with Messrs. Barzani and Rahmeh and possibly others to, among other things, issue the CMC Order and steal Iraq Telecom's investment in Korek.  *See* Raedas Decl. at ¶¶ 8-9. Specifically, Iraq Telecom has evidence that Dr. Rabee, the CMC's former Director General (i.e., Chief Executive), and Dr. Ali Nasser Alwan Al-Khwildi ("**Dr. Al-Khwildi**"), the CMC's Director General and former President of the CMC's Council of Trustees, solicited illicit payments and other unlawful benefits from the Iraqi Shareholders in exchange for issuing decisions benefitting the Iraqi Shareholders at a substantial and devastating cost to Iraq Telecom and its investment in Korek.  *See* Raedas Decl. at ¶ 9.  As relevant to this Application and described further below, Iraq Telecom has evidence that Mr. Rahmeh, on behalf of Mr. Barzani and the other Iraqi Shareholders, purchased real estate, through nominee buyers, for the use of Drs. Rabee and Al-Khwildi and their families, including the UK Properties, in furtherance of the scheme.  As discussed at length in the Raedas Declaration, the nominee buyers are close business associates of Mr. Rahmeh.  *See* Raedas Decl. at ¶¶ 12-25.

**B.      Associates of Mr. Rahmeh Purchase Property Used By CMC Officials**

**1.      Barn Hill Property**

Through the Raedas Investigation, Iraq Telecom has learned that, in September 2014, shortly after issuance of the CMC Order, Mr. Youssef—a long-time business partner of Mr. Rahmeh, who is known to serve as the nominee beneficial owner of several Iraqi and Lebanese companies on behalf of Mr. Rahmeh—*ostensibly* purchased a property located at 59 Barn Hill, Wembley, London HA9 9LL (the "**Barn Hill Property**"), wholly in cash, for £830,000 (well over USD 1 million).  *See* Raedas Decl. at ¶¶ 29-31.[16]  Mr. Youssef has never lived in the Barn Hill Property.  *See* Raedas Decl. at ¶ 30.  Iraq Telecom also has evidence, including from official UK electoral roll records of individuals who lived at 59 Barn Hill, that CMC Official Dr. Al-Khwildi and his family lived in the Barn Hill Property from January 2015 to at least October 2017.  *See* Raedas Decl. at ¶ 30 n.25.

The (1) connections between Messrs. Rahmeh and Youssef; (2) timing of the purchase and closing (i.e., the offer to purchase the property was submitted on August 18, 2014, the same day that the CMC rejected Korek's appeal of the CMC Order and the property exchanged hands in September—less than three months after the CMC Order); and (3) evidence that Dr. Al-Khwildi lived in the Barn Bill Property from 2015 to 2017, provide compelling evidence that Mr. Rahmeh, through Mr. Youssef, purchased the Barn Hill Property for Dr. Al-Khwildi as compensation for his efforts, as a senior CMC Official, to harm Iraq Telecom between 2014 and the present.

---

[16]      The evidence collected by Raedas that Mr. Youssef was the purchaser includes the Amended Memorandum of Sale for the Barn Hill Property as well as excerpts from the land registry for the property.  *See* Raedas Decl. at Exs. 21-24.

2. **Higher Drive Property**

Iraq Telecom also has evidence that, in December 2016, Mr. Succar, another close business associate of Mr. Rahmeh, *purportedly* purchased a property located at 25 Higher Drive, London (the "**Higher Drive Property**"), wholly in cash, for £1.5 million (over USD 1.75 million). *See* Raedas Decl. at ¶¶ 32-34.[17]  Like Mr. Youssef, Mr. Succar has never lived in the Higher Drive Property. *See* Raedas Decl. at ¶ 33.  Instead, Dr. Rabee and his family use the Higher Drive Property. *See id.*[18]

Based on (1) the connections between Messrs. Rahmeh and Succar; and (2) the evidence that Dr. Rabee and his family use the Higher Drive Property, Iraq Telecom believes that Mr. Rahmeh, through Mr. Succar, purchased the Higher Drive Property for Dr. Rabee and his family as compensation for his adverse actions as a CMC Official against Agility, Orange and Iraq Telecom between 2014 and the present.  Conspicuously, Dr. Rabee's family moved out of the Higher Drive Property on September 4, 2019, just days after Iraq Telecom filed its Statement of Claim in the ICC Proceeding, which was the first time Iraq Telecom revealed the evidence it had uncovered regarding the Higher Drive Property. *See* Raedas Decl. at ¶ 34; *see* Benson Decl. at Ex. 2.

## VIII.  Role of Dechert

Based on the Raedas Investigation, Iraq Telecom has learned that Dechert represented the buyer in *both* the Barn Hill Property and Higher Drive Property transactions. *See* Raedas Decl. at ¶¶ 35-38.  The Dechert reference-number for the Barn Hill Property purchase is **979629**-137114.

---

[17]    The evidence collected by Raedas that Mr. Succar was the purchaser includes the official copy of the Register of Title and an extract of the Land Registry for the Higher Drive Property. *See* Raedas Decl. at Exs. 26 & 27.

[18]    According to information available from Experian, via a third-party database, regarding 25 Higher Drive, Mr. Rabee's son, Hussein Rabee, is listed as a resident of the property and a telephone number for an "S Rabee" is also associated with the property. *See* Raedas Decl. at Ex. 28.

Raedas Decl. at ¶ 36.  The Dechert reference-number for the Higher Driver Property purchase is **979629**-149219.  Raedas Decl. at ¶ 38.  Because the first number is the same, the ultimate client/buyer for both properties is likely the same.  Raedas Decl. at ¶¶ 39-40; Tahler Decl. at ¶ 7.

Iraq Telecom and Raedas also have information that Dechert has previously represented both Messrs. Barzani and Rahmeh, as well as the ZR Group (which is owned by Mr. Rahmeh), in related and unrelated matters.  *See* Raedas Decl. at ¶¶ 42-45.  For example, Camille Abousleiman, formerly chairman and partner of Dechert's London office, and currently Of Counsel, (1) advised Mr. Barzani in 2011 in connection with the Investment Transaction; and (2) represented Mr. Rahmeh from around 2015 until early 2019 relating to a dispute involving a Lebanese power plant, as well as in 2013 involving a dispute with the Iraqi Ministry of Electricity.  Raedas Decl. at ¶¶ 43-44.

Given (1) the close relationship among Messrs. Rahmeh, Youssef and Succar; (2) Dechert's representation of the buyers in both the purchase of the Barn Hill and Higher Driver Properties; (3) Dechert's use of the same client number for both the purchase of the Barn Hill and Higher Driver Properties; and (4) Dechert's previous representation of Messrs. Barzani and Rahmeh in related and unrelated matters, it is a reasonable inference that client number #979629 is Mr. Rahmeh (or one of his associates or businesses).  Accordingly, Dechert will likely have information about, among other things, (1) the identity of the true buyer(s) of the UK Properties; (2) the date(s) upon which the true buyer(s) engaged Dechert; (3) the source of the funds used to purchase the properties (i.e., bank name, account number and beneficial owner or accountholder); and (4) other information regarding the UK Properties.

## FOREIGN PROCEEDINGS

I.    **ICC Proceeding**

A.    **Procedural History**

On June 4, 2018, Iraq Telecom filed a Request for Arbitration ("**RFA**") with the Secretariat of the ICC against CS Ltd and Mr. Barzani for various breaches of agreements relating to the Investment Transaction, including the IHL Shareholders' Agreement.[19]  *See* Benson Decl. at ¶ 6. On September 10, 2018, CS Ltd and Mr. Barzani filed their answer to the RFA.  Benson Decl. at ¶ 7.

On March 29, 2019, the Tribunal was constituted.  *Id.*  Thereafter, on May 15, 2019, the Tribunal issued an order setting forth the procedural timetable for the ICC Proceeding ("**May 2019 Procedural Order**").  *Id.*  Pursuant to the May 2019 Procedural Order, Iraq Telecom filed the ICC Statement of Claim on August 28, 2019.  The Statement of Defense is due on December 11, 2019 and document production is scheduled for April 2020.  *Id.*

B.    **Relevant Allegations**

In the ICC Statement of Claim, Iraq Telecom alleges that CS Ltd and Mr. Barzani breached various agreements relating to the Investment Transaction, including by (1) failing to act in the best interests of Korek; (2) violating their non-compete obligations; (3) failing to honor the Call Option; (4) engaging in self-dealing; and (5) failing to disclose conflict of interests in transactions relating to Korek, all of which caused Iraq Telecom to suffer damages in excess of USD 1.1 billion. Benson Decl. at ¶ 8 & Ex. 2.

---

[19]    The IHL Shareholders' Agreement requires that any disputes relating to these agreements must be resolved by arbitration under the ICC Rules.  *See* Benson Decl. at ¶ 7 n.3.

Iraq Telecom further alleges that Mr. Barzani and his associates, including Mr. Rahmeh, colluded with the CMC Officials to bring about the CMC Order. Benson Decl. at ¶ 9. Specifically, as it relates to the instant Application, the Statement of Claim includes allegations that Messrs. Barzani and Rahmeh purchased the UK Properties for the CMC Officials as part of a network of financial transactions, cash pay-offs, and bribes designed to bring about the CMC Order. *Id.* As a remedy for this misconduct, Iraq Telecom seeks damages in excess of USD 600 million. *Id.*

## II.     UK Proceeding

Iraq Telecom intends to bring a claim in the English High Court of Justice, Business and Property Courts of England and Wales, Queen's Bench Division, Commercial Court against the following individuals and entities for corrupt conduct in violation of the Iraqi Civil Code: (1) Dr. Al-Khwildi, who has at all material times been a senior official of the CMC and in 2014, was the President of the CMC's Board of Commissioners and is now the CMC's Director General (i.e., Chief Executive); (2) Dr. Rabee, who has at all material times been a senior member of the CMC and in 2014 served as its Director General and is currently a member of its Board of Commissioners; (3) Mr. Rahmeh, one of the directors of IHL and Mr. Barzani's agent; and (4) IHL, Korek's parent company. Specifically, Iraq Telecom intends to bring claims against Drs. Al-Khwildi and Rabee for losses and damages resulting from their unlawful acts, including that they accepted bribes in exchange for taking actions adverse to Iraq Telecom, including by issuing the CMC Order. *See* Aziz Decl. at ¶ 37; Declaration of Matthew Bunting ("**Bunting Decl.**"), annexed hereto as Appendix E, at ¶¶ 6-7.

## REQUESTED DISCOVERY

The Requested Discovery includes documents and information possessed, controlled and/or accessible by Dechert relating to the UK Properties. Exhibit 1 to the Tahler Declaration includes a summary of the Requested Discovery and its relevance to the Foreign Proceedings.

Based on Iraq Telecom's investigation to date, the Requested Discovery will likely show, among other things, that (1) the "buyer" of the Barn Hill and Higher Drive Properties is not Mr. Youssef or Mr. Succar but rather Mr. Rahmeh (or one of his associates or companies); (2) the process of purchasing the UK Properties coincided with the CMC Order and other actions by the CMC adverse to Iraq Telecom, Agility and Orange between 2013 and the present; (3) the source of funds for the purchase of the UK Properties came from Mr. Rahmeh, either directly or through one of his known close associates or nominees, or one of his controlled companies; and (4) any funds not used to purchase the UK Properties were returned to an account or accounts held by Mr. Rahmeh or a closely related individual or company.

Such evidence will support Iraq Telecom's claims in the Foreign Proceedings that Messrs. Barzani and Rahmeh colluded with the CMC to bring about the CMC Order, including by paying off the CMC Officials with real estate purchases.

## ARGUMENT

Iraq Telecom respectfully submits that this Court should grant the Application because (1) it meets the statutory requirements set forth in Section 1782 (i.e., the person from whom discovery is sought resides in the district to which the application is made, the request seeks testimony, information and the production of documents, the discovery is for use in proceedings before a foreign tribunal and the applicant is an "interested person"); and (2) weighing the discretionary factors established by controlling case law (e.g., whether (a) the target of discovery is a participant in the foreign proceedings; (b) the foreign tribunals are receptive to the use of the Requested Discovery; (c) the request is an attempt to circumvent foreign law; and (d) the request is unduly burdensome) compels such result.  Indeed, granting the Application will serve Section 1782's "twin aims of providing efficient assistance to participants in international litigation and encouraging foreign countries by example to provide similar assistance to [U.S.] courts."  *Intel*

*Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 252 (2004) (internal quotations and citation omitted).

## I.     Granting Iraq Telecom's Application *Ex Parte* is Appropriate and Fair Under Section 1782

It is procedurally appropriate for this Court to entertain this *ex parte* application pursuant to Section 1782.  Indeed, this Court has stated that Section "1782(a)'s plain language [] especially when made in conjunction with the purposes of the statute as discussed by the Supreme Court in *Intel*, should read it to encompass ex parte proceedings."  *In re Ex Parte Application of Société d'Etude de Réalisation et d'Exploitation Pour le Traitement du Mais*, No. 13-mc-0266, 2013 WL 6164435, at *2 n.1 (E.D. Pa. Nov. 22, 2013).  As that case explained, there is no prejudice from the *ex parte* grant of the right to issue the subpoenas "because [the opposing parties] will have an opportunity to move to quash should [they] so desire."  *Id.*

Section 1782 specifically provides that the "order may prescribe the practice and procedure" and goes on to say "[t]o the extent that the order does not prescribe otherwise, the testimony or statement shall be taken, and the document or other thing produced, in accordance with the Federal Rules of Civil Procedure."  Section 1782(a).

## II.     Iraq Telecom's Application Meets the Statutory Requirements of Section 1782

For the reasons discussed below, the Application meets each of the following statutory requirements set forth in Section 1782:

> The district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal, including criminal investigations conducted before formal accusation. The order may be made…upon the application of any interested person and may direct that the testimony or statement be given, or the document or other thing be produced, before a person appointed by the court…. To the extent that the order does not prescribe otherwise, the testimony or statement shall be taken, and the document or other thing produced, in accordance with the Federal Rules of Civil Procedure.

Section 1782(a).  Specifically, Section 1782 requires that the (1) person from whom discovery is sought resides in or is found in the district; (2) discovery is for use in a proceeding before a foreign tribunal, and (3) application is made by either a foreign tribunal or an interested party.  *See In re Biomet Orthopaedics Switzerland GmBh*, 742 F. App'x 690, 695 (3d. Cir. 2018).[20]

### A.      Dechert "Resides" or is "Found" in This District

An individual or company resides in the Eastern District if its office is located within the Eastern District.  *See In re Ex Parte Application of Société d'Etude de Réalisation et d'Exploitation Pour le Traitement du Mais*, 2013 WL 6164435 at *2 (finding that an internet services provider resided within the Eastern District because its address was located within the Eastern District).  Dechert's principal executive office is located at Cira Centre, 2929 Arch St., Philadelphia, PA 19104, within the Eastern District.[21]  Thus, Dechert resides in the Eastern District for purposes of Section 1782 and the first statutory requirement is satisfied.

### B.      The Requested Discovery is "For Use" in a "Foreign Proceeding"

Under the second statutory requirement, an applicant must demonstrate that the Requested Discovery is for use in a proceeding before a foreign tribunal.  As discussed further below, (1) the ICC and UK Proceedings constitute foreign proceedings under Section 1782; and (2) the Requested Discovery is for use in these proceedings.

---

[20]      In *In re O'Keeffe*, 646 F. App'x 263, 265 n.4 (3d Cir. 2016) (internal quotations and citation omitted), the Third Circuit articulated a fourth factor that the "request seeks the testimony or statement of a person or the production of a document or other thing."  The Third Circuit in *In re Biomet*, did not address this factor.  Nevertheless, the Requested Discovery is for testimony, documents and information.  Applicant is requesting that Dechert produce documents and information about client "979629" and the UK Properties, which are documents or things.

[21]      *See* Commonwealth of Pennsylvania Department of State Corporations Listing (attached as Appendix F); *see also* DISCLAIMER AND OTHER LEGAL NOTICES, LEGAL NOTICES, *DECHERT LLP*, https://www.dechert.com/disclaimer-legal-notices.html ("*Dechert LLP* in the US ('Dechert LLLP US') is a Pennsylvania limited liability partnership); PHILADELPHIA, *DECHERT LLP*, https://www.dechert.com/locations/offices/philadelphia.html (listing Cira Centre, 2929 Arch St., Philadelphia, PA 19104 as Dechert's address).

### 1.    ICC Proceeding is a Foreign Proceeding

Courts have found that commercial arbitrations, such as the ICC Proceeding, constitute foreign tribunals under Section 1782.[22]   Indeed, the Sixth Circuit recently reaffirmed that under Section 1782, "tribunal" "encompasses private, contracted-for commercial arbitrations."   *In re Application to Obtain Discovery for Use in Foreign Proceedings*, No. 19-5315, 2019 WL 4509287, at *14 (6th Cir. Aug. 8, 2019).[23]   District courts have also found the same—that private commercial arbitrations, including ICC arbitrations, are considered "foreign tribunals" under Section 1782.   *See, e.g.*, *In re Ex Parte Application of Kleimar N.V.*, 220 F. Supp. 517, 521-22 (S.D.N.Y. 2016) (holding that the London Maritime Arbitrators Association constituted a "foreign

---

[22]    This Court previously found that a bilateral investment treaty ("**BIT**") arbitration was a foreign proceeding under Section 1782.  *See In re Application of Chevron Corp.,* Misc. Action Nos. 10-MC-208, 10-MC-209, 2010 WL 5173279, at *4 (E.D. Pa. Dec. 20, 2010), *rev'd on other grounds sub nom*, *In re Chevron Corp.,* 650 F.3d 276 (3d Cir. 2011) ("this Court concludes that more recent authority supports the contention that international arbitrations, such as the BIT arbitration, are included.").   Specifically, this Court stated that the Supreme Court in *Intel,* 542 U.S. 241, found that "tribunal" included international *arbitral* tribunals and that other courts "have consistently found that international arbitrations are included."   *Id.* (listing cases); *see also In re Hallmark Capital Corp.*, 534 F. Supp. 2d 951, 952 (D. Minn. 2007) (finding that tribunals include private arbitration bodies); *In re Roz Trading Ltd.*, 469 F. Supp. 2d 1221 (N.D. Ga. 2006) (finding that an arbitration before the International Arbitral Centre of the Austrian Federal Economic Chamber in Vienna was a foreign or international tribunal in accordance with Section 1782). Although the arbitration at issue in *Chevron* was a BIT arbitration, this Court did not distinguish between arbitrations involving governments and private commercial arbitrations.   Accordingly, a finding by this Court that the ICC Proceeding at issue in the instant Application is a foreign tribunal for purposes of Section 1782 is entirely consistent with previous statements by this Court.

[23]    It should be noted that while the Third Circuit has not specifically opined on this question, the weight of authority supports Iraq Telecom's position.  Given that the Sixth Circuit just found in *In re Application to Obtain Discovery for Use in Foreign Proceedings*, 2019 WL 4509287 at *1, that "tribunal" under Section 1782 includes private commercial arbitrations, such as the ICC Proceeding, and other district courts have found the same, the ICC Proceeding should plainly qualify here.   Recent precedent clearly outweighs contrary outdated authorities finding that "tribunal" only encompasses governmental or intergovernmental arbitral bodies based on the "statutory text, the meaning of that text based on common definitions and the usage of the language at issue, as well as the statutory context and history of [Section 1782]."  *See Republic of Kazakhstan v. Biedermann Int'l*, 168 F.3d 880, 883 (5th Cir. 1999); *see also Nat'l Broad. Co. [NBC] v. Bear Stearns & Co.,* 165 F.3d 184, 190 (2d Cir. 1999)*.*  Analyzing the twenty-year old decisions of the Second and Fifth Circuits, the Sixth Circuit "[did] not agree that legislative history is required to resolve the scope of the word in [Section 1782]" including because the Second and Fifth Circuits "turned to legislative history too early in the interpretation process."  *See In re Application to Obtain Discovery for Use in Foreign Proceedings*, 2019 WL 4509287, at *11.

Significantly, despite *NBC v. Bear Stearns*, a district court in the Second Circuit post-*Intel* has held that a private commercial arbitration tribunal may be considered "a 'foreign tribunal' within the domain of Section 1782." *In re Ex Parte Application of Kleimar N.V.*, 220 F. Supp. at 521-22.

tribunal" for purposes of Section 1782); *see also In re Babcock Borsig AG*, 583 F. Supp. 2d 233, 238-40 (D. Mass. 2008) (finding that the ICC is a "tribunal" under Section 1782).

Following the reasoning of the Sixth Circuit and recent district court opinions, this Court should find that the ICC Proceeding is a foreign proceeding for purposes of Section 1782.

### 2.    UK Proceeding is a Foreign Proceeding

The English High Court of Justice, Business and Property Courts of England and Wales, Queen's Bench Division, Commercial Court is indisputably a "foreign tribunal" for purposes of Section 1782.  *See, e.g., Intel,* 542 U.S. at 258; *see In re Letter of Request from Crown Prosecution Serv. Of the United Kingdom*, 870 F.2d 686, 691 (D.C. Cir. 1989) ("there is no question that British courts qualify as 'tribunals.'").

While the UK Proceeding is not yet pending, the Supreme Court as well as this Court have held that a Section 1782 request can be used to obtain information before the foreign proceeding is commenced so long as it is within reasonable contemplation.  *See Intel*, 542 U.S. at 243, 259 (Section 1782 "requires only that a dispositive ruling…be within reasonable contemplation."); *see also In re Ex Parte Application of Société d'Etude de Réalisation et d'Exploitation Pour le Traitement du Mais*, 2013 WL 6164435 at *3 (finding that an "expected criminal proceeding in the United Kingdom…provides an independently adequate instantiation of a proceeding in a foreign tribunal") (internal citations omitted); *In re Hornbeam Corp.*, 722 F. App'x 7, 9 (2d Cir. 2018) ("Precedent does not demand that foreign proceedings be pending or imminent; rather a [Section 1782] applicant must present to the district court some concrete basis from which it can determine that the contemplated proceeding is more than just a twinkle in counsel's eye.") (internal quotations and citations omitted).

In determining whether a proceeding is "within reasonable contemplation," courts have considered various factors, including whether the applicant has (1) retained foreign counsel;

(2) reviewed certain company documents; (3) retained experts; (4) made affirmative representations in oral argument that they would file the action before a specific time period; (5) provided valid reasons for obtaining the requested discovery; or (6) provided a detailed, legitimate explanation of its ongoing investigation. *See, e.g.*, *Application of Consorcio Ecuatoriano de Telecomunicaciones S.A. v. JAS Forwarding (USA), Inc.*, 747 F.3d 1262, 1271 (11th Cir. 2014) (finding that the applicant's contemplated civil and private criminal suits were reasonably contemplated because of its "facially legitimate and detailed explanation of its ongoing investigation, its intent to commence a civil action against its former employees, and the valid reasons for [the applicant] to obtain the requested discovery."); *see also Sandra Holding Ltd. v. Al Saleh*, No. 18-mc-91406-PBS, 2019 WL 3072197, at *3 (D. Mass. July 15, 2019) (finding that an action was "reasonably contemplated" where the applicant had retained foreign counsel to initiate said action, reviewed certain company documents, "stated with some specificity a basic theory of liability and the type of suit it plan[ned] to initiate" and "persuasively explained how the discovery sought might be applied in its pleading"); *In re Hansainvest Hanseatische Investment-GmbH*, 364 F. Supp. 3d 243, 249 (S.D.N.Y. 2018) (finding that an action was "reasonably contemplated" where the applicants had hired German counsel, retained experts, sent a detailed demand and "critically" where the applicants' counsel "made an affirmative representation at oral argument that the [a]pplicants would file their litigation before the end of the year").

Agility, on behalf of Iraq Telecom, has not only retained Raedas to conduct an investigation, but has also retained Quinn Emanuel Urquhart & Sullivan UK LLP ("**Quinn Emanuel**") to initiate the UK Proceeding. *See* Raedas Decl. at ¶ 2; Bunting Decl. at ¶ 6. Quinn Emanuel has, over the course of nine months, devoted substantial resources to bring the

preparations of such a claim to an advanced stage.  *See* Bunting Decl. at ¶ 8; *see also* Aziz Decl. at ¶ 38.

Furthermore, as evidenced by the numerous foreign proceedings commenced by Iraq Telecom, including the ICC Proceeding, and the extensive investigation undertaken by Raedas, the Applicant and its counsel are vested in pursuing these claims and seeking redress for the fraud and wrongdoing committed by Messrs. Barzani and Rahmeh and CS Ltd and the CMC Officials. *See In re Hornbeam Corp.*, 722 F. App'x at 9 (finding that a proceeding was within reasonable contemplation including because the applicant had previously brought two actions against the corporation from which it was seeking discovery and "represented that it intended to initiate further litigation once it obtained additional information."); *see also Consorcio Ecuatoriano*, 747 F.3d at 1270-71 (finding that a proceeding was within reasonable contemplation where the applicants' auditors had conducted an extensive investigation and internal audit and the applicant's legal and compliance director swore in its declaration that it was contemplating bringing the action but needed evidence pursuant to the application in order to submit its pleading under Ecuadorean law). The UK Proceeding is therefore within reasonable contemplation and more than just a twinkle in counsel's eye.

### 3.      The Requested Discovery is "For Use" in the ICC and UK Proceedings

The Requested Discovery is also for "use" in the ICC and UK Proceedings.  As discussed *supra* at 7, 20-21, Iraq Telecom seeks evidence regarding the true purchasers of the UK Properties. Iraq Telecom has evidence of the bribery (i.e., evidence that close associates of Mr. Rahmeh purchased the UK Properties and the CMC Officials and their families—*not* Mr. Rahmeh's associates—lived in and/or used the UK Properties).  However, the Requested Discovery seeks

27

additional evidence that Mr. Rahmeh purchased the UK Properties for the CMC Officials using his known business associates as nominee buyers.

Iraq Telecom will use the Requested Discovery in the Foreign Proceedings to support its claims that Mr. Rahmeh, through Messrs. Youssef and Succar, agreed to purchase the UK Properties for the CMC Officials in exchange for, among other things, issuing the CMC Order, all for the objective of depriving Iraq Telecom of its investment. *See supra* at 20-21. Thus, the Requested Discovery is for use in the Foreign Proceedings.[24]

### C.  Iraq Telecom Is an "Interested Person"

Lastly, Iraq Telecom's status as a claimant in the ICC Proceeding and a potential litigant as a victim of fraud in the UK Proceeding renders it an "interested person" in the Foreign Proceedings under Section 1782. Indeed, as the Supreme Court has acknowledged, "[n]o doubt litigants are included among, and may be the most common example of, the interested persons who may invoke [Section] 1782." *Intel*, 542 U.S. at 256 (internal quotations omitted).[25] Thus, the third statutory requirement plainly is satisfied.

## III.  Discretionary Factors Weigh in Favor of Iraq Telecom's Application

The discretionary factors set out by the Supreme Court in the seminal *Intel* decision also strongly favor granting the Application. These factors include: (1) "whether the person from whom discovery is sought is a participant in the foreign proceeding"; (2) "the nature of the foreign

---

[24]    *See* Bunting Decl. at ¶¶ 11-13 (discussing how UK courts would be receptive to such evidence).

[25]    Section 1782 "reaches beyond litigants" and would include Iraq Telecom as a potential complainant. *See In re Ex Parte Application of Société d'Etude de Réalisation et d'Exploitation Pour le Traitement du Mais*, 2013 WL 6164435 at *3 (finding that the applicant, a victim of fraud, was an "interested person" in connection with an expected criminal proceeding in the United Kingdom). It is not necessary under Section 1782 that an applicant be a party or a litigant as "[a]ny other person…[who] possess(es) a reasonable interest in obtaining the assistance" is also included as an interested party. *See In re Letter of Request from Crown Prosecution Service of the United Kingdom*, 870 F.2d 686, 689-90 (D.C. Cir. 1989) (quoting Professor Hans Smit, "the dominant drafter of, and commentator on, the 1964 revision of [Section 1782].").

tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance"; (3) "whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States"; and (4) "whether the request is otherwise unduly intrusive or burdensome."  *Intel*, 542 U.S. at 264-65; *see also Kulzer v. Esschem, Inc.*, 390 F. App'x 88, 91 (3d Cir. 2010).

### A.       Dechert is Not a Participant in the ICC or UK Proceedings

The Supreme Court in *Intel* stated that "when the person for whom discovery is sought is a participant in the foreign proceeding…, the need for [Section 1782] aid generally is not as apparent as it ordinarily is when evidence is sought from a nonparticipant in a matter arising abroad."  *Intel*, 542 U.S. at 266.  Here, Dechert is neither a participant nor anticipated to be one in either the ICC or UK Proceedings, which are against Messrs. Barzani and Rahmeh and the CMC Officials, among others.  *See* Bunting Decl. at ¶ 9; *see* Benson Decl. at ¶ 18; *see supra* at 19-20. Moreover, the Application is not alleging that Dechert has either committed or willingly participated in the fraud against Iraq Telecom.  As such, this factor weighs in favor of granting the Application.  *See In re O'Keeffe*, 646 F. App'x 263, 266 (3d Cir. 2016).

### B.       The Foreign Tribunals are Receptive to U.S. Judicial Assistance

As discussed further below, there is no indication that either the Tribunal in the ICC Proceeding or the UK court would reject the evidence collected pursuant to Section 1782.  As such, this factor weighs in favor of granting the Application.  *See In re Application of Chevron Corp.*, Misc. Action Nos. 10-MC-208, 10-MC-209, 2010 WL 5173279, at *4 (E.D. Pa. Dec. 20, 2010), *rev'd on other grounds sub nom*, *In re Chevron Corp.*, 650 F.3d 276 (3d Cir. 2011) (reversing and remanding for the district court to consider privilege issues).

###### 1.      ICC Proceeding

In general, arbitral tribunals administered by the ICC are receptive to assistance from U.S. district courts in terms of gathering relevant evidence for use in proceedings before them.  *See* Benson Decl. at ¶ 23.  While the ICC Rules do not include express provisions regarding gathering evidence abroad, they do not limit the type(s) of discovery that may be presented to the tribunal in support of a particular litigant's case.  Benson Decl. at ¶¶ 22-23.  In other words, ICC Rules do not prohibit the arbitral tribunal from considering documents and information obtained from third parties abroad including law firms, such as the Requested Discovery.  *See id*.

Additionally, the Tribunal presiding over the pending ICC Proceeding has *not* issued *any* rules precluding Iraq Telecom from collecting and/or using evidence obtained from foreign jurisdictions in the Proceeding, including evidence gathered in the United States by U.S. courts or through U.S. litigation (e.g., a 1782 application).  *See* Benson Decl. at Ex. 3.  In addition, to date, the respondents in the ICC Proceeding have not lodged any objection with the Tribunal to the use of evidence (to be) obtained by Iraq Telecom in connection with the SDNY 1782 Application.[26] *See* Benson Decl. at ¶ 24.  As this Court has stated, there is a "presumption in favor of foreign tribunal receptivity that can only be offset by reliable evidence that the tribunal would reject the evidence."  *See In re Application of Chevron Corp.*, 2010 WL 5173279, at \*5.

###### 2.      UK Proceeding

Tribunals in the United Kingdom are receptive to assistance from U.S. district courts in terms of gathering relevant evidence for use in proceedings before them.  *See* Bunting Decl. at ¶¶ 11-13.

---

[26]      *See* Opinion & Order, *In re Ex Parte Application of Iraq Telecom Ltd.*, No. 18-mc-00458-LGS-OTW (S.D.N.Y. Aug. 13, 2019).

Furthermore, there is no indication that the United Kingdom would reject evidence collected pursuant to Section 1782. *See Intel,* 542 U.S. at 261-62 (citing S*outh Carolina Ins. Co. v. Assurantie Maatschappij "De Zeven Provincien" N.V.*, [1987] 1 App. Cas. 24, an English case, and noting that the "House of Lords [now known as the Supreme Court] ruled that nondiscoverability under English law did not stand in the way of a litigant in English proceedings seeking assistance in the United States under [Section 1782]."); Bunting Decl. at ¶ 11.  Indeed, this Court has stated that it is "unaware of any policy observed by the…English courts that would limit 'the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance.'" *In re Ex Parte Application of Société d'Etude de Réalisation et d'Exploitation Pour le Traitement du Mais*, 2013 WL 6164435 at *3 (internal citations omitted).

## C.      The Application Does Not Circumvent the Rules of the Foreign Tribunals

The Application does not "attempt to circumvent" proof-gathering restrictions of the ICC or the UK courts; thus, the third discretionary factor also weighs in favor of granting discovery. *See Intel*, 542 U.S. at 264-65.  For purposes of this inquiry, proof-gathering restrictions are best understood as "'rules akin to privileges that *prohibit* the acquisition or use of certain materials,' not whether it has 'rules that *fail to facilitate* investigation of claims by empowering parties to require their adversarial and non-party witnesses to provide information.'"  *In re Accent Delight Int'l Ltd.,* No. 16-MC-125 (JMF), 2018 WL 2849724, at *4 (S.D.N.Y. June 11, 2018) (quoting *Mees v. Buiter*, 793 F.3d 291, 303, n.20 (2d Cir. 2015)).  In addition, in the Third Circuit, an applicant is not required to "seek discovery relief in the foreign forum first." *In re O'Keeffe*, 646 F. App'x at 268.

### 1.      ICC Proceeding

The ICC Rules provide for the submission of documentary evidence as well as expert and oral testimony, regardless of whether it was obtained from within the jurisdiction of the tribunal.

*See* Benson Decl. at ¶ 14.   Furthermore, the ICC Rules do not *bar* a party from using specific

categories of evidence, like property records.   *See* Benson Decl. at ¶ 22.   Accordingly, there is no

evidence that the Application is an attempt to circumvent ICC Rules.

### 2.   UK Proceeding

Similarly, the Application does not "attempt to circumvent" proof-gathering restrictions of

the UK tribunals.   *See* Bunting Decl. at ¶ 15.

### D.   The Application is Narrowly Tailored to Avoid Unnecessary Burdens in Accordance with the Federal Rules Of Civil Procedure

Finally, the fourth factor favors granting discovery because the Application is narrowly

tailored to include only relevant and easily identifiable information and documents and avoid any

undue burden on Dechert.   *See supra* at 20-21; Tahler Decl. at Exs. 2 & 3.

First, "Section 1782 expressly incorporates the Federal Rules of Civil Procedure."[27]   *In re*

*Ex Parte Global Energy Horizons Corp.*, 647 F. App'x 83, 85 (3d Cir. 2016).   As described above,

the Requested Discovery directly bears upon the corruption and fraud allegations in the ICC and

UK Proceedings, including Mr. Rahmeh's believed purchase of the UK Properties for the CMC

---

[27]   While Iraq Telecom does not anticipate any substantial issue with privilege, it reserves the right to challenge the assertion of privilege including under all available mechanisms under the crime-fraud exception.   In the Third Circuit, "a party seeking to apply the crime-fraud exception must demonstrate that there is a reasonable basis to suspect (1) that the privilege holder was committing or intending to commit a crime or fraud, and (2) that the attorney-client communication or attorney work product was used in furtherance of that alleged crime or fraud."   *In re Grand Jury*, 705 F.3d 133, 155 (3d Cir. 2012).   However, the Third Circuit has stressed that "[t]he burden is not a particularly heavy one" and that "demonstrating a reasonable basis to suspect the perpetration of a crime, if based on adequate evidence, satisfies the first prong of the crime-fraud exception."   *In re Grand Jury Investigation*, 445 F.3d 266, 274-275 (3d Cir. 2006); *Haines v. Liggett Grp. Inc.*, 975 F.2d 81, 95-96 (3d Cir. 1992) (approving the District Court's determination that the "probable cause" formulation and the "sufficient to support" standard "amount to the same basic proposition"); *see also United States v. Zolin*, 491 U.S. 554, 572 (1989) ("a lesser evidentiary showing is needed to trigger *in camera* review than is required ultimately to overcome the privilege.   The threshold we set, in other words, need not be a stringent one.") (internal citation omitted).   To be clear, the Applicant is not alleging that Dechert engaged in a crime, but rather that the holder of the privilege, Mr. Rahmeh and/or one of his close associates or companies—committed fraud and used the law firm to further the fraud.

Officials as compensation for their adverse conduct against Iraq Telecom. *See supra* at 15-17. As such, the Requested Discovery is highly relevant to the ICC and UK Proceedings.

Second, the Requested Discovery would not be unduly burdensome for Dechert to produce, as the requests are targeted in scope and are of the type regularly maintained by and easily accessible to Dechert. Indeed, as the relevant matter numbers have been identified, and presumably Dechert operates as any other law firm, Dechert can likely easily access the files on its systems with virtually no burden whatsoever.

Because the Requested Discovery (1) seeks material documents and information; (2) is limited by scope and date; (3) is maintained or accessible in the normal course of business by Dechert; and (4) is sufficiently specific to allow Dechert to identify and produce the documents and information with minimal burden, *see supra* at 20-21; Tahler Decl. at Exhibits 2 & 3 (proposed subpoenas), the Application comports with the Federal Rules of Civil Procedure and should be granted.

## CONCLUSION

Based on the foregoing, Iraq Telecom respectfully requests the Court to issue an Order granting the Application and authorizing the Applicant to serve Dechert with the subpoenas attached as Exhibits 2 & 3 to the Tahler Declaration, directing Dechert to produce the Requested Discovery in its possession, custody and control and appear for a deposition by December 2, 2019.

* * *

Dated:    November 5, 2019

By: _____

SKARZYNSKI MARICK & BLACK, LLP

James Sandnes
PA Bar Number:  41721
One Battery Park Plaza
New York, New York, 10004
(212) 820-7700
*jsandnes@skarzynski.com*

-and-

QUINN EMANUEL URQUHART &
SULLIVAN, LLP

Kristin Tahler*
Lauren H. Dickie*
Kristin Casey*

1300 I Street NW, Suite 900
Washington, District of Columbia 20005-3314
(202) 538-8000

**Pro Hac Vice* to be submitted.

*Counsel for Applicant, Iraq Telecom Limited*