# EXHIBIT 1

**IN THE MATTER OF AN ARBITRATION UNDER
THE RULES OF ARBITRATION OF THE
INTERNATIONAL CHAMBER OF COMMERCE**

**IRAQ TELECOM LIMITED
(United Arab Emirates)**

*Claimant*

**v.**

**KOREK INTERNATIONAL (MANAGEMENT) LTD.
(Cayman Islands)**

**and**

**SIRWAN SABER MUSTAFA
(Iraq)**

*Respondents*

_____

**REQUEST FOR ARBITRATION**

_____

Kirkland & Ellis International LLP
30 St Mary Axe
London, EC3A 8AF
United Kingdom

Jones Day
2 rue Saint-Florentin
75001 Paris
France

Counsel for the Claimant
4 June 2018

# TABLE OF CONTENTS

**(A) THE PARTIES** ...................................................................................................**6**
   A.1   The Claimant ...................................................................................................... 6
   A.2   The Respondents ............................................................................................... 7

**(B) THE DISPUTE** ...................................................................................................**9**
   B.1   Background ........................................................................................................ 9
   B.2   Refusal to comply with Call Option .............................................................. 14
   B.3   Breach of IT Ltd.'s veto right in respect of the 3G Annex to the License ........... 15
   B.4   Mismanagement of Korek ............................................................................... 16
        B.4.1     Failure to call/attend IH Board and KSC meetings ............................ 16
        B.4.2     Failure to provide information ........................................................... 17
        B.4.3     Refusal to appoint a CEO for Korek .................................................. 18
        B.4.4     Refusal to allow the replacement of IT Ltd.'s nominee on the IH Board and the KSC ............................................................... 19
   B.5   Refusal to convert Korek into a private joint stock company .............................. 19
   B.6   IraqCell ........................................................................................................... 20
   B.7   The IBL Loan .................................................................................................. 23
   B.8   Summary of breaches of the IH SHA, the Subscription Agreement and the IraqCell Agreement ........................................................................................ 25
   B.9   Self-Dealing Dispute ...................................................................................... 28

**(C) THE ARBITRATION AGREEMENT** ..........................................................**30**
   C.1   Clause 48 of the IH SHA ................................................................................ 30
   C.2   Clause 34 of the Subscription Agreement ....................................................... 32
   C.3   Clause 3 of the IraqCell Agreement ................................................................ 34
   C.4   The Claimant has complied with Clause 48 of the IH SHA, Clause 34 of the Subscription Agreement and Clause 3 of the IraqCell Agreement ...................... 34

**(D) RELIEF SOUGHT** ...........................................................................................**36**

**(E) COMMENTS AS TO PROCEDURE** ..............................................................**38**

## INTRODUCTION

1.      Iraq Telecom Limited ("**IT Ltd.**") hereby files this Request for Arbitration pursuant to:

(a)      Clause 48 of the shareholders' agreement dated 10 March 2011 entered into between International Holdings Limited ("**International Holdings**"), Korek Telecom Company LLC ("**Korek**"), Mr. Sirwan Saber Mustafa (also known and referred to herein as "**Mr. Barzani**"), Korek International (Management) Ltd. ("**CS Ltd.**") and IT Ltd. (the "**IH SHA**");[1]

(b)      Clause 34 of the amended and restated subscription agreement relating to Korek, dated 27 July 2011, entered into between International Holdings, Korek, Mr. Barzani, Mr. Jawshin Hassan Jawshin Barazany, Mr. Jiqsy Hamo Mustafa, CS Ltd., IT Ltd., Alcazar Capital Partners and Atlas Services Nederland B.V. (the "**Subscription Agreement**");[2]

(c)      Clause 3 of the letter agreement entered into on or around 27 July 2011 between Mr. Barzani, IT Ltd. and International Holdings (the "**IraqCell Agreement**"),[3] which incorporates by reference Clause 34 of the Subscription Agreement; and

(d)      the Rules of Arbitration of the International Chamber of Commerce (the "**ICC**" and the "**Rules**").

2.      In accordance with Article 4(3) of the Rules, this Request sets out the following:

(a)      the name, description, address and contact details of each of the parties and their respective representatives (Section (A));

(b)      a description of the nature and circumstances of the dispute giving rise to the claims and of the basis upon which the claims are made (Section (B));

(c)      details of the arbitration agreement (Section (C));

(d)      a statement of the relief sought (Section (D)); and

---

[1]   IH SHA (**Exhibit C-1**).

[2]   Subscription Agreement (**Exhibit C-2**).

[3]   IraqCell Agreement (**Exhibit C-3**).

(e)    IT Ltd.'s comments as to procedure (Section (E)).

3.    Before setting out, in Section (B) below, the details of the various disputes which have arisen, we have set out below a brief overview of the context in which these disputes have arisen.

4.    In 2011, when investing USD 810 million to acquire an indirect minority stake in Korek, IT Ltd. negotiated a detailed set of agreements (referred to herein as the Transaction Documents),[4] including the IH SHA, containing various shareholder rights such as: (i) a call option to acquire a majority stake in International Holdings (the sole shareholder of Korek); (ii) certain shareholder veto rights; (iii) various corporate governance rights, including the ability to propose Korek's CEO and CFO; and (iv) certain information rights regarding Korek.

5.    Unfortunately, subsequent to the entry into the IH SHA, the various shareholder rights that had been negotiated carefully by IT Ltd. were recklessly disregarded by CS Ltd. and Mr. Barzani.

6.    Amongst other things, CS Ltd. and Mr. Barzani have:

(a)    refused to complete a call option pursuant to which IT Ltd. is entitled under the IH SHA to acquire a majority interest in International Holdings (see Section B.2 below);

(b)    breached IT Ltd.'s veto rights by procuring (against IT Ltd.'s will and contrary to IT Ltd.'s clear instructions) that Korek enter into an onerous and unfavourable amendment to Korek's national mobile licence agreement (see Section B.3 below); and

(c)    failed to manage Korek in accordance with the agreements concluded between the parties, ignoring IT Ltd.'s contractual rights, and acting contrary to standards of good corporate governance (see Section B.4 below).

---

[4]    As defined in the IH SHA (**Exhibit C-1**), Schedule 2; Subscription Agreement (**Exhibit C-2**), Schedule 10.

7.  Over the course of time, CS Ltd. and Mr. Barzani marginalised IT Ltd. such that, despite its significant investment in Korek, IT Ltd. now has no proper visibility over the affairs of Korek and is operating in an information vacuum.

8.  There have been no regular meetings of the Korek Supervisory Committee (the "**KSC**") despite the IH SHA requiring Mr. Barzani to call such meetings at least quarterly.[5] In spite of repeated requests by IT Ltd., there has been no KSC meeting for over a year.

9.  Similarly, IT Ltd.'s numerous information requests regarding key matters pertaining to Korek and its operations have simply been ignored. Currently, there is no semblance of corporate governance at Korek let alone the "international standards" of corporate governance required by the IH SHA.[6]

10. To exacerbate the situation yet further, IT Ltd. is now uncovering disturbing evidence that: (i) Mr. Barzani has been operating a business, IraqCell Telecommunication Limited ("**IraqCell**"), that competes directly with Korek, in breach of his obligations (see Section B.6 below); (ii) Mr. Barzani has been colluding with a third party bank, IBL Bank S.A.L. ("**IBL**") with respect to Korek's financing arrangements to the detriment of Korek and IT Ltd. (see Section B.7 below); and (iii) Mr. Barzani and representatives of CS Ltd. have been involved in self-dealing transactions and have undisclosed interests in a number of Korek's key suppliers and service providers (the "**Self-Dealing Dispute**") (see Section B.9 below).[7]

11. As will be elaborated upon in the Statement of Claim in due course, when one considers the chronology of events, it is notable that relations deteriorated rapidly once the period for the exercise of the IT Ltd. call option began and the CEO of Orange S.A. (one of the ultimate shareholders of IT Ltd.) made a public statement in May 2014 suggesting that IT Ltd. would be exercising the call option in order to gain a majority stake in Korek. It was clear thereafter that CS Ltd. and Mr. Barzani would seek to ensure, <u>by all possible means</u>, that the call option process would be thwarted so as to prevent ceding control of Korek to IT Ltd. CS Ltd. and Mr. Barzani's laser-like focus on not

---

[5]  IH SHA (**Exhibit C-1**), Clause 7.12.

[6]  *Id.*, Clauses 6.1 and 7.1.

[7]  IT Ltd. has commenced the contractual dispute resolution process with respect to the Self-Dealing Dispute and reserves the right to seek consolidation of this dispute with the present proceedings once the requisite pre-arbitral steps have been completed.

relinquishing control of Korek has shaped many of its actions in the past few years and resulted in a catalogue of serious breaches of the Transaction Documents.

12.     A non-exhaustive summary of the provisions of the IH SHA and the Subscription Agreement which have been breached by the Respondents are set out in Section B.8 below.

**(A)     THE PARTIES**

**A.1     The Claimant**

13.     IT Ltd. is a private company limited by shares, incorporated in the Dubai International Financial Centre ("**DIFC**") with registered number 1019, having its registered office at:

> Unit 11, Level 3
> Gate Village Building 10
> Dubai International Financial Centre
> Dubai, 507043
> United Arab Emirates

14.     IT Ltd. has duly authorised Kirkland & Ellis International LLP and Jones Day to represent it in these proceedings. All communications in these proceedings intended for the Claimant should be addressed as follows:

> KIRKLAND & ELLIS INTERNATIONAL LLP
> 30 St. Mary Axe
> London EC3A 8AF
> United Kingdom
>
> Telephone: +44 (0)20 7469 2000
> Fax: +44 (0)20 7469 2001
>
> Attention:
> Chris Colbridge (chris.colbridge@kirkland.com)
> Rajinder Bassi (rajinder.bassi@kirkland.com)
> Philipp Kurek (philipp.kurek@kirkland.com)
> Kartikey Mahajan (kartikey.mahajan@kirkland.com)

6

JONES DAY

2 rue Saint-Florentin

75001 Paris

France

Telephone: + 33 1 56 59 39 39

Fax: +33 1 56 59 39 38

Attention:

Jean-Pierre Harb (jpharb@jonesday.com)

Ileana Smeureanu (ismeureanu@jonesday.com)

Alexandre Meyniel (ameyniel@jonesday.com)

## A.2    The Respondents

15.    The Respondents in this arbitration are CS Ltd. and Mr. Barzani.

16.    CS Ltd. is a private company limited by shares incorporated in the Cayman Islands with registered office at:

> Korek International (Management) Ltd.
>
> Close Brothers (Cayman) Limited
>
> Box 1034
>
> 4th Floor Harbour Place
>
> 103 South Church Street
>
> George Town
>
> Grand Cayman KY1-1102
>
> Cayman Islands

17.    Pursuant to Clause 44 of the IH SHA and Clause 25 of the Subscription Agreement, any notice to CS Ltd. in connection with the IH SHA/Subscription Agreement should also be copied to:

> Nawzad Junde
>
> English Village
>
> Villa 203
>
> Erbil, Kurdistan

Republic of Iraq[8]

18.     Mr. Barzani is a private individual (and is understood to be the majority shareholder of CS Ltd.). Mr. Barzani is a member of the prominent Barzani family (sometimes spelled Barazany or Barzany) and a powerful and influential member of the Kurdistan community. Mr. Barzani's uncle, Mr. Masoud Barzani, has been the leader of the Kurdish Democratic Party since 1979 and was president of the Kurdistan Regional Government ("**KRG**") from 2005 to November 2017, when he resigned. Mr. Barzani's first cousin, Nechirvan Barzani, is the current Prime Minister of the KRG. Mr. Barzani's contact details are set out below:

Kurdistan Street nr. 45

Pirmam

Erbil

Kurdistan

Republic of Iraq

and

Erbil-Massief-Sallahaddin

Dar Althiafa-House Number 3

Erbil

Kurdistan

Republic of Iraq[9]

19.     In the pre-arbitral phase of this dispute, both CS Ltd. and Mr. Barzani were represented by:

BOIES SCHILLER FLEXNER (UK) LLP

5 New Street Square

---

[8]  Pursuant to Clause 44 of the IH SHA, any notice to CS Ltd. in connection with the IH SHA should also be copied to Camille Abousleiman at Dewey & LeBoeuf LLP, 1 Minster Court, Mincing Lane, London EC3R 7YL, United Kingdom. However, by letter of 1 April 2017 CS Ltd. gave notice that notifications in respect of the IH SHA and the Subscription Agreement should no longer be sent to Mr. Abousleiman (**Exhibit C-4**).

[9]  Pursuant to Clause 44 of the IH SHA and Clause 25 of the Subscription Agreement, any notice to Mr. Barzani in connection with the IH SHA/Subscription Agreement should also be copied to Camille Abousleiman at Dewey & LeBoeuf LLP, 1 Minster Court, Mincing Lane, London EC3R 7YL, United Kingdom. However, by letter of 1 April 2017 Mr. Barzani gave notice that notifications in respect of the Subscription Agreement and the IH SHA should no longer be sent to Mr. Abousleiman (**Exhibit C-5**).

London EC4A 3BF

United Kingdom

Telephone: +44 203 908 0800

Fax: +44 203 908 0801

Ken Beale (kbeale@bsfllp.com)

Dominic Roughton (droughton@bsfllp.com)

David Hunt (dhunt@bsfllp.com)

**(B)**     **THE DISPUTE**

**B.1**     **Background**

20.     Korek started operations in Iraq in 2000 and initially held a regional mobile telephone licence for Kurdistan. Then, in 2007, Korek was awarded a nationwide mobile telecommunications licence (the "**License**")[10] by the Iraqi Communications and Media Commission (the "**CMC**"), the regulatory body responsible for the media and telecommunications sector in Iraq.

21.     As Korek did not have sufficient funds to pay the second instalment of the licence fee payable pursuant to the License, Korek sought external funding. As a result, in September 2007, Agility Public Warehousing Company KSC ("**Agility**") invested USD 250 million into Korek by way of a convertible senior loan note, guaranteed by the Kurdistan Regional Government of Iraq. The USD 250 million that Agility invested was transferred directly from Agility's bank account to the CMC's bank account.

22.     In late 2009, it became clear that Korek needed further financial support and additional technical expertise to roll out its network outside of Kurdistan into the rest of Iraq. In this context, Orange S.A. ("**Orange**"), formerly France Télécom S.A., a French multinational telecommunications corporation, was identified as a suitable joint venture partner.

23.     As part of the transaction (the "**Investment Transaction**"), it was agreed that, in return for an investment of approximately USD 810 million (including a shareholder loan of

---

[10]   License (**Exhibit C-6**).

USD 285 million), Agility and Orange would acquire an indirect stake of 44% in Korek by subscribing for new shares and diluting the shares of its then shareholders (three Iraqi individuals, namely Mr. Barzani, Mr. Jawshin Hassan Jawshin Barazany and Mr. Jiqsy Hamo Mustafa, together the "**Original Shareholders**").

24.    In this context, IT Ltd. was established as a joint venture vehicle between Agility and Orange, and CS Ltd. was established as a joint venture vehicle for the Original Shareholders. As noted above, IT Ltd. understands that Mr. Barzani is CS Ltd.'s controlling shareholder, holding 75% of the shares in CS Ltd.

25.    Further, International Holdings was established as a joint venture vehicle between IT Ltd. and CS Ltd. and as the sole shareholder of Korek.

26.    The group's structure following the Investment Transaction, implemented in July 2011, is set out below:



(a)    Agility's interest is held indirectly via a number of holding entities including, amongst others, Alcazar Capital Partners (*Cayman Islands*).

(b)    Orange's interest is held indirectly via a number of holding entities, including, amongst others, Atlas Services Nederland B.V. (*the Netherlands*).

(c)   It is understood that on or around the time of the Investment Transaction, Mr. Aso Ali acquired an interest in CS Ltd. and that CS Ltd. is jointly owned by the Original Shareholders and Mr. Ali.

27.   Pursuant to a change of control provision in Korek's License, the CMC's consent to the Investment Transaction was required, with such consent duly obtained in May 2011. Shortly thereafter, in July 2011, the Investment Transaction was implemented pursuant to the terms of the Subscription Agreement. Amongst other things, the Subscription Agreement provides that:

(a)   Mr. Barzani unconditionally and irrevocably guarantees to IT Ltd. as a continuing obligation to procure that CS Ltd. will comply properly and punctually with its obligations under the Subscription Agreement and the Transaction Documents (including the IH SHA and the IraqCell Agreement)[11] (Clause 14.11); and

(b)   each party (including CS Ltd. and Mr. Barzani) shall take (or procure the taking of) all such steps as may be required or be reasonably necessary to give full effect to the Subscription Agreement and the other Transaction Documents (including the IH SHA and the IraqCell Agreement), and shall procure that their Affiliates (as defined therein) comply with all obligations under the Subscription Agreement and/or the other Transaction Documents (Clause 23.1).

28.   The IH SHA further governs the ongoing relationship between the parties. Amongst other things, the IH SHA provides that:

(a)   the business of the Group (as defined therein) is mobile telecommunications and related services and shall be conducted in the best interests of the Group (Clause 3);

(b)   in order to promote the best interests of the Group, the parties shall use their respective reasonable endeavours to ensure that the Group is afforded the best possible business advantages and market position (Clause 4);

(c)   the International Holdings board of directors (the "**IH Board**") is responsible for the overall direction and management of International Holdings and shall at

---

[11]   The IH SHA and Subscription Agreement define the IraqCell Agreement as the "Sanatel Letter".

all times act in the best interests of International Holdings (Clause 6); the IH Board shall consist of seven members, namely:

(i)     three directors nominated by CS Ltd. (the "**CS Ltd. Directors**");

(ii)    three directors nominated by IT Ltd. (the "**IT Ltd. Directors**"); and

(iii)   one independent director, also nominated by CS Ltd.

(d)     since Korek is a limited liability company ("**LLC**") and does not have a board of directors as a matter of Iraqi law, it is managed by a managing director (the "**Statutory Manager**"). The parties therefore agreed to establish the KSC, a contractual body responsible for the overall direction and management of Korek which shall at all times act in the best interests of Korek. The KSC consists of seven members (being the same persons as the members of the IH Board), and each party is required to exercise its powers and rights under the IH SHA to procure that the KSC is constituted and operates at all times in the manner set out in the IH SHA (Clause 7);

(e)     Mr. Barzani acts as the Statutory Manager of Korek, and the parties (i.e. CS Ltd.) must procure that at all times the Statutory Manager acts in the best interests of Korek and in accordance with Korek's by-laws and the instructions of the KSC (Clause 9);

(f)     IT Ltd. shall have the right to propose candidates for appointment as Korek's CEO, and Mr. Barzani as Korek's Statutory Manager shall formally appoint the CEO proposed by IT Ltd. (Clauses 8.3 and 8.4);

(g)     the parties and Mr. Barzani as Korek's Statutory Manager shall take all reasonable steps to ensure that, at all times, Korek's CEO and the Senior Managers[12] act in accordance with the instructions of the IH Board and the KSC and comply with the terms of the IH SHA and the Transaction Documents (Clause 8.7);

---

[12]   As defined in the IH SHA (**Exhibit C-1**), Schedule 2.

(h)    CS Ltd. and Mr. Barzani shall (and shall procure that International Holdings and Korek shall) use their respective powers to ensure that no action or decision is taken with certain prescribed veto matters without the prior approval or written consent of IT Ltd. (Clause 11);

(i)    the parties and their respective affiliates shall not compete with the Group in the Republic of Iraq (Clause 17);

(j)    CS Ltd. grants IT Ltd. a call option pursuant to which CS Ltd. shall sell to IT Ltd. such number of shares in International Holdings as shall be required to give IT Ltd. an aggregate holding of 51% in International Holdings (i.e. majority control) (Clause 23);

(k)    the parties shall consider the possibility of converting Korek from an LLC (which, as noted above, does not have a board of directors) to a private joint stock company (which does have a board) (Clause 27);

(l)    the parties shall immediately give notice where their own and/or their Affiliates' interests are or are reasonably likely to conflict with the interests of the Group, in which case specific restrictions or exclusions would apply (Clause 28); and

(m)    so far as it is legally able, each party shall exercise all voting rights and powers (direct or indirect) available to it to ensure that the provisions of the IH SHA (and the other agreements referred to in it) are completely and punctually observed and performed and generally that full effect is given to the principles set out in the IH SHA, and each party shall procure that its Affiliates comply with all obligations under the IH SHA and/or the Transaction Documents (Clause 31).

29.    More than two years after the Investment Transaction was implemented, the CMC grew hostile towards Agility and Orange. Following a number of increasingly aggressive letters sent by the CMC to Korek, the CMC issued an improper and discreditable decision in July 2014 purporting to render the Investment Transaction "*void, null and*

*invalid*" and ordering Korek "*to reinstate the status as it was on 13/3/2011*" (the "**CMC Decision**").[13] In other words, the CMC sought to unwind the Investment Transaction.

30.    Troubling evidence has since emerged that strongly suggests that the CMC Decision was the result of bad faith and collusion between the CMC and certain individuals assumed to be acting on behalf of Mr. Barzani (including Mr. Raymond Rahmeh, a close confidante and frequent representative of Mr. Barzani's who was appointed to the IH Board and the KSC by CS Ltd.). In particular, the Claimant has become aware of serious allegations of bribery, corruption and collusion between persons closely linked to Messrs Barzani and Rahmeh on the one hand, and the CMC on the other hand. The Claimant can only assume that these unlawful transactions were instigated by Mr. Barzani to procure the issuance of the CMC Decision, and, as such, were specifically timed and designed to further frustrate the Claimant's ability to exercise its call option (see Section B.2 below). These transactions would not only constitute a breach of the duties applicable to Messrs Barzani and Rahmeh, but would also constitute crimes under the anti-corruption laws of the jurisdictions where such instances of corruption and bribery were transacted.

**B.2    Refusal to comply with Call Option**

31.    As noted above, pursuant to Clause 23 of the IH SHA, CS Ltd. granted IT Ltd. a call option whereby CS Ltd. would sell to IT Ltd. such number of its fully paid shares in International Holdings as (at the date of exercise of such call option) required to give IT Ltd. an aggregate holding of 51% of the total issued and allotted share capital of International Holdings (the "**Call Option**").

32.    IT Ltd. chose to exercise the Call Option in order to gain control of International Holdings (and hence Korek) and take forward its investment.

33.    IT Ltd. formally exercised the Call Option by notice of 5 November 2014.[14] In accordance with the process set out in Clause 23 of the IH SHA, on 26 July 2015 the Call Option Sale Price (as defined in the IH SHA) was determined at USD 82.5

---

[13]   CMC Decision (**Exhibit C-7**). The effect and legality of the CMC Decision are the subject of separate proceedings, including an investment treaty arbitration by Agility against the Republic of Iraq (ICSID Case No. ARB/17/7).

[14]   Letter from IT Ltd. to CS Ltd. dated 5 November 2014 (**Exhibit C-8**).

million.[15] Accordingly, pursuant to Clause 23.9 of the IH SHA, CS Ltd. was required to complete the Call Option by 19 August 2015 (i.e. 15 business days after determination of the Call Option Price).[16]

34.  However, in flagrant breach of its obligations under Clause 23 of the IH SHA, CS Ltd. sought to obstruct the Call Option process by refusing to properly engage at various points. CS Ltd. ultimately refused to complete the Call Option. As described at paragraph 11 above, the desire to maintain control of Korek at all costs drove CS Ltd. to seek to frustrate the Call Option process in reckless disregard of IT Ltd.'s clear contractual rights. A full chronology of of CS Ltd.'s conduct in frustrating IT Ltd.'s Call Option in order to maintain control over Korek will be set out in the Statement of Claim.

**B.3    Breach of IT Ltd.'s veto right in respect of the 3G Annex to the License**

35.  The parties negotiated a series of important shareholder veto rights in the IH SHA. Pursuant to Clause 11.3 of the IH SHA, the parties, including CS Ltd. and Mr. Barzani, are required to use their respective powers to ensure that no action or decision (whether by the IH Board, the KSC, any entity within the Group or any of the officers or managers within the Group) relating to the "IT Ltd. Veto Matters" is taken without the prior approval or written consent of IT Ltd. Pursuant to Clause 11.4 of the IH SHA, the IT Ltd. Veto Matters include (amongst other things) "*entering into, amending (in any material respect) or terminating any material License, including the National Mobile License*".

36.  On 10 November 2014, Korek entered into an addendum to the License, which, *inter alia,* granted Korek a licence to provide 3G services in Iraq (the "**3G Annex**").[17]

37.  IT Ltd. had made it clear that it was exercising its veto rights and not consenting to Korek entering into the 3G Annex, which IT Ltd. considered to be unfavourable to Korek. Amongst other things, IT Ltd. considered the additional licence fee of USD 300 million payable pursuant to the 3G Annex to be unreasonably high given the limited

---

[15]  Letter from IT Ltd. to CS Ltd. dated 26 July 2015 (**Exhibit C-9**).

[16]  Letter from IT Ltd. to CS Ltd. dated 29 July 2015 (**Exhibit C-10**).

[17]  3G Annex (**Exhibit C-11**).

service frequencies and relatively short term of the 3G Annex. Furthermore, it was abundantly apparent to the Claimant that, even assuming that the licence fee were reasonable - which it was not - Mr. Barzani had given no consideration to how it would be funded. In addition, the 3G Annex sought to introduce additional, more onerous, transfer and change of control restrictions than those set out in the original License.

38.   Under the License, a transfer of 10% or fewer shares in Korek were exempt from the requirement of obtaining CMC consent. The 3G Annex amended this transfer provision by requiring that <u>any</u> direct or indirect transfer of shares in Korek be first approved in writing by the CMC. The provision seemed designed solely to frustrate IT Ltd.'s implementation of the Call Option, which had been exercised by IT Ltd. only days before Korek's unauthorised entry into the 3G Annex. Without the 3G Annex, there would be no requirement to obtain CMC consent as only 7% of Korek's shares were being sought to be transferred pursuant to the Call Option. CS Ltd. has since purported not to fulfil the Call Option, relying on the more stringent transfer restrictions introduced by the 3G Annex (which came into effect after IT Ltd. exercised the Call Option).

39.   Mr. Barzani acted in blatant disregard of IT Ltd.'s clear objections to Korek entering into the 3G Annex when he caused Korek to enter into the 3G Annex, despite claiming that he would not do so. As a result, Mr. Barzani caused Korek to incur USD 300 million of liabilities on its balance sheet in the most deceptive of manners. Incredibly, IT Ltd. learnt of this through a press release rather than through Mr. Barzani. A full chronology of Mr. Barzani's conduct in blatantly ignoring IT Ltd.'s clear veto rights will be set out in the Statement of Claim.

**B.4    Mismanagement of Korek**

### B.4.1   Failure to call/attend IH Board and KSC meetings

40.   Pursuant to Clause 6.11 of the IH SHA, meetings of the IH Board should be held at least quarterly. Similarly, pursuant to Clause 7.12 of the IH SHA, meetings of the KSC should also be held at least quarterly. In addition, pursuant to Clauses 6.9 and 7.9 of the IH SHA, Mr. Barzani (as the chairman of the IH Board and the KSC) is responsible for calling such IH Board and KSC meetings.

41.   However, in the last two years only <u>one</u> meeting of the IH Board/KSC has been held when the minimum number of meetings during this period should have been at least eight each.

42.   In many instances, it was IT Ltd. who had to push for such meetings. For example, following issuance of the CMC Decision, IT Ltd. requested that Mr. Barzani call an emergency meeting of the IH Board and the KSC (in accordance with Clauses 6.11 and 7.12 of the IH SHA). Mr. Barzani refused to do so. When the IT Ltd. Directors were subsequently left with no choice but to call a meeting themselves to address urgently how Korek and its shareholders should respond to/comply with the CMC Decision, the CS Ltd. Directors (including Mr. Barzani) refused to attend such meetings.

43.   Further, the last meeting of the IH Board and the KSC took place over a year ago on 3 March 2017. However, CS Ltd. and Mr. Barzani have since sought to declare the 3 March 2017 meeting invalid, and no meeting of the IH Board or the KSC has been held since (despite requests for such meetings by IT Ltd.). This has only exacerbated the information vacuum (described at Section B.4.2 below) and lack of corporate governance (described at Sections B.4.3 and B.4.4 below) to the clear detriment of IT Ltd.

### B.4.2   Failure to provide information

44.   Clause 15 of the IH SHA sets out Korek's and International Holdings' information and reporting obligations vis-à-vis the parties, including IT Ltd. Furthermore, Clause 6 of the management services agreement between Mr. Barzani and Korek dated 27 July 2011 (the "**Barzani Management Agreement**",[18] which is a Transaction Document) further requires Mr. Barzani to keep the KSC informed and up-to-date with respect to certain information received by him and/or Korek.

45.   However, despite numerous requests by IT Ltd. and its representatives on the IH Board and the KSC, Mr. Barzani, CS Ltd. and its representatives (who together have day-to-day control over the management and operation of Korek and hence have access to (and control access to) relevant documents and information) have simply refused to provide any meaningful information about Korek's financial situation and operations, thereby

---

[18]   Barzani Management Agreement (**Exhibit C-12**).

marginalising IT Ltd., which is currently in the untenable position of having no access to key information regarding Korek. As a result, IT Ltd. has been unable to validate the accuracy of any of the draft financial accounts provided by Korek, which were characterised by increasingly large, questionable payments to certain suppliers.

46. For a number of years now, IT Ltd. has not been provided with any relevant information that it has asked for and that it is entitled to under the Transaction Documents. This has left IT Ltd. and its representatives on the IH Board and the KSC with little visibility on the activities of Korek and no ability to make informed decisions about Korek's finances or strategic direction. Indeed, as a result of Mr. Barzani's determined resistance to provide any semblance of transparency, neither International Holdings nor Korek has issued any audited financial statements since the date of IT Ltd.'s investment.

47. By way of example, IT Ltd. has not received a single substantive response to any of the financial information requests it has sent over the last 12 months, including with respect to exorbitant and disproportionate alleged liabilities incurred by Korek. Such liabilities include an alleged USD 150 million claim against Korek by the Iraqi Telecommunications and Post Company and an alleged USD 18.6 million of consulting and legal fees incurred by Korek in the year 2016.

48. In addition, it was only from media reports that IT Ltd. learnt that in late 2017 the CMC imposed substantial fines on Korek and issued a final warning to Korek for allegedly violating the terms of the License. IT Ltd. was never informed of these developments and its information request with respect thereto has gone unanswered.

49. As a result, IT Ltd., which has invested approximately USD 810 million and holds a 44% indirect stake in Korek, has been effectively frozen out, with virtually no access to any meaningful information or documents relating to Korek's operation, financial performance, assets and liabilities.

### B.4.3    Refusal to appoint a CEO for Korek

50. Pursuant to Clause 8.3 of the IH SHA, IT Ltd. has the right to propose candidates for appointment as the CEO of Korek. Furthermore, Clause 8.4 of the IH SHA requires Mr. Barzani, as the Statutory Manager of Korek, to formally appoint the CEO proposed by IT Ltd. Similarly, pursuant to Clause 9.4 of the IH SHA, CS Ltd. must procure that Mr.

Barzani, acting as managing director of Korek, acts in accordance with his obligations under Clause 8.4 of the IH SHA.

51.     Korek's last CEO, Ms. Ghada Gebara, resigned with effect from 15 June 2015. Since then, IT Ltd. has proposed no fewer than <u>four</u> CEO candidates for appointment by Mr. Barzani. However, Mr. Barzani, in breach of his obligations under Clause 8.4 of the IH SHA, has failed to appoint any of the candidates proposed for appointment by IT Ltd., leaving Korek without a CEO for almost three years. This is particularly egregious considering the difficulties Korek faces. Having no CEO steering the strategic direction of Korek is evidently not in the best interests of Korek.

### B.4.4   Refusal to allow the replacement of IT Ltd.'s nominee on the IH Board and the KSC

52.     Clause 6.3 of the IH SHA gives IT Ltd. the right to propose for appointment by a shareholders' general meeting three members of the IH Board, and the right to propose the removal of any director so proposed for appointment and propose the appointment of another in his place. Clause 7.3 mirrors that right in respect of the KSC.

53.     In April 2016, IT Ltd. gave notice of its intention to replace Mr. Marc Rennard (one of IT Ltd.'s nominees on the IH Board and the KSC) with Mr. Olivier Froissart (who was already deeply familiar with the Korek business and well known to the parties).[19] However, despite repeated requests by IT Ltd., CS Ltd. has been obstructive and refused to take any steps to effect the replacement of Mr. Rennard in accordance with Clauses 6.3 and 7.3 of the IH SHA.

### B.5   Refusal to convert Korek into a private joint stock company

54.     As set out above, Mr. Barzani and CS Ltd. have consistently disregarded IT Ltd.'s contractual and governance rights, effectively leaving Mr. Barzani in sole control of Korek. Mr. Barzani's influence over Korek is further entrenched by the fact that, as noted at paragraph 28(d) above, Korek does not have a board of directors but is managed by a sole Statutory Manager (i.e. Mr. Barzani) who has wide-ranging powers over Korek.

---

[19]   Letter from IT Ltd. dated 8 April 2016 (**Exhibit C-13**).

55.   Pursuant to Clause 27 of the IH SHA, the parties had agreed to consider the possibility of converting Korek from an LLC to a private joint stock company ("**PJSC**"). Unlike an LLC, a PJSC would have a board of directors, thus significantly curtailing Mr. Barzani's power and influence over Korek.

56.   In this respect, the IT Ltd. Directors repeatedly requested that Korek work towards converting into a PJSC.[20]

57.   However, clearly motivated by Mr. Barzani's desire to retain absolute control over Korek, CS Ltd. and the CS Ltd. Directors (including Mr. Barzani) refused to work towards the conversion of Korek into a PJSC in any meaningful way.

**B.6    IraqCell**

58.   Pursuant to Clause 17 of the IH SHA, CS Ltd. and Mr. Barzani agreed that neither they nor their Affiliates would compete with the Group in the Republic of Iraq. In this context, the IH SHA defines "compete" as "*undertaking, or being interested in any business which carries out, any Core Restricted Activities*".[21] Core Restricted Activities, in turn, are defined as:

> "*(i) the provision of mobile voice and data communications services, (ii) the provision of any service in connection with or in relation to the telecommunications industry permitted by the National Mobile License, (iii) the provision of Wimax telecommunication services, (iv) the making, directly or indirectly, of any application for a telecommunications License in the Republic of Iraq, (v) the carrying on of a mobile virtual network operator business, or (vi) the carrying on of any tower or mobile infrastructure business; in each case in the Republic of Iraq, whether alone or jointly with others or whether as principal, agent, shareholder or otherwise and whether for the relevant entity's or person's own benefit or that of others*".[22]

---

[20]   See for example letter from IT Ltd. to CS Ltd. dated 17 May 2017 (**Exhibit C-14**); letter from IT Ltd. to Mr. Barzani dated 17 May 2017 (**Exhibit C-15**).

[21]   IH SHA (**Exhibit C-1**), Clause 17.1(c)(i).

[22]   *Id.*, Clause 17.1(c)(ii).

59.     In addition, pursuant to Clause 1.2 of the IraqCell Agreement,[23] Mr. Barzani undertook and agreed that:

    (a)     he would not take any action or decision in respect of his then shareholding in IraqCell, a mobile infrastructure business operating in the Republic of Iraq, and would procure that IraqCell does not trade and does not compete in any way with Korek without the prior written consent of IT Ltd.; and

    (b)     unless otherwise agreed in writing by IT Ltd., he would use all reasonable endeavours to liquidate or dissolve IraqCell as soon as reasonably practicable following the date of the IraqCell Agreement (without any liability for Korek, International Holdings or IT Ltd.).

60.     In breach of the above obligations, Mr. Barzani holds an 80% equity interest in IraqCell, and serves as IraqCell's director.[24] IraqCell has been neither liquidated nor dissolved. To the contrary, IraqCell is an active mobile infrastructure business with substantial operations in the Republic of Iraq. Amongst other things, on or around 23 April 2014, the Kurdistan Regional Government awarded IraqCell a licence to install and run a fibre optic network between all towns and cities in the Kurdistan Region.[25] Similarly, the CMC awarded IraqCell a provisional CDMA & WiMax licence for the southern region of Iraq.[26]

61.     It has also been reported recently that IraqCell is working on a project to install 1,500 km of fibre-optic cables for Korek to provide data connectivity from Dohuk to Erbil, and that the project pipeline involves a further 4,000 km.

62.     Neither Mr. Barzani's continued interest in IraqCell, his directorship, nor any of IraqCell's aforementioned activities (including the project involving Korek) were ever disclosed to IT Ltd.

---

[23]   IraqCell Agreement (**Exhibit C-3**).

[24]   IraqCell Agreement (**Exhibit C-3**), Clause 1.1; IraqCell Ministerial Decree (**Exhibit C-16**); IraqCell Fibre Optic Licence (**Exhibit C-17**).

[25]   IraqCell Fibre Optic Licence (**Exhibit C-17**).

[26]   Study on Telecommunications Infrastructure Sharing Strategy (**Exhibit-18**), page 7.

63.     In light of the foregoing, it is clear that Mr. Barzani competes with Korek in the
        Republic of Iraq on the basis that: (i) IraqCell carries out "Core Restricted Activities"
        within the meaning of the IH SHA; and (ii) by virtue of his 80% equity interest in and
        directorship of IraqCell, Mr. Barzani is "*undertaking*" and/or "*interested in* [a] *business
        which carries out* […] *Core Restricted Activities*".[27]

64.     Both Mr. Barzani and CS Ltd. (on the basis that Mr. Barzani is an Affiliate of CS Ltd.)[28]
        are therefore in breach of Clause 17.1 of the IH SHA.

65.     Furthermore, Clause 17.3 of the IH SHA requires the immediate removal from the IH
        Board and the KSC of any person who is appointed to the governing body of a company
        which competes with the Group in the Republic of Iraq. However, contrary to
        Clause 17.3 of the IH SHA, and despite repeated requests by IT Ltd.,[29] CS Ltd. has not
        removed Mr. Barzani (and Mr. Barzani has not resigned) from the IH Board and the
        KSC.

66.     Mr. Barzani has also failed to make a payment of USD 100 million to cover the
        estimated damages suffered as a result of Mr. Barzani's breach of his non-compete
        obligation (the "**Non-Compete Payment**"), as required pursuant to Clause 17.7 of the
        IH SHA.[30]

67.     Mr. Barzani is furthermore in breach of his obligations under the IraqCell Agreement
        on the basis that IraqCell has neither been liquidated nor dissolved, but instead is
        actively trading and competing with Korek.

---

[27]   IH SHA (**Exhibit C-1**), at Clause 17.1(c)(i).

[28]   *Id.*, Schedule 2, which provides that "*any shareholder of CS Ltd holding an indirect interest in Shares* [of
       International Holdings] *comprising at least 5% (five per cent.) of the total number of Shares* [of International
       Holdings] *and their Affiliates shall be deemed to be an Affiliate of CS Ltd*". As noted at paragraph 18 above,
       it is understood that Mr. Barzani holds 75% of the shares of CS Ltd., and thus has an indirect interest of
       approximately 42% in International Holdings.

[29]   Letter from IT Ltd. to CS Ltd. dated 6 November 2017 (**Exhibit C-19**); letter from IT Ltd. to Mr. Barzani
       dated 6 November 2017 (**Exhibit C-20**); letter from IT Ltd. to CS Ltd. dated 24 December 2017 (**Exhibit C-
       21**); letter from IT Ltd. to Mr. Barzani dated 24 December 2017 (**Exhibit C-22**).

[30]   Letter from IT Ltd. to Mr. Barzani dated 24 December 2017 (**Exhibit C-22**).

**B.7    The IBL Loan**

68.    As part of the Investment Transaction, on 27 July 2011, IT Ltd. and International Holdings entered into a facility agreement pursuant to which IT Ltd. provided a shareholder loan of USD 285 million to International Holdings (the "**IT Shareholder Loan**"),[31] and International Holdings in turn entered into a shareholder loan agreement with Korek pursuant to which it on-lent the loan to Korek.[32] Separately, Korek provided a guarantee to IT Ltd., guaranteeing International Holdings' obligations to IT Ltd. under the IT Shareholder Loan.[33]

69.    In December 2011, Korek required additional funds to pay an instalment of the licence fee. As a result, Mr. Barzani and Mr. Rahmeh arranged for Korek to obtain a USD 150 million loan from IBL at an interest rate of 13.25% (the "**IBL Loan**").[34] IT Ltd. approved Korek's entry into the IBL Loan on the basis of representations by Messrs Barzani and Rahmeh that the IBL Loan was an unsecured, third-party bank loan on market terms and that IBL was the only bank willing to provide funding.

70.    As a precondition to the IBL Loan being made available to Korek, IT Ltd. was required to subordinate the IT Shareholder Loan in favour of the IBL Loan (the "**Subordination Agreement**").[35] Mr. Barzani also personally guaranteed Korek's performance under the IBL Loan,[36] with IT Ltd. indemnifying Mr. Barzani for IT Ltd.'s *pro rata* share of any amounts that may be paid by Mr. Barzani under his guarantee.[37]

71.    It has since come to the Claimant's attention that the IBL Loan is in fact fully cash collateralised, and that the IBL Loan is an elaborate sham concocted by Mr. Barzani, Mr. Rahmeh, and IBL in order to disguise what in truth is nothing more than a

---

[31]    IT Shareholder Loan (**Exhibit C-23**).

[32]    Shareholder Loan Agreement dated 27 July 2011 between International Holdings and Korek (**Exhibit C-24**).

[33]    Guarantee dated 27 July 2011 between Korek (as guarantor) and IT Ltd. (**Exhibit C-25**).

[34]    IBL Loan (**Exhibit C-26**).

[35]    Subordination Agreement (**Exhibit C-27**).

[36]    IBL Loan (**Exhibit C-26**), Clause 6.

[37]    Deed on Indemnity dated 24 December 2011 between IT Ltd., Mr. Barzani, Korek and International Holdings (**Exhibit C-28**), Clause 3.

shareholder loan provided by Mr. Barzani on preferential terms. In this regard, the Claimant notes:

(a)     statements in IBL's annual reports appear to reference the IBL Loan and the fact that it is cash collateralised;[38]

(b)     a letter from IBL to Korek dated 30 August 2017 in which IBL request that Korek provide "*additional collateral*" for the IBL Loan (the "**IBL Letter**");[39]

(c)     statements made by Mr. Jekhsi Hamo Mustafa on behalf of CS Ltd. in DIFC court proceedings, in which Mr. Jekhsi Hamo Mustafa all but admitted the existence of such cash collateral; and

(d)     IBL's own behaviour in respect of the IBL Loan - the IBL Loan had been due for repayment by Korek in two tranches in 2015, but when Korek failed to repay the loan when due, IBL (save for two repayment demands in 2015) did not take any further action to recover the loan until the IBL Letter in August 2017.

72.     Contrary to Clause 28 of the IH SHA, the true nature of the IBL transaction was never disclosed to (but in fact actively concealed from) the Claimant.

73.     The Claimant believes that Mr. Barzani secretly provided cash collateral to secure the IBL Loan as part of an arrangement designed to do the following:

(a)     to prioritise Mr. Barzani's creditor rights over those of IT Ltd. (in particular because, as noted above, one of the conditions of IBL granting the loan was that it should take priority over the IT Shareholder Loan); and

(b)     to effect payments to Mr. Barzani alone by having Korek mask these as interest payments to IBL.

74.     With regard to the latter point, the Claimant has since learnt that IBL entered into a secret arrangement with Mr. Barzani pursuant to which IBL undertook to pay to Mr.

---

[38]  For example, IBL's 2016 Annual Report references a loan of approximately USD 150 million at an interest rate of just over 13% to a "*non-resident customer*" covered by "*cash collateral*" of greater value than the principal loan (**Exhibit C-29**, p. 59).

[39]  IBL Letter (**Exhibit C-30**).

Barzani an amount equal to 12.75% of the 13.25% total interest received by IBL under IBL Loan agreement. In other words, contrary to *inter alia* Clauses 3, 4 and 9 of the IH SHA, Mr. Barzani entered into a secret "kick back" arrangement whereby IBL paid to Mr. Barzani more than 96% of the interest expense paid to it by Korek.

75.    The effect of this sham arrangement is that the IBL Loan is, in effect, a shareholder loan provided by Mr. Barzani with the benefit of a subordination agreement vis-a-vis the IT Shareholder Loan. Furthermore, Korek is paying 13.25% interest on what is in reality a fully collateralised loan, for which an appropriate market rate would be substantially lower (as evident based on the arrangement between IBL and Mr. Barzani). Mr. Barzani and Mr. Rahmeh did not disclose the position to IT Ltd. or any of IT Ltd.'s representatives on the IH Board or the KSC.

**B.8    Summary of breaches of the IH SHA, the Subscription Agreement and the IraqCell Agreement**

76.    It is IT Ltd.'s position that CS Ltd.'s actions and omissions set out above have breached, *inter alia*:

(a)    Clauses 3 and 4 of the IH SHA by failing to act in the best interest of the Group;

(b)    Clause 6.6 of the IH SHA by failing to procure that the shareholders' general meeting of International Holdings and the IH Board effect the replacement of Mr. Rennard by Mr. Froissart as IT Ltd.'s representative on the IH Board;

(c)    Clauses 6.7 and 7.7 of the IH SHA by failing to procure that its nominees on the IH Board and the KSC attended IH Board and KSC meetings;

(d)    Clause 7 of the IH SHA by failing to exercise its powers and rights under the IH SHA to procure that its representatives on the KSC act in accordance with the IH SHA;

(e)    Clause 8.7 of the IH SHA by failing to take reasonable steps to ensure that Korek's CEO and senior managers act in accordance with the terms of the IH SHA and the Transaction Documents;

(f)      Clause 9.4 of the IH SHA by failing to procure that Mr. Barzani in his capacity as Korek's Statutory Manager act in accordance with Clause 8.4 of the IH SHA (CEO appointment) and in the best interest of Korek;

(g)      Clause 11.3 of the IH SHA by failing to procure that IT Ltd.'s veto right in respect of the 3G Annex was observed;

(h)      Clause 17 of the IH SHA on the basis that its Affiliate, Mr. Barzani, competes with the Group in the Republic of Iraq and CS Ltd. has failed to remove Mr. Barzani from the IH Board and the KSC;

(i)      Clause 23 of the IH SHA by refusing to complete the Call Option;

(j)      Clause 27 of the IH SHA by failing to consider properly the possibility of a conversion of Korek into a PJSC;

(k)      Clause 28 of the IH SHA by failing to declare its and/or its Affiliates' (including Mr. Barzani's) conflict of interest in relation to, amongst other things, Korek's dealings with IraqCell and the IBL Loan transaction;

(l)      Clause 31 of the IH SHA by: (i) failing to exercise its voting rights and powers to ensure that the provisions of the IH SHA, the Subscription Agreement and the Barzani Management Agreement were completely and punctually observed and generally that full effect was given to the principles set out in the IH SHA; and (ii) failing to procure that Mr. Barzani (as an Affiliate of CS Ltd.) complied with all his obligations under the IH SHA, the Subscription Agreement, the IraqCell Agreement, and the Barzani Management Agreement; and

(m)     Clause 23.1 of the Subscription Agreement by failing to take steps to give full effect to the Subscription Agreement, the IH SHA, the IraqCell Agreement, and the Barzani Management Agreement.

77.     It is IT Ltd.'s position that Mr. Barzani's acts and omissions set out above have breached, *inter alia*:

(a)      Clauses 3, 4, and 9 of the IH SHA by failing to act in the best interests of the Group;

(b)    Clause 6.6 of the IH SHA by failing to procure that the shareholders' general meeting of International Holdings and the IH Board effected the replacement of Mr. Rennard by Mr. Froissart as IT Ltd.'s representative on the IH Board;

(c)    Clauses 6.11 and 7.12 by failing to convene IH Board and KSC meetings, as required by the IH SHA;

(d)    Clause 7 of the IH SHA by failing to exercise his powers and rights under the IH SHA to procure that the KSC act in accordance with the IH SHA;

(e)    Clause 8.4 of the IH SHA by refusing to appoint any of the CEOs proposed by IT Ltd. pursuant to Clause 8.3;

(f)    Clause 8.7 of the IH SHA by failing to take reasonable steps to ensure that Korek's CEO and senior managers act in accordance with the terms of the IH SHA and the Transaction Documents;

(g)    Clause 11.3 of the IH SHA by causing Korek to enter into the 3G Annex, in breach of IT Ltd.'s veto right in respect thereof;

(h)    Clause 17 of the IH SHA on the basis that Mr. Barzani competes with the Group in the Republic of Iraq, has not resigned from the IH Board and the KSC, and has not made the Non-Compete Payment;

(i)    Clause 27 of the IH SHA by failing to consider properly the possibility of a conversion of Korek into a PJSC;

(j)    Clause 28 of the IH SHA by failing to declare his conflict of interest in relation to, amongst other things, Korek's dealings with IraqCell and the IBL Loan transaction;

(k)    Clause 1.2 of the IraqCell Agreement on the basis that IraqCell has not been liquidated or dissolved but continues to trade and competes with Korek;

(l)    Clause 31 of the IH SHA by: (i) failing to exercise his powers to ensure that the provisions of the IH SHA and the Subscription Agreement were completely and punctually observed and generally that full effect was given to the principles set out in the IH SHA; and (ii) failing to procure that CS Ltd. (an Affiliate of Mr.

27

Barzani's) complied with all its obligations under the IH SHA, the Subscription Agreement, and the other Transaction Documents;

(m)     Clause 14.11 of the Subscription Agreement by failing to procure that CS Ltd. complied properly and punctually with its obligations under the Subscription Agreement, the IH SHA, and the other Transaction Documents; and

(n)     Clause 23.1 of the Subscription Agreement by: (i) failing to take steps to give full effect to the Subscription Agreement, the IH SHA, and the Barzani Management Agreement; and (ii) failing to procure that CS Ltd. (an Affiliate of Mr. Barzani's) complied with its obligations under the Subscription Agreement, the IH SHA and the other Transaction Documents.

**B.9     Self-Dealing Dispute**

78.     In addition to the foregoing, it has come to the Claimant's attention that Mr. Barzani and representatives of CS Ltd., including shareholders of CS Ltd. and CS Ltd.'s appointees on the IH Board and the KSC, hold substantial undisclosed interests in a number of Korek's key suppliers and service providers. In pursuit of their own personal benefit, Mr. Barzani and these CS Ltd. representatives have caused Korek to issue sizable purchase orders to such suppliers/service providers.

79.     IT Ltd. has issued a notice of dispute in respect to such conduct (referred to herein as the Self-Dealing Dispute) on 18 January 2018.[40] The Claimant reserves the right to seek consolidation of the Self-Dealing Dispute for the Tribunal's determination in these proceedings once the requisite pre-arbitral steps have been completed. A brief summary of the Self-Dealing Dispute is set out below.

80.     As will be further particularised in due course, the Claimant has discovered that, amongst other things:

(a)     Mr. Barzani is the beneficial owner of the Darin Group (via a nominee shareholder arrangement). Darin Group is Korek's second largest supplier,

---

[40]   Letter from IT Ltd. to CS Ltd. and Mr. Barzani dated 18 January 2018 (**Exhibit C-31**); letter from IT Ltd. to CS Ltd. and Mr. Barzani dated 20 April 2018 (**Exhibit C-32**).

which received purchase orders totalling at least USD 262.3 million during the years 2011 through 2016;

(b)     Mr. Barzani and the other Original Shareholders own K-Energy, which received purchase orders from Korek exceeding USD 13 million during the same period; and

(c)     Mr. Aso Ali, another shareholder of CS Ltd., is the owner of Halabja Group, which received purchase orders from Korek totalling at least USD 105.3 million during the same period.

81.   Furthermore, the Claimant has discovered the following instances of self-dealing by Mr. Rahmeh (the supposedly independent member of the IH Board and the KSC nominated by CS Ltd.). Amongst other things, Mr. Rahmeh:

(a)     controls payments to third party suppliers via interposed third-party companies (for example, Hajras, ZR Collection, and ZR Group) which have no apparent purpose, but which are in turn controlled by a close associate of Mr. Rahmeh's (e.g. Hajras) or owned by Mr. Rahmeh himself (e.g. ZR Collection and ZR Group);

(b)     benefits from an undisclosed arrangement between (i) Korek, (ii) Al Bilad Islamic Bank for Investment and Finance PSC ("**Al Bilad**") (Korek's primary banker) and (iii) Mr. Rahmeh's ZR Collection, whereby ZR Collection charges Korek substantial fees for guarantees issued by Al Bilad to third parties in favour of Korek;

(c)     failed to disclose a substantial shareholding interest (concealed via a proxy) in Al Bilad through which he benefits from Korek's business with Al Bilad;

(d)     has directed services required by Korek to companies in which he has a beneficial interest. One such company, called DoubleU, provides Korek with so-called value-added services, and receives significant sums of money for such services;

(e)     benefits from an arrangement between Korek and International Company for Legal Consulting ("**IC4LC**"), a legal practice based in Lebanon which

supposedly provides legal services to Korek in Iraq. The fees charged to Korek for legal work are exorbitant and cannot be reconciled with the business activities of Korek or its requirement for legal services. In the period 2013 to 2015, IC4LC was paid a sum in excess of USD 20 million. IC4LC is the unregistered trading name of a legal practice run by a Lebanese lawyer, Mr. Michel Azar. Mr. Azar appears to be a close associate of Mr. Rahmeh's and is a director of numerous companies owned by Mr. Rahmeh. The IP domain name for IC4LC was registered by Mr. Rahmeh's brother and payments to the firm were made into a bank that was at the relevant time owned by Mr. Rahmeh; and

(f)   failed to disclose a substantial interest (concealed via an opaque ownership structure) in one of Korek's competitors, Mobitel Ltd, an Iraqi mobile telecommunications company with substantial operations in Kurdistan.

82.   None of these interests or arrangements were ever disclosed to IT Ltd. In fact, to the contrary, Mr. Barzani and his associates went to great lengths to conceal their interests in the above transactions. Mr. Barzani's and CS Ltd.'s actions in this respect are in clear breach of their obligations under the IH SHA, including but not limited to the obligation to act in the Group's best interests pursuant to Clauses 3 and 4 of the IH SHA, CS Ltd.'s obligations under Clause 28 of the IH SHA, and Mr. Barzani's obligations with respect to his position as a member of the IH Board and the KSC pursuant to Clauses 6 and 7 of the IH SHA. In addition, Mr. Barzani's actions are also contrary to International Holdings' Articles of Association[41] (including but not limited to Article 18(D)) and in breach of his duties under applicable law as Korek's statutory manager and as a director of International Holdings.

## (C)   THE ARBITRATION AGREEMENT

### C.1   Clause 48 of the IH SHA

83.   Clause 48 of the IH SHA provides:

> "*48.1   If any dispute, controversy or claim of whatever nature arises under, out of or in connection with this Agreement, including any question*

---

[41]   International Holdings' Articles of Association (**Exhibit C-33**).

*regarding its existence, validity or termination or any non-contractual obligations arising out of or in connection with this Agreement (a Dispute), the parties shall use all reasonable endeavours to resolve the matter amicably. If one party gives notice that a Dispute has arisen and the parties are unable to resolve the Dispute within 30 (thirty) days of service of such notice then the Dispute shall be referred to two (2) IT Ltd Representatives and two (2) CS Ltd Representatives who shall attempt to resolve the Dispute. The parties agree that such IT Ltd Representatives and CS Ltd Representatives shall have full power to resolve such Dispute on behalf of all parties.*

48.2    *If such IT Ltd Representatives and CS Ltd Representatives are unable to resolve the Dispute within 30 (thirty) days, the parties agree to submit the matter to settlement proceedings under the ICC ADR Rules. If the Dispute has not been settled pursuant to the ICC ADR Rules within 45 (forty five) days following the filing of a Request for ADR (as defined in the ICC ADR Rules) or within such other period as the parties to the Dispute may agree in writing, the parties to the Dispute shall have no further obligations under this clause 48.2. No party shall resort to arbitration against another under this Agreement until the expiry of this 45 (forty five) day period.*

48.3    *If the parties fail to resolve the Dispute in accordance with clauses 48.1 and 48.2, such Dispute shall be referred to and finally resolved by arbitration under the Arbitration Rules of the ICC (Rules), which Rules are deemed to be incorporated by reference into this clause. The number of arbitrators shall be three (3).*

48.4    *In the event that CS Ltd and/or Mr. Sirwan Saber Mustafa, on the one hand, and IT Ltd, on the other hand, are the only parties to the Dispute, (i) 1 (one) of the arbitrators shall be appointed by IT Ltd, (ii) one of the arbitrators shall be appointed by CS Ltd and/or Mr. Sirwan Saber Mustafa, (iii) the third arbitrator shall be jointly*

31

*appointed by the 2 (two) arbitrators appointed by IT Ltd and CS Ltd and/or Mr. Sirwan Saber Mustafa; and (iv) in the event that such arbitrators are unable to agree on the identity of the third arbitrator, such arbitrator shall be appointed by the ICC in accordance with the Rules.*

48.5    *In the event that CS Ltd and/or Mr. Sirwan Saber Mustafa, on the one hand, and IT Ltd, on the other hand, are not the only parties to the Dispute, the three arbitrators shall be appointed by the ICC in accordance with the Rules.*

48.6    *The parties hereby agree that any restriction in the Rules upon the proposition or appointment of an arbitrator by reason of nationality shall not apply to any arbitration commenced pursuant to this clause. The seat, or legal place, of arbitration shall be Dubai International Financial Centre. The language to be used in the arbitration shall be English.* […]"

**C.2    Clause 34 of the Subscription Agreement**

84.    Clause 34 of the Subscription Agreement, on substantially identical terms to Clause 48 of the IH SHA, provides:

"*34.1    If any dispute, controversy or claim of whatever nature arises under, out of or in connection with this Agreement, including any question regarding its existence, validity or termination or any non-contractual obligations arising out of or in connection with this Agreement (a Dispute), the parties shall use all reasonable endeavours to resolve the matter amicably. If one party gives notice that a Dispute has arisen and the parties are unable to resolve the Dispute within 30 (thirty) days of service of such notice then the Dispute shall be referred to two IT Ltd Representatives and two CS Ltd Representatives who shall attempt to resolve the Dispute and the parties agree that such IT Ltd Representatives and CS Ltd Representatives shall have full power to resolve such Dispute on behalf of all parties.*

32

34.2    *If such IT Ltd. Representatives and CS Ltd Representatives are unable to resolve the Dispute within 30 (thirty) days, the parties agree to submit the matter to settlement proceedings under the ADR Rules of the ICC (ADR Rules). If the Dispute has not been settled pursuant to the ADR Rules within 45 (forty five) days following the filing of a Request for ADR (as defined in the ADR Rules) or within such other period as the parties to the Dispute may agree in writing, the parties to the Dispute shall have no further obligations under this clause 34.2. No party shall resort to arbitration against another under this Agreement until the expiry of this 45 (forty five) day period.*

34.3    *If the parties fail to resolve a Dispute in accordance with clauses 34.1 and 34.2, such Dispute shall be referred to and finally resolved by arbitration under the Arbitration Rules of the ICC (Rules), which Rules are deemed to be incorporated by reference into this clause. The number of arbitrators shall be three (3).*

34.4    *In the event that CS Ltd and/or Mr. Sirwan Saber Mustafa, on the one hand, and IT Ltd, on the other hand, are the only parties to the Dispute, (i) 1 (one) of the arbitrators shall be appointed by IT Ltd, (ii) one of the arbitrators shall be appointed by CS Ltd and/or Mr Sirwan Saber Mustafa, (iii) the third arbitrator shall be jointly appointed by the 2 (two) arbitrators appointed by IT Ltd and CS Ltd and/or Mr Sirwan Saber Mustafa; and (iv) in the event that such arbitrators are unable to agree on the identity of the third arbitrator, such arbitrator shall be appointed by the ICC in accordance with the Rules.*

34.5    *In the event that CS Ltd and/or Mr Sirwan Saber Mustafa, on the one hand, and IT Ltd, on the other hand, are not the only parties to the Dispute, the three arbitrators shall be appointed by the ICC in accordance with the Rules.*

33

> 34.6     *The parties hereby agree that any restriction in the Rules upon the nomination or appointment of an arbitrator by reason of nationality shall not apply to any arbitration commenced pursuant to this clause. The seat, or legal place, of arbitration shall be the Dubai International Financial Centre. The language to be used in the arbitration shall be English.* […]"

### C.3     Clause 3 of the IraqCell Agreement

85.     Clause 3 of the IraqCell Agreement provides that the provisions of Clause 34 of Subscription Agreement (set out at paragraph 84 above) shall apply *mutatis mutandis* to the IraqCell Agreement.

### C.4     The Claimant has complied with Clause 48 of the IH SHA, Clause 34 of the Subscription Agreement and Clause 3 of the IraqCell Agreement

86.     In summary, a dispute between the parties may be referred to arbitration under the IH SHA and the Subscription Agreement if:

(a)     the claimant gives notice that a dispute has arisen (the "**Notice of Dispute**");

(b)     after 30 days from the service of the Notice of Dispute, if the parties have been unable to resolve the dispute, the dispute is referred to two representatives of each party who shall have full power to resolve the dispute;

(c)     after 30 days from when the dispute is referred to the parties' respective representatives, if the representatives have been unable to resolve the dispute, the dispute is submitted to settlement proceedings under the ADR Rules of the ICC;[42] and

---

[42]   Article 10 of the Mediation Rules of the International Chamber of Commerce (the "**ICC Mediation Rules**") provides that "*Where, prior to the date of the entry into force of the Rules, the parties have agreed to refer their dispute to the ICC ADR Rules, they shall be deemed to have referred their dispute to the ICC Mediation Rules, unless any of the parties objects thereto, in which case the ICC ADR Rules shall apply.*" Accordingly, the relevant part of the pre-action procedure was conducted in accordance with the ICC Mediation Rules.

(d)     at least 45 days have passed since the filing of a Request for Mediation.[43]

87.     The Claimant has complied with all the pre-arbitral steps set out above. The Claimant:

(a)     sent Notices of Dispute to:

(i)     CS Ltd. on 2 February 2016, 29 November 2016, 31 October 2017 and 6 November 2017;[44] and

(ii)     Mr. Barzani on 29 November 2016, 31 October 2017 and 6 November 2017;[45]

(b)     referred the dispute for resolution by its designated representatives by notices to:

(i)     CS Ltd. on 10 March 2016, 24 January 2017, 24 December 2017 and 13 January 2018;[46] and

(ii)     Mr. Barzani on 24 January 2017, 24 December 2017 and 13 January 2018;[47] and

(c)     submitted the dispute to settlement proceedings under the ICC Mediation Rules by filing Requests for Mediation in respect of:

---

[43]   Clause 17 of the IH SHA sets out an abridged version of these pre-arbitral steps with respect to certain breaches of Clause 17. By complying with the steps prescribed by Clause 48 of the IH SHA and Clause 34 of the Subscription Agreement, the Claimant has also complied with the steps set out in Clause 17 of the IH SHA.

[44]   Letter from IT Ltd. to CS Ltd. dated 2 February 2016 (**Exhibit C-34**); letter from IT Ltd. to CS Ltd. dated 29 November 2016 (**Exhibit C-35**); letter from IT Ltd. to International Holdings, CS Ltd., Korek and Mr. Barzani dated 31 October 2017 (**Exhibit C-36**); letter from IT Ltd. to CS Ltd. dated 6 November 2017 (**Exhibit C-19**).

[45]   Letter from IT Ltd. to Mr. Barzani dated 29 November 2016 (**Exhibit C-37**); letter from IT Ltd. to Mr. Barzani dated 29 November 2016 (**Exhibit C-38**); letter from IT Ltd. to International Holdings, CS Ltd., Korek and Mr. Barzani dated 31 October 2017 (**Exhibit C-36**); letter from IT Ltd. to Mr. Barzani dated 6 November 2017 (**Exhibit C-20**).

[46]   Letter from IT Ltd. to CS Ltd. dated 10 March 2016 (**Exhibit C-39**); letter from IT Ltd. to CS Ltd. dated 24 January 2017 (**Exhibit C-40**); letter from IT Ltd. to CS Ltd. dated 24 December 2017 (**Exhibit C-21**); letter from IT Ltd. to International Holdings, CS Ltd., Korek and Mr. Barzani dated 13 January 2018 (**Exhibit C-41**).

[47]   Letter from IT Ltd. to Mr. Barzani dated 24 January 2017 (**Exhibit C-42**); letter from IT Ltd. to Mr. Barzani dated 24 January 2017 (**Exhibit C-43**); letter from IT Ltd. to Mr. Barzani dated 24 December 2017 (**Exhibit C-22**); letter from IT Ltd. to International Holdings, CS Ltd., Korek and Mr. Barzani dated 13 January 2018 (**Exhibit C-41**).

(i)     CS Ltd. on 6 July 2016, 12 April 2017, 15 March 2018 and 26 March 2018; and

(ii)    Mr. Barzani on 12 April 2017, 15 March 2018 and 26 March 2018.[48]

88.     As at the date hereof, more than 45 days have passed since the dispute was submitted to settlement proceedings under the ICC Mediation Rules and the parties have not been able to resolve the matter amicably.

89.     Accordingly, the Claimant hereby refers the dispute to arbitration pursuant to Clause 48 of the IH SHA, Clause 34 of the Subscription Agreement and Clause 3 of the IraqCell Agreement.

**(D)     RELIEF SOUGHT**

90.     Whilst reserving the right to claim further and/or other relief in due course, the Claimant indicates at this stage that it seeks the following relief:

(a)     an order that CS Ltd. and Mr. Barzani have breached the IH SHA, the Subscription Agreement and the IraqCell Agreement as set out in Section B.8 above;

(b)     an order that CS Ltd. and Mr. Barzani procure that IT Ltd. is provided with the information requested by it in accordance with Clause 15 of the IH SHA (including, without limitation, (i) any and all information related to the IBL Loan; and (ii) any and all information related to payments or other forms of value given to any public officials in Iraq, including any officials of the CMC);

(c)     an order requiring Mr. Barzani to appoint (or CS Ltd. to procure the appointment) as Korek's CEO a person nominated by IT Ltd. in its sole discretion;

---

[48]  Copies of the Requests for Mediation and correspondence evidencing filing of the Requests for Mediation is not exhibited hereto due to the without prejudice nature of the mediation proceedings. However, the Claimant reserves the right to rely on (where necessary redacted) correspondence and documents to evidence compliance with the requirement to refer the disputes to settlement proceedings under the ADR Rules of the ICC, and that more than 45 days have elapsed since the filing of the Requests for ADR.

(d)     an order requiring CS Ltd. and Mr. Barzani to effect the replacement of Mr. Rennard by Mr. Froissart as a member of the IH Board and the KSC;

(e)     an order requiring CS Ltd. and Mr. Barzani to effect the conversion of Korek into a PJSC;

(f)     an order that Mr. Barzani resign his position as a member of the IH Board and the KSC, and resign as Korek's Statutory Manager, and/or that CS Ltd. procure Mr. Barzani's removal from the IH Board and the KSC and Mr. Barzani's removal as Korek's Statutory Manager;

(g)     an order that CS Ltd. and Mr. Barzani procure the appointment of an independent and internationally reputable firm of professional administrators over International Holdings and Korek who shall, with full power, acting on behalf of the International Holdings and Korek:

(i)     appoint an independent interim Statutory Manager for Korek pending conversion of Korek into a PJSC; and

(ii)    appoint an independent and internationally reputable firm of professional forensic accountants with full power to inspect, preserve and take copies of documents and records of Korek and International Holdings (including copying of documents, records and information held electronically) and make all other necessary enquiries of third parties with respect to the issues set out herein;

(h)     an order that CS Ltd. procure Mr. Rahmeh's removal from the IH Board and the KSC;

(i)     an order that CS Ltd. and Mr. Barzani pay damages to IT Ltd. in respect of their breaches of the IH SHA, the Subscription Agreement and the IraqCell Agreement in an amount to be determined during the course of this arbitration;

(j)     an order that the Respondents pay all costs in connection with these arbitral proceedings pursuant to Article 38(5) of the DIFC Arbitration Law, including (but not limited to) the costs of the Tribunal, the ICC, as well as any legal and other fees, costs and/or expenses incurred by the Claimant including (but not

limited to) legal fees, expert fees and costs in respect of the time spent by the Claimant's representatives on a full indemnity basis;

(k)     an order that CS Ltd. and Mr. Barzani pay post-award interest on all sums awarded at the maximum permitted rate until payment in full; and

(l)     such other relief as the Tribunal may deem appropriate.

91.     The Claimant reserves its right to plead its case further in due course and to advance further arguments and produce such further evidence (whether factual or legal) as may be necessary to complete or supplement the presentation of its claims or to respond to any arguments or allegations advanced by the Respondents. The Claimant also reserves its right to produce further documentary evidence and expert evidence, and to produce witness evidence in order to supplement and support the claims made in this Request for Arbitration.

92.     The Claimant also reserves the right to seek consolidation of the Self-Dealing (described in Section B.9) with the present proceedings, and to seek appropriate relief in respect thereof including interim relief pending completion of the pre-arbitral steps related to such dispute.

## (E)     COMMENTS AS TO PROCEDURE

93.     Pursuant to Clause 48 of the IH SHA and Clause 34 of the Subscription Agreement, the parties have agreed that:

(a)     the number of arbitrators shall be three;

(b)     one of the arbitrators shall be appointed by IT Ltd., one of the arbitrators shall be appointed by CS Ltd. and Mr. Barzani, and the third arbitrator shall be appointed jointly by the two arbitrators appointed by (i) IT Ltd. and (ii) CS Ltd. and Mr. Barzani respectively; in the event that such arbitrators are unable to agree on the identity of the third arbitrator, such arbitrator shall be appointed by the ICC in accordance with the Rules;

(c)     the language to be used in the arbitration shall be English; and

(d)     the seat of the arbitration shall be the DIFC.

38

94.   In accordance with Clause 48 of the IH SHA and Clause 34 of the Subscription Agreement, the Claimant hereby nominates Dr. Michael Pryles AO PBM as its party-appointed arbitrator. To the best of the Claimant's knowledge, Mr. Pryles is independent from the parties. Mr. Pryles's contact details are set out below:

> Dispute Resolution Services Pty Ltd
> Suite 304
> 521 Toorak Road, Toorak
> Victoria 3142, Australia
>
> Telephone: +613 8590 5642
> Mobile Telephone: +61 407 900 186
>
> Email: michael@michaelpryles.com

95.   In accordance with Article 1.1 of Appendix III of the Rules, a payment of USD 5,000 has been made to the ICC as filing fee for this Request for Arbitration.

96.   In accordance with Article 3(1) of the Rules, this Request for Arbitration and all the accompanying documents are submitted in eight copies. A copy has also been sent to CS Ltd.'s and Mr. Barzani's legal counsel (Boies Schiller Flexner (UK) LLP) today.

Respectfully submitted on behalf of **Iraq Telecom Limited**,

By: *Kirkland & Ellis International LLP*

Kirkland & Ellis International LLP

30 St. Mary Axe

London EC3A 8AF

United Kingdom

By: *Jones Day*

Jones Day

2 rue Saint-Florentin

75001 Paris

France

4 June 2018

# EXHIBIT 2

This Exhibit Has Been Withheld and a Motion for Permission to File It Under Seal Will Be Filed with the Court Promptly Upon the Matter Being Opened on the ECF System.

# EXHIBIT 3

This Exhibit Has Been Withheld and a Motion for Permission to File It Under Seal Will Be Filed with the Court Promptly Upon the Matter Being Opened on the ECF System.