# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

IN RE:

EX PARTE APPLICATION OF
IRAQ TELECOM LIMITED FOR AN
ORDER TO OBTAIN DISCOVERY FOR
USE IN FOREIGN PROCEEDINGS
PURSUANT TO 28 U.S.C. §1782

MISCELLANEOUS ACTION

Case No. 19-175

## MEMORANDUM IN SUPPORT OF IRAQ TELECOM LIMITED'S MOTION TO COMPEL THE PRODUCTION OF DOCUMENTS CLAIMED TO BE PRIVILEGED

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................1

STATEMENT OF FACTS ......................................................................................................4

I.      FACTUAL BACKGROUND...........................................................................................4

      A.      CMC Collusion with the Iraqi Shareholders............................................................4

      B.      Background on Mr. Rahmeh and His Relationships With the Clients ...................5

      C.      The Clients Purchase Property Used By CMC Officials ........................................6

      D.      Role of Dechert ...............................................................................................12

II.      PROCEDURAL HISTORY.........................................................................................13

      A.      1782 Application & Related Court Order.............................................................13

      B.      Productions ......................................................................................................13

      C.      Privilege Log....................................................................................................14

ARGUMENT ...................................................................................................................15

I.      LEGAL FRAMEWORK............................................................................................16

      A.      A Choice of Law Analysis is Unnecessary Because There Is No Conflict Between the Relevant Privilege Laws of the United States and England.............16

      B.      Applicable Privilege Standard ...........................................................................17

II.      DECHERT AND THE CLIENTS HAVE NOT AND CANNOT CARRY THEIR BURDEN TO ESTABLISH PRIVILEGE AS TO VIRTUALLY ANY OF THE LOGGED DOCUMENTS ........................................................................................18

      A.      Almost None of the Logged Documents Involve the Clients, but Rather Third-Parties ...................................................................................................18

      B.      Dechert and the Clients Have Failed to Establish that the Logged Documents Provide Legal Advice, as Opposed to Real Estate Business Advice ...............................................................................................................26

      C.      The Mere Sending of Non-Privileged Documents to Counsel Does Not Create a Valid Privilege Claim ...........................................................................28

III.      BECAUSE THE CLIENTS USED THEIR ATTORNEY-CLIENT RELATIONSHIP WITH DECHERT TO ADVANCE A FRAUD, THE CRIME-FRAUD EXCEPTION APPLIES ....................................................................................30

      A.      There is Reasonable Basis to Believe the Clients Committed or Intended to Commit a Crime or Fraud .................................................................................32

      B.      The Clients Used Dechert's Services in Furtherance of Their Crimes.................33

CONCLUSION..................................................................................................................35

i

# TABLE OF AUTHORITIES

## Cases

*Advanced Tech. Assocs., Inc. v. Herley Indus., Inc.*,
   No. CIV.A. 96-0132, 1996 WL 711018 (E.D. Pa. Dec. 5, 1996) .......................... 18, 19, 20, 23

*Aerojet Rocketdyne, Inc. v. Glob. Aerospace, Inc.*,
   No. 2:17-CV-01515 KJM AC, 2019 WL 1178635 (E.D. Cal. Mar. 13, 2019),
   *reconsideration denied in part*, No. 2:17-CV-01515-KJM-AC, 2019 WL
   4640513 (E.D. Cal. Sept. 24, 2019) ...................................................................... 31

*Andritz Sprout-Bauer, Inc. v. Beazer E., Inc.*,
   174 F.R.D. 609 (M.D. Pa. 1997) ............................................................................ 29

*Anwar v. Fairfield Greenwich Ltd.*,
   982 F. Supp. 2d 260 (S.D.N.Y. 2013) .................................................................... 16

*In re Application of Christensen*,
   No. M19-138(JFK), 2006 WL 278169 (S.D.N.Y. Feb. 3, 2006) ............................ 17

*Astra Aktiebolag v. Andrx Pharms., Inc.*,
   208 F.R.D. 92 (S.D.N.Y. 2002) .............................................................................. 16

*In re Berks Behavioral Health LLC*,
   500 B.R. 711 (Bankr. E.D. Pa. 2013) ............................................................... 19, 21

*In re Chevron Corp.*,
   650 F.3d 276 (3d Cir. 2011) ................................................................................... 20

*Fed. Trade Comm'n v. Abbvie, Inc.*,
   No. CV 14-5151, 2015 WL 8623076 (E.D. Pa. Dec. 14, 2015) ............................. 26

*Fed. Trade Comm'n v. Abbvie Inc.*,
   No. CV 14-5151, 2016 WL 4478803 (E.D. Pa. Aug. 25, 2016) ............................. 28

*In re Federation Internationale de Basketball*,
   117 F. Supp. 2d 403 (S.D.N.Y. 2000) .................................................................... 17

*In re financialright GmbH*,
   No. 17-MC-105 (DAB), 2017 WL 2879696 (S.D.N.Y. June 22, 2017) ................. 15

*Giovan v. St. Thomas Diving Club, Inc.*,
   37 V.I. 176 (Terr. V.I. June 16, 1997) ............................................................... 19, 22

*In re Grand Jury*,
   705 F.3d 133 (3d Cir. 2012) ................................................................ 17, 28, 30, 31, 33

*In re Grand Jury Investigation*,
  599 F.2d 1224 (3d Cir. 1979) ................................................................. 17

*In re Grand Jury Investigation*,
  918 F.2d 374 (3d Cir. 1990) ................................................................... 18

*In re Grand Jury Proceedings*,
  604 F.2d 798 (3d Cir. 1979) ................................................................... 33

*In re Grand Jury Subpoena*,
  745 F.3d 681 (3d Cir. 2014) ................................................................... 30

*In re Grand Jury Subpoena*,
  No. 2013R00691-009, 201 F. Supp. 3d 767 (W.D.N.C. 2016) ............................. 27

*In re Grand Jury Subpoena (Mr. S.)*,
  662 F.3d 65 (1st Cir. 2011) .............................................................. 26, 27

*In re Grand Jury Subpoenas Dated Jan. 20, 1998*,
  995 F. Supp. 332 (E.D.N.Y. 1998) ........................................................... 22

*Inigo v. Giordano*,
  925 F.2d 641 (3d Cir. 1991) ................................................................... 30

*Kiobel v. Royal Dutch Petroleum Co.*,
  No. 02CIV7618(HBP), 2005 WL 1925656 (S.D.N.Y. Aug. 11, 2005) ........................ 30

*Koehler v. Bank of Bermuda, Ltd.*,
  M18-302, 931745(MHD), 2003 WL 289640 (S.D.N.Y. Feb. 11, 2003) ...................... 31

*Lady Liberty Transp. Co. v. Philadelphia Parking Auth.*,
  No. CIV.05-1322, 2007 WL 707372 (E.D. Pa. Mar. 1, 2007) ............................. 26

*Mangouras v. Squire Patton Boggs*,
  No. 17-3633, 2020 WL 6554050 (2d Cir. Nov. 9, 2020) ................................. 15

*Midwest Athletics & Sports All. LLC v. Ricoh USA, Inc.*,
  2020 WL 5554361 (E.D. Pa. Sept. 16, 2020) ..................................... 16, 20, 24

*In re Neurontin Antitrust Litig.*,
  801 F. Supp. 2d 304 (D.N.J. 2011) ........................................................... 33

*In re Niaspan Antitrust Litig.*,
  No. 13-MD-2460, 2017 WL 3668907 (E.D. Pa. Aug. 24, 2017) ........................... 26

*Quagliarello v. Dewees*,
  802 F. Supp. 2d 620 (E.D. Pa. 2011) ......................................................... 19

*Resolution Tr. Corp. v. Diamond*,
  773 F. Supp. 597 (S.D.N.Y. 1991) ................................................ 29

*Rhoads Indus., Inc. v. Bldg. Materials Corp. of Am.*,
  254 F.R.D. 238 (E.D. Pa. 2008)................................................... 29

*Rhone–Poulenc Rorer Inc. v. Home Indem. Co.*,
  32 F.3d 851 (3d Cir. 1994) ......................................................... 17

*Roberts Tech. Grp., Inc. v. Curwood, Inc.*,
  No. CIV.A. 14-5677, 2015 WL 4503547 (E.D. Pa. July 20, 2015)........................................ 29

*Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
  319 F.R.D. 100 (S.D.N.Y. 2017) ........................................... 22, 25, 26, 33

*SmithKline Beecham Corp. v. Apotex Corp.*,
  232 F.R.D. 467 (E.D. Pa. 2005)........................................... 18, 23, 27, 28

*Sullivan v. Warminster Twp.*,
  274 F.R.D. 147 (E.D. Pa. 2011)................................................... 17

*In re Teleglobe Commc'ns Corp.*,
  493 F.3d 345 (3d Cir. 2007) ....................................................... 25

*Thompson v. Chertoff*,
  No. 3:06-CV-004-RLM, 2007 WL 4125770 (N.D. Ind. Nov. 15, 2007) ............................... 29

*Tulip Computers Int'l, B.V. v. Dell Computer Corp.*,
  210 F.R.D. 100 (D. Del. 2002), *aff'd and adopted sub nom. Tulip Computer Int'l
  B.V. v. Dell Computer Corp.*, No. CIV.A. 00-981-KAJ, 2003 WL 24046752 (D.
  Del. Feb. 10, 2003) .................................................................. 15

*United States v. Davita, Inc.*,
  301 F.R.D. 676 (N.D. Ga. 2014), *on reconsideration in part*,
  No. 1:07-CV-2509-CAP-JSA, 2014 WL 11531065 (N.D. Ga. May 21, 2014) ..................... 29

*United States v. Doe*,
  429 F.3d 450 (3d Cir. 2005) ....................................................... 33

*United States v. Hallinan*,
  290 F. Supp. 3d 355 (E.D. Pa. 2017), *aff'd sub nom. United States v. Neff*,
  787 F. App'x 81 (3d Cir. 2019) ............................................ 30, 31, 33

*United States v. Zolin*,
  491 U.S. 554 (1989)................................................................ 31, 34

*United States v. (Under Seal)*,
  748 F.2d 871 (4th Cir. 1984) ...................................................... 27

*In re Universal Serv. Fund Tel. Billing Practices Litig.*,
  232 F.R.D. 669 (D. Kan. 2005) ........................................................................ 29

*Upjohn Co. v. U.S.*,
  449 U.S. 383 (1981).......................................................................................... 18

*In re Veiga*,
  746 F. Supp. 2d 27 (D.D.C. 2010) .................................................................. 17

*Westinghouse Elec. Corp. v. Republic of Philippines*,
  951 F.2d 1414 (3d Cir. 1991) .................................................................... 18, 25

**Rules / Statutes**

28 U.S.C. § 1782............................................................................... 1, 15, 16, 17

Fed. R. Evid. 501 ................................................................................................ 17

**Other Authorities**

8 *Wigmore on Evidence* (McNaughton rev. 1961) ........................................ 17

Applicant Iraq Telecom Limited ("**Iraq Telecom**") hereby moves for an order compelling Dechert LLP ("**Dechert**") to produce documents withheld on meritless claims of privilege or, in the alternative, for *in camera* inspection of the withheld documents.

## PRELIMINARY STATEMENT

Kuwaiti and French investors formed Iraq Telecom to participate in the development of the cellular phone infrastructure in Iraq, including by investing eight hundred million dollars in Korek Telecom Company LLC ("**Korek**" or the "**Company**"), an Iraqi telecommunications company. As a result of its investment in Korek, Iraq Telecom became a joint owner of the Company along with Korek's original shareholders, including Sirwan Saber Mustafa Barzani ("**Mr. Barzani**") (collectively with Mr. Barzani, the "**Iraqi Shareholders**").

In its application (ECF 1-1) ("**Application**") for judicial assistance pursuant to 28 U.S.C. § 1782, Iraq Telecom detailed evidence it had gathered revealing how corrupt Iraqi government officials charged with regulating the telecommunications industry facilitated the stealing of Iraq Telecom's investment in Korek by Mr. Barzani and the Iraqi Shareholders. A key component of the scheme was the purchase of two pricey residential properties in London (the "**UK Properties**") by *nominee buyers* represented by international law firm Dechert – Pierre Gergi Boutros Youssef ("**Mr. Youssef**") and Mansour Farid Succar ("**Mr. Succar**", together with Mr. Youssef, the "**Clients**") – for two Iraqi government officials, Dr. Safa Aldin Rabee ("**Dr. Rabee**") and Dr. Ali Nasser Alwan Al-Khwildi ("**Dr. Al-Khwildi**"),—responsible for regulating Korek and who used their outsized regulatory power to issue decisions harmful to Iraq Telecom and ultimately pave the way for Iraq Telecom's massive loss at Mr. Barzani's gain. Specifically, the Application alleged that Raymond Rahmeh ("**Mr. Rahmeh**"), Mr. Barzani's henchman, orchestrated these crooked London-home purchases through the Clients and with the assistance of Dechert—presumably without Dechert's knowledge that it was facilitating governmental corruption. This was evidenced

1

by the fact that Dechert also previously represented Iraq Telecom's antagonists, and the presence of Drs. Rabee's and Al-Khwildi's families at the residences rather than the nominee purchasers themselves who by all accounts never surfaced in the transactions or at the properties, and, inferentially, that Mr. Rahmeh was centrally involved.

This Court granted Iraq Telecom's Application to subpoena Dechert. Documents were produced that directly and unequivocally expose, *inter alia*, the (1) engagement of Dechert by the Clients in both theoretically independent home purchases; (2) involvement of some of Dechert's most senior partners, as well as a small army of other lawyers, and outside advisors and individuals; (3) role of Mr. Barzani's fixer Mr. Rahmeh and his company, the ZR Group, in the purchases; and (4) presence of Dr. Rabee's daughter on emails related to the very home believed to have been purchased for the Rabee family as a central component in the scheme that ultimately resulted in the devastating loss to Iraq Telecom. In short, it is beyond dispute that the transactions at issue were anything but the simple residential real estate purchases they purported to be.

Notably, the nominal "Clients"—the purported purchasers of the residential properties—are conspicuously missing from virtually all Dechert documentation. Nevertheless, following the grant of the Application, the Clients hired separate counsel in the United States at the eleventh hour to delay production and aggressively fight Iraq Telecom's straightforward request for Dechert's documents. This is despite not being named in the underlying foreign proceedings and purportedly having no financial interest in the outcome whatsoever. Remarkably, the Clients now seek to conceal as purportedly privileged *hundreds* of documents (an extraordinarily disproportionate number when compared to the 722 documents that were produced) by improperly casting a broad net over what may rightfully be withheld. As the Court will see from the below, it is beyond dispute that these supposedly privileged documents will further support Iraq Telecom's

allegations, and that despite the Clients' present efforts, this evidence may not rightfully be shielded by privilege, as the high bar required to establish and maintain privilege has not and cannot be met.

*First*, despite the fact that the attorney-client privilege protects communications between an attorney and a client, the purported Clients appear as direct recipients on a mere ***three*** of the ***467 documents*** listed on a privilege log prepared by the Clients and produced to Iraq Telecom (the "**Log**"). *See* Certification and Supplemental Declaration of Kristin N. Tahler ("**Supp. Tahler Decl.**"), annexed hereto as **Appendix A**, at Ex. 1. The majority of the remaining documents involve third-parties. Since the communications do not involve the holders of the privilege, Dechert and the Clients have failed to establish either (1) that the communications are privileged, or (2) that any privilege claim has not been waived by the involvement of third parties. While the Clients suggest that certain third-parties served as their "agents," they have failed to justify this assertion, nor can one conceive of any credible basis for third parties such as employees of the ZR Group— a major Lebanese conglomerate known most for its role in the oil and gas industry—to act as agents in connection with residential property purchases in London.

*Second*, Dechert and the Clients have failed to adequately establish that logged documents and communications were made for the purpose of obtaining or providing legal advice, as opposed to being routine business issues associated with real estate transactions such as the progress of the transaction, the procurement of insurance and closing dates. Here again, the sheer number of allegedly privileged documents associated with two residential real estate transactions alone suggests that relevant, non-privileged documents are being withheld, as do the logged descriptions, which conjure business rather than privileged matters.

*Third*, Dechert and the Clients improperly assert privilege over approximately 95 admittedly non-privileged documents based on these documents having been subsequently forwarded to Dechert. It is beyond reproach, however, that non-privileged documents do not become privileged simply because they are forwarded to an attorney. While it is possible for privilege to attach to such non-privileged documents in certain scenarios—if, for example, a client sends a series of email messages which themselves would reveal the advice requested—such scenarios are not the case here.

*Fourth*, because attorneys were used (albeit apparently inadvertently) to advance a fraud, the crime-fraud exception applies and the documents may not be withheld. Specifically, there is significant evidence that the UK Properties were purchased for Iraqi government officials in exchange for their adverse actions against Iraq Telecom. Dechert's assistance facilitated the fraud and the exception thus applies.

For these and the reasons further detailed herein, in particular that the Log fails to substantiate privilege under the Third Circuit's standard or under English law, Iraq Telecom respectfully requests that this Court compel *Dechert* to produce all of the documents in the Log.

## STATEMENT OF FACTS

## I.   FACTUAL BACKGROUND

### A.   CMC Collusion with the Iraqi Shareholders

As detailed in the Application,[1] Iraq Telecom has obtained evidence that certain Iraqi government officials of the Iraqi Communications and Media Commission (the "**CMC**") (referred to hereinafter as the "**CMC Officials**") solicited and accepted payments and gifts from the Iraqi

---

[1]      Iraq Telecom incorporates by reference the Factual Background set forth in the Application at 8-18 and only details herein the information most pertinent to the instant motion.  All capitalized terms, unless otherwise defined herein, have the same meaning as in the Application.

Shareholders in exchange for taking adverse actions against Iraq Telecom, including by issuing an order on July 2, 2014 that effectively sought to strip Iraq Telecom of its shares in Korek and unlawfully redistribute Iraq Telecom's significant investment in the Company to the Iraqi Shareholders (the "**CMC Order**"). *See* Application at 4-5, 14-15; Declaration of Nicholas Bortman (ECF 1-7) ("**First Raedas Decl.**") at ¶ 9; Supplemental Declaration of Nicholas Bortman ("**Supp. Raedas Decl.**"), annexed hereto as **Appendix B**, at ¶ 11.

Specifically, Iraq Telecom has evidence that Dr. Rabee, the CMC's former Director General (i.e., Chief Executive), and Dr. Al-Khwildi, the CMC's Director General and former President of the CMC's Council of Trustees, solicited illicit payments and other unlawful benefits from the Iraqi Shareholders in exchange for issuing decisions benefitting the Iraqi Shareholders at an ultimately substantial and devastating cost to Iraq Telecom and its investment in Korek.[2] As noted above, this evidence shows that Mr. Rahmeh, on behalf of Mr. Barzani and the other Iraqi Shareholders, purchased real estate through nominee buyers, including the Clients, for the use of Drs. Al-Khwildi and Rabee and their families, including the UK Properties purchased in 2014 and 2016 respectively, in furtherance of the scheme.[3]

### B.   Background on Mr. Rahmeh and His Relationships With the Clients

#### 1.   Mr. Rahmeh & ZR Group

Mr. Rahmeh is a notorious Lebanese businessman with an estimated wealth of $1-2 billion. He has been implicated in several corrupt activities and scandals, including the murder of U.S.

---

[2]   *See* First Raedas Decl. at ¶ 9.

[3]   *See* First Raedas Decl. at ¶¶ 12-25.

defense contractor Dale Stoffel in Iraq.[4] He is a close associate of Mr. Barzani and was a purportedly independent member of the Korek Supervisory Committee.

He, along with his brother Tedy Rahmeh, own and control ZR Group. ZR Energy SAL ("**ZR Energy**") is a Lebanese energy trade company that, among other things, imports fuel oil for Electricité du Liban, Lebanon's main electricity producer, and is part of the ZR Group.[5]

> 2.   Relationship with the Clients

To advance his various interests, Mr. Rahmeh utilizes a number of deputies, including Messrs. Youssef and Succar, to serve nominee roles. Mr. Youssef has been described as Mr. Rahmeh's "right-hand man" in Iraq and was also implicated in the murder of a U.S. defense contractor, alongside Mr. Rahmeh.[6]  Mr. Succar is also a close business associate and family friend of Mr. Rahmeh.[7]

**C.   The Clients Purchase Property Used By CMC Officials**

> 1.   Barn Hill Property

In September 2014, shortly after issuance of the CMC Order, which started in motion the ultimate loss of Iraq Telecom's investment in Korek, Mr. Youssef *ostensibly* purchased a property located at 59 Barn Hill, Wembley, London HA9 9LL (the "**Barn Hill Property**"), wholly in cash, for £830,000 (well over USD 1 million).[8] Conspicuously, to make a simple purchase for a personal,

---

[4]   *See* First Raedas Decl. at ¶ 14. Notably, Mr. Rahmeh's allegedly corrupt activities extend much beyond CMC officials and Korek, and include (1) the theft of Iraqi state funds in connection with a contract between a U.S. defense contractor and the Iraqi Ministry of Defense; (2) collusion with Iraqi defense ministry officials; and (3) the supply of defective fuel by ZR Energy (Mr. Rahmeh's company) to Lebanon's state electricity company during severe energy shortages, which involved bribery of the "independent" agency that tested the fuel. *See* Supp. Raedas Decl. at ¶ 8.

[5]   *See* First Raedas Decl. at ¶ 20.

[6]   *See id.* at ¶ 13-14.

[7]   *See id*. at ¶¶ 21-28.

[8]   *See id*. at ¶ 29.

residential home, international law firm Dechert was hired and had a significant team involved in the transaction, including at least three attorneys and three business associates, while Mr. Youssef remained notably absent from anything having to do with the transaction in his name.[9] The following evidence, as well as the Dechert production and the Log, supports the allegation that that this was not a straightforward purchase, but instead a scheme orchestrated by Mr. Rahmeh, using Mr. Youssef as a nominee purchaser pawn, to effect the purchase of the Barn Hill Property for Dr. Al-Khwildi as compensation for his efforts, as a CMC Official, to harm Iraq Telecom:

    (1) Mr. Youssef is an associate and personal friend of Mr. Rahmeh.[10]

    (2) According to the Log, Mr. Rahmeh participated in communications with Dechert regarding the Barn Hill Property on no fewer than 22 occasions (which stands in sharp contrast to the *zero* email communications involving Mr. Youssef ).[11]

    (3) Dechert's engagement letter [12] addressed to Mr. Youssef is signed by a prominent Lebanese partner of Dechert, Camille Abousleiman ("**Mr. Abousleiman**"), who is a close and long-time adviser to Mr. Rahmeh and the Iraqi Shareholders.[13] The engagement letter also cites client number reference 977903, which is understood to be a client number used by Mr. Rahmeh and the ZR Group.[14]

    (4) Notwithstanding Mr. Youssef's status as Dechert's "client" and role as the purported purchaser of the Barn Hill Property, all known instructions in the

---

[9]    *See* Supp. Raedas Decl. at ¶¶ 12-22.

[10]    *See* First Raedas Decl. at ¶¶ 13-14.

[11]    *See* Supp. Raedas Decl. at ¶¶ 13; Supp. Tahler Decl. at Exs. 1 & 2 (documents listed under Category B for Raymond Rahmeh).

[12]    *See* Supp. Raedas Decl. at Ex. 3.

[13]    *See id*. at ¶¶ 15-16; First Raedas Decl. at ¶¶ 42-44.

[14]    *See* Supp. Raedas Decl. at ¶ 15 & Ex. 3.

transaction were provided by Sandy Achkouty ("**Ms. Achkouty**"), ZR Group's administration manager.[15]

(5) The first evidence from the Dechert production involving the Barn Hill Property is dated August 12, 2014, just a few weeks after the CMC Order.[16]

(6) Mr. Youssef's proof of funds letter was a single letter from IBL Bank S.A.L. ("**IBL Bank**"), which has long-standing close ties to Korek and facilitated a sham loan, causing a substantial windfall to Mr. Barzani while severely damaging Iraq Telecom.[17] The cash payment for the property was also made from IBL Bank.[18]

(7) According to a receipt, on October 13, 2014, "Adnan Al Silami," a nominee for Dr. Al-Khwildi, picked up the keys to the Barn Hill Property.[19]

(8) Despite having theoretically paid over a million dollars for the house, Mr. Youssef has never lived in the Barn Hill Property.[20]

(9) Dr. Al-Khwildi and his family lived in the Barn Hill Property from January 2015 to at least October 2017, as evidenced by the UK electoral register, which lists the names and addresses of individuals registered to vote.[21]

---

[15]   *See id* at ¶ 13, 21.
[16]   *See id*. at ¶ 11-12.
[17]   *See id*. at ¶ 24.
[18]   *See id*. at ¶ 26.
[19]   *See id*. at ¶¶ 28-29.
[20]   *See id*. at ¶ 27; First Raedas Decl. at ¶ 30.
[21]   *See* First Raedas Decl. at ¶ 30.

2.    25 Higher Drive Property

In November 2016, Mr. Succar purchased a property located at 25 Higher Drive, London (the "**Higher Drive Property**"), wholly in cash, for £1.5 million (over USD 1.75 million).[22] As with the Barn Hill Property, Dechert was hired to assist with the purchase.[23] Over a dozen advisors and others worked on the purportedly simple residential real estate transaction, including at least nine attorneys and five business associates, while Mr. Succar himself was all but invisible.[24]

Through the Raedas Investigation and the documents produced by Dechert to date, Iraq Telecom has uncovered the following compelling evidence that Mr. Rahmeh, through nominee purchaser pawn Mr. Succar, purchased the Higher Drive Property for Dr. Rabee as compensation for his efforts, as a CMC Official, to harm Iraq Telecom between 2014 and the present:

(1) Mr. Succar is an associate and personal friend of Mr. Rahmeh.[25]

(2) It appears that Mr. Rahmeh participated in communications with Dechert regarding the Higher Drive Property on no less than 58 occasions, far more than the *zero* email communications involving Mr. Succar.[26]

(3) On or around August 29, 2016, Mr. Rahmeh and an employee of ZR Group reached out to Dechert regarding the purchase of the Higher Drive Property.[27]  This was just two weeks after the Iraqi Shareholders essentially asked the CMC, on which Dr. Rabee served, to confirm that Iraq Telecom could not exercise a "call option"[28] to

---

[22]    *See id*. at ¶¶ 32-34; Supp. Raedas Decl. at ¶ 30.

[23]    *See* Supp. Raedas Decl. at ¶ 35, Ex. 16.

[24]    *See id*. at ¶¶ 33-41.

[25]    *See* First Raedas Decl. at ¶ 21-28.

[26]    *See* Supp. Raedas Decl. at ¶¶ 33-34.

[27]    *See* Supp. Tahler Decl. at Ex. 1, Log Nos. 93-95.

[28]    As detailed in the Application, in 2011, when Iraq Telecom first invested in Korek, Iraq Telecom and the Iraqi Shareholders agreed to a "call option" (the "**Call Option**"), through which

purchase control of Korek, which Iraq Telecom wished to do.[29] Subsequently, with the Higher Drive Property approaching closing, on October 17, 2016, the CMC (in a letter signed by Dr. Rabee) issued a strong warning in response that Iraq Telecom should not be permitted to exercise the Call Option without such approval, resulting in yet further harm to Iraq Telecom.[30]

(4) Ibrahim Zaouk ("**Mr. Zaouk**"), the owner of ZR Energy DMCC and another close associate of Mr. Rahmeh, allegedly "acted as [a] designated agent for Mr. Succar in connection with certain requests for legal advice" regarding the Higher Drive Property.[31]

(5) Dechert's engagement letter is signed by a partner of Dechert, Simon Briggs ("**Mr. Briggs**").[32] Like Mr. Abousleiman, Mr. Briggs represented the Iraqi Shareholders and Mr. Barzani personally in various proceedings.[33]

(6) Mr. Rahmeh's personal lawyer, Michel Azar, authenticated Mr. Succar's identification.[34]

(7) As with Mr. Youssef, Mr. Succar's proof of funds letter was a single letter from IBL Bank, an entity with close ties to Korek, and the cash payment for the property was also made from IBL Bank.[35]

---

Iraq Telecom could acquire further shares in Korek and thereby obtain majority control over the Company. *See* Application at 3-4.

[29]   *See* Supp. Raedas Decl. at ¶ 49.

[30]   *See id*.

[31]   *See id*. at ¶ 40; Supp. Tahler Decl. at Ex. 1, p. 32.

[32]   *See* Supp. Raedas Decl. at Ex. 16.

[33]   *See id*.at ¶ 32.

[34]   *See id*. at ¶ 44.

[35]   *See id*. at ¶¶ 43, 45.

(8) Notwithstanding Mr. Succar's role as the purported purchaser of the Higher Drive Property, all known instructions in the transaction were provided by Ms. Achkouty of the ZR Group.[36] Transaction documents were sent to Dechert in London from ZR Group's offices in Beirut.[37]

(9) Riham Rabee ("**Ms. Rabee**"), the daughter of Dr. Rabee, is copied on communications between Nicholas Hapgood, the seller's agent, and Ms. Achkouty regarding the Higher Drive Property.[38] A draft sale contract identifies Mr. Succar's London address as 50 Quadrangle, W2, an apartment owned by Ms. Rabee's husband.[39]

(10)    Mr. Succar has never lived in the Higher Drive Property.[40]

(11)    There is evidence that Dr. Rabee, his wife Jinan, and their son, Hussein Rabee used the property.[41]

(12)    Conspicuously, Dr. Rabee's family moved out of the Higher Drive Property on September 5, 2019, just days after Iraq Telecom filed its claims in an arbitration proceeding, which was the first time Iraq Telecom revealed the evidence it had uncovered regarding Dr. Rabee and the Higher Drive Property.[42]

---

[36]    *See id*. at ¶ 39.
[37]    *See id*.
[38]    *See id*. at ¶ 47; Supp. Tahler Decl. at Ex. 1, Log Nos. 96, 300, 301, 302, 303, and 304 and Ex. 2 (documents listed under Category B for Riham Rabee).
[39]    *See* Supp. Raedas Decl. at ¶ 48.
[40]    *See id*. at ¶ 46; First Raedas Decl. at ¶ 33.
[41]    *See* First Raedas Decl. at ¶ 33.
[42]    *See id*. at ¶ 34.

D.     **Role of Dechert**

Dechert represented Mr. Youssef in the Barn Hill Property transaction and Mr. Succar in the Higher Drive Property transaction.[43] Both engagement letters are addressed to the Clients and identify Ms. Achkouty of the ZR Group as an authorized representative.[44] Based on the documents produced to date, the Clients seemingly represented to Dechert that they were the true buyers of the UK Properties.[45] Accordingly, Dechert represented to representatives of the sellers in both transactions that Messrs. Youssef and Succar were the true purchasers.[46] Despite this, it appears that Dechert had virtually no contact with the Clients, and instead, communicated primarily with Ms. Achkouty, Mr. Rahmeh and other individuals associated with the ZR Group (which is owned by Mr. Rahmeh).[47]

Dechert has previously represented both Messrs. Barzani and Rahmeh, as well as the ZR Group, in related and unrelated matters.[48] For example, Mr. Abousleiman, formerly chairman and partner of Dechert's London office, and currently Of Counsel, (1) advised Mr. Barzani in 2011 in connection with the Investment Transaction; and (2) represented Mr. Rahmeh from around 2015 until early 2019 relating to a dispute involving a Lebanese power plant, as well as in 2013 involving a dispute with the Iraqi Ministry of Electricity.[49]

---

[43]     *See* Supp. Raedas Decl. at Exs. 3, 17.

[44]     *See id*.

[45]     *See id*.

[46]     *See id*. at ¶¶ 20, 38.

[47]     *See id*. at ¶¶ 12-14, 21-22, 32-34, 39-40.

[48]     *See* First Raedas Decl. at ¶¶ 42-45.

[49]     *See id*. at ¶¶ 43-44.

## II.   PROCEDURAL HISTORY

### A.   1782 Application & Related Court Order

On November 5, 2019, Iraq Telecom filed the Application seeking non-party discovery (the "**Requested Discovery**") from Dechert for use in (1) a pending arbitration administered by the International Chamber of Commerce; and (2) a contemplated proceeding in the United Kingdom (collectively, the "**Foreign Proceedings**"). (ECF 1.) Specifically, Iraq Telecom sought to serve two subpoenas (the "**Subpoenas**") seeking discrete information, documents and testimony from Dechert to further support and corroborate its claims in the Foreign Proceedings of collusion between the CMC Officials and Messrs. Barzani and Rahmeh.

The Court granted the Application on December 5, 2019. (ECF 11.)

### B.   Productions

Iraq Telecom served Dechert with the Subpoenas on December 9, 2020. (ECF 15.) Dechert originally represented to Iraq Telecom that it would directly produce documents on February 14, 2020.[50] Instead of making a production on that day, Dechert notified Iraq Telecom, for the first time, that the Clients would intervene—a noteworthy fact given that the Clients are not named in any of the underlying proceedings commenced by Iraq Telecom as redress for its losses.[51] Indeed, rather than avoid the expense and hassle of hiring counsel and accepting Dechert's production of what should have been a vanilla set of documents showing the mundane details of residential purchases, the Clients objected to Dechert's proposed production (and presumably, view of the application of privilege), retained separate U.S. counsel, and took on the role of making

---

[50]    *See* Supp. Tahler Decl. at ¶ 5.

[51]    *See id.* at ¶ 6.

productions, despite the fact that the ultimate responsibility of production would remain (as it does today) with Dechert, the entity named in the subpoena.[52]

Following a several week delay, the Clients' counsel made the first of several productions.[53] In total, Iraq Telecom has received approximately 722 documents (2,802 pages).[54]

### C.    Privilege Log

The Clients initially refused to produce a privilege log, despite the fact that the Court-ordered Subpoena called for a privilege log.[55] Having voluntarily inserted themselves in the proceeding and brought in counsel independent of Dechert to assert privilege objections, the Clients claimed that the cost of asserting those objections via a standard privilege log was unduly burdensome.[56] Nevertheless, in a good faith effort to resolve this dispute without burdening the Court, Iraq Telecom agreed to cover significant costs in preparing the log.[57]

After a number of meet and confers and correspondence on the issue, Iraq Telecom and the Clients' counsel reached a compromise as to the format of the privilege log.[58] As part of the agreement, Iraq Telecom reserved all rights to raise any objections to the substantive claims or any privilege asserted therein, including Iraq Telecom's right to raise such matters with the Court, if necessary.[59]

---

[52]    *See id.*
[53]    *See id.* at ¶ 11.
[54]    *See id.*
[55]    *See id.* at ¶ 12.
[56]    *See id.*
[57]    *See id.*
[58]    *See id.* at ¶ 13.
[59]    *See id.*

On October 20, 2020, counsel for the Clients produced the Log, which included 467 logged documents (the "**Logged Documents**") relating to both UK Properties. The Log applies "legal professional privilege" and/or "attorney client privilege" to almost each Logged Document.[60] *Incredibly, there were only two documents for which Mr. Youssef was a direct recipient and only a single document for which Mr. Succar was a direct recipient.*[61] In light of this and the other facts and circumstances surrounding the Log, Iraq Telecom unsurprisingly had significant concerns regarding the documents withheld.  On October 27, 2020, Iraq Telecom sent a letter to Dechert and the Clients' counsel to raise certain threshold questions and deficiencies surrounding the Log and to get a better understanding of their position on the Log.[62] On October 28, 2020, Dechert represented that it was not involved in the creation of the Log and did not intend to comment on it.[63] On November 4, 2020, counsel for the Clients briefly responded to Iraq Telecom's letter; however, they failed to sufficiently address even the threshold issues raised.[64] Realizing that further correspondence would be futile, and seeking to avoid yet further delay, Iraq Telecom requested from the Court a briefing schedule for this motion to compel.[65]

## ARGUMENT

As set forth below, there are multiple independent reasons why the privilege cannot hold. But lest the depth of this brief be misinterpreted, it bears noting that the ultimate answer is plain. Where, as here, there is virtually no client involvement, and the content of the communications

---

[60]     *See id*. at Ex. 1.  Log Numbers 191 and 330 do not specify the basis for privilege, and Log Number 402 asserts "attorney mental impressions/work product" in addition to legal professional privilege and attorney client privilege.

[61]     *See id*.  at Ex. 1, Log Nos. 227, 284, and 110; Ex. 2 (documents listed under Category A for the Clients).

[62]     *See id*. at ¶ 15.

[63]     *See id*. at ¶ 16.

[64]     *See id*. at ¶ 17.

[65]     *See id*.

connotes real estate business advice, rather than legal advice—the privilege claims simply cannot stand.

## I.    LEGAL FRAMEWORK

### A.    A Choice of Law Analysis is Unnecessary Because There Is No Conflict Between the Relevant Privilege Laws of the United States and England

When a privilege dispute involves foreign attorney-client communications, federal courts generally apply the touch base choice-of-law test. *See Tulip Computers Int'l, B.V. v. Dell Computer Corp.*, 210 F.R.D. 100, 104 (D. Del. 2002), *aff'd and adopted sub nom. Tulip Computer Int'l B.V. v. Dell Computer Corp.*, No. CIV.A. 00-981-KAJ, 2003 WL 24046752 (D. Del. Feb. 10, 2003). "Under this test, communications that relate to activity in a foreign country are governed by that country's privilege law, while communications that "touch base" with the United States are controlled by United States privilege law." *Id*.; *see also Mangouras v. Squire Patton Boggs*, No. 17-3633, 2020 WL 6554050, at *8 (2d Cir. Nov. 9, 2020) (explaining that the "touch base" test is the applicable choice-of-law test for questions of privilege in the Section 1782 context); *In re financialright GmbH*, No. 17-MC-105 (DAB), 2017 WL 2879696, at *3 (S.D.N.Y. June 22, 2017) (applying the "touch base" choice of law analysis in a Section 1782 proceeding).

Typically, a court will "apply the law of the country that has the predominant or the most direct and compelling interest in whether [the] communications should remain confidential, unless that foreign law is contrary to the public policy of this forum." *Anwar v. Fairfield Greenwich Ltd.*, 982 F. Supp. 2d 260, 264 (S.D.N.Y. 2013) (quoting *Astra Aktiebolag v. Andrx Pharms., Inc.,* 208 F.R.D. 92, 98 (S.D.N.Y. 2002)). However, where there is no conflict between the laws of the different jurisdictions or the court would reach the same result applying the law of either jurisdiction, a court need not make a determination as to which law governs. *See*, *e.g.*, *id*. (affirming magistrate judge's order that concluded there was no need to resolve the question of

16

which jurisdiction's law applies "because the same result obtains whether the communications 'touch base' [in the United States] or in the Netherlands.").

Here, England likely has the predominant and compelling interest in whether the communications in the Log should remain confidential because the Dechert attorneys involved were primarily English attorneys and the legal representation related to real estate transactions in England. Nevertheless, this Court need not make a choice-of-law determination because, as detailed herein, the Court would reach the same conclusion applying either jurisdiction's law. Indeed, virtually all of the Logged Documents are plainly not privileged under U.S. law or English law.

## B.     Applicable Privilege Standard

Under U.S. law, because the jurisdictional basis for this proceeding rests on a federal statute, 28 U.S.C. § 1782(a), federal common law governs any assertions of privilege. *See Midwest Athletics & Sports All. LLC v. Ricoh USA, Inc.*, 2020 WL 5554361, at *2 (E.D. Pa. Sept. 16, 2020) ("Because this case arises under federal law, federal common law of privilege applies.") (citing Fed. R. Evid. 501); *see also In re Veiga*, 746 F. Supp. 2d 27, 32 (D.D.C. 2010) (applying federal privilege law in Section 1782 proceeding); *In re Application of Christensen,* No. M19-138 (JFK), 2006 WL 278169, at *1 (S.D.N.Y. Feb. 3, 2006) (same); *In re Federation Internationale de Basketball,* 117 F. Supp. 2d 403, 407 (S.D.N.Y. 2000) (same).

The Third Circuit has defined the attorney-client privilege as follows:

> [t]he traditional elements of the attorney client privilege that identify communications that may be protected from disclosure in discovery are: (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar of a court, or his or her subordinate, and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion of law or (ii) legal

17

> services or (iii) assistance in some legal proceeding, and (d) not for
> the purpose of committing a crime or tort; and (4) the privilege has
> been (a) claimed and (b) not waived by the client.

*Sullivan v. Warminster Twp.*, 274 F.R.D. 147, 150 (E.D. Pa. 2011) (quoting *Rhone–Poulenc Rorer Inc. v. Home Indem. Co.*, 32 F.3d 851, 862 (3d Cir. 1994)). English law employs a similar privilege standard. *See* Supplemental Declaration of Matthew Bunting Declaration ("**Supp. Bunting Decl.**"), annexed hereto as **Appendix C**, at ¶ 6.

Importantly, under both U.S. law and English law, the party asserting attorney-client privilege as a basis to withhold documents bears the burden of establishing the privilege. *In re Grand Jury*, 705 F.3d 133, 160 (3d Cir. 2012); Supp. Bunting Decl. at ¶ 7. The Third Circuit has explained that "because the privilege obstructs the search for the truth and because its benefits are, at best, 'indirect and speculative,' it must be 'strictly confined within the narrowest possible limits consistent with the logic of its principle.'" *In re Grand Jury Investigation*, 599 F.2d 1224, 1235 (3d Cir. 1979) (quoting 8 *Wigmore on Evidence* § 2291, at 554 (McNaughton rev. 1961)).

## II.   DECHERT AND THE CLIENTS HAVE NOT AND CANNOT CARRY THEIR BURDEN TO ESTABLISH PRIVILEGE AS TO VIRTUALLY ANY OF THE LOGGED DOCUMENTS

### A.   Almost None of the Logged Documents Involve the Clients, but Rather Third-Parties

#### 1.   Privilege Does Not Attach to the Logged Documents Between Non-Client Third-Parties and Dechert

Dechert and the Clients have failed to demonstrate that privilege attaches to the majority of the Logged Documents because almost none of the Logged Documents involve communications between the Clients and Dechert and privilege does not attach to the communications between Dechert and non-client third parties. The purpose of attorney-client privilege is to "encourage full and frank communication between attorneys and their **clients**." *Upjohn Co. v. U.S.,* 449 U.S. 383,

389 (1981) (emphasis added). Accordingly, privilege only attaches to communications between attorneys and third-party non-clients where the "party is the client's agent or possesses 'a commonality of interest with the client.'" *SmithKline Beecham Corp. v. Apotex Corp.*, 232 F.R.D. 467, 476–77 (E.D. Pa. 2005) (quoting *In re Grand Jury Investigation*, 918 F.2d 374, 386 n. 20 (3d Cir. 1990)); *see* Supp. Bunting Decl. at ¶ 8. While the analysis relating to whether privilege attaches to communications with agents is different under U.S. law and English law, the Court will reach the same result applying either analysis.

Under U.S. law, in order for privilege to attach to communications with a third-party, the party asserting privilege must demonstrate that the third-party disclosure was "necessary for the client to obtain informed legal advice," *see Westinghouse Elec. Corp. v. Republic of Philippines*, 951 F.2d 1414, 1423 (3d Cir. 1991), and that agent was a "necessary intermediary." *Advanced Tech. Assocs., Inc. v. Herley Indus., Inc.*, No. CIV.A. 96-0132, 1996 WL 711018, at *5 (E.D. Pa. Dec. 5, 1996). "[F]or a third-party disclosure to be necessary to obtain legal advice, it must be a ***virtually indispensable*** circumstance or condition related to obtaining such assistance or advice." *See Advanced Tech. Assocs.*, 1996 WL 711018, at *8 (emphasis added); *see In re Berks Behavioral Health LLC*, 500 B.R. 711, 719 (Bankr. E.D. Pa. 2013) (agent must be "reasonably necessary to facilitate the client's communication with a lawyer or another privileged person") (internal quotations and citations omitted); *Quagliarello v. Dewees*, 802 F. Supp. 2d 620, 633 (E.D. Pa. 2011) (conversations in the presence of the client's parents were protected by attorney-client privilege because they "facilitated [p]laintiff's obtaining legal counsel on the day of her arrest."); *Giovan v. St. Thomas Diving Club, Inc.*, 37 V.I. 176, 181 (Terr. V.I. June 16, 1997) (explaining that evidence of a purported agent providing "substantial assistance to the plaintiff in his business affairs and in recounting events to counsel regarding said business dealings to enable counsel to

19

provide adequate legal advice to the plaintiff" was not sufficient to support a conclusion that communications with the purported agent were subject to privilege but not making a final determination as to agency).

*Advanced Technology* is instructive. There, the plaintiff corporation argued that a friend and business associate was a "necessary intermediary" whose communications with the plaintiff's president were privileged because the plaintiff's president was unfamiliar with the U.S. legal system, had difficulty with the English language and needed to rely on the purported agent to communicate with attorneys. *See* 1996 WL 711018 at *4. This court found that there was no evidence to show "that absent [the purported agent's] involvement, [the plaintiff's president] would have been either unable or unwilling to obtain legal assistance on behalf of [plaintiff]" and explained that the purported agent's involvement in the matter was "nothing more than a desirable, but ultimately non-essential, convenience." *Id*. at *8. Moreover, the court concluded that the purported agent "had no formal role as agent," and that his "involvement as an intermediary began as informal assistance offered to a personal friend with whom he communicated frequently on unrelated business matters." *Id*.

Under English law, privilege may attach to communications between an attorney and a non-client third-party in limited circumstances where the following requirements are met: (1) the third party is not merely an agent of the lawyer or client in a general sense, but an agent for the purpose of communicating with the other party to give or obtain legal advice; and (2) in that capacity, the agent acts merely as a conduit. *See* Supp. Bunting Decl. at ¶ 8. However, where an agent has ***any*** personal input on the communication, she or he is engaging in independent communication that likely falls outside the scope of privilege. *See id*.

20

Here, only three of the 467 Logged Documents were sent directly to the Clients.[66] The majority of the other Logged Documents are communications with third-parties, including (1) individuals associated with ZR Group, which include (a) Sandy Achkouty, (b) Raymond Rahmeh; (c) Ibrahim Zaouk, and (d) Rita Khater; (2) Riham Rabee; and (3) third-parties involved in the transactions, such as sellers' agents, counsel and surveyors.[67] It is clear that these third-parties are outside of the privilege and that communications among or involving them may not be shielded by privilege. *See In re Chevron Corp.*, 650 F.3d 276, 290 (3d Cir. 2011) (privilege does not attach to communications made in the presence of non-privileged third parties); *Midwest Athletics*, 2020 WL 5554361, at *3 (finding that for most of the documents on the privilege log, "the inclusion of third parties on the correspondence destroys any privilege.").

Implicitly recognizing this fact, Dechert and the Clients attempt to cloak these documents in privilege through the Clients' conclusory assertions that (1) Ms. Achkouty and Mr. Zaouk were "designated agents" of the Clients; and (2) Mr. Rahmeh "participated in confidential communications as part of the attorney-client relationship."[68] Such attempts, which are clearly driven by a desire to conceal further incriminating evidence against Mr. Rahmeh and his comrades, rather than protect privilege, must be rejected. *See, e.g., In re Berks Behavioral Health*, 500 B.R. at 720–21 (rejecting an assertion of privilege over communications that included a purported "agent" because the characterization of the "agent" as such was "motivated by a desire to withhold adverse information and not, as represented, to preserve privilege"). As to Ms. Khater, Mr. Rabee,

---

[66]     In other words, the Clients only appear in the "To" field of the Log in three log entries. *See* Supp. Tahler Decl. at Ex. 1, Log Nos. 227, 284, and 110.

[67]     *See id*. at Ex. 2 (documents listed under Category B).

[68]     *See id.* at Ex. 1, p. 32.

and the sellers' agents, counsel and surveyors, the Clients do not even attempt to provide a justification.

The Clients and Dechert have not even attempted to make the necessary showing to establish these individuals as agents, including (1) how the ZR Group, its cast of employees and the daughter of an Iraqi government official purportedly became "agents" for buying a house in foreign country; (2) why they did so; (3) any qualifications possessed; and (4) of critical importance, why they were necessary. They have not because they cannot. Simply put, these parties were not "virtually indispensable" (under U.S. law), or agents that acted as mere conduits (under English law).

(a)     Sandy Achkouty

While Ms. Achkouty was listed as the designated representative in the Engagement agreements, there has been no showing as to why her involvement was necessary, nor can there be for what was a private individual communicating with attorneys in connection with a residential purchase. *See, e.g., In re Grand Jury Subpoenas Dated Jan. 20, 1998*, 995 F. Supp. 332, 340 (E.D.N.Y. 1998) ("A private person, however, generally has no need for a representative to communicate with an attorney. Only in extraordinary cases . . . has the attorney-client privilege been extended to the designated representative of an individual client.") (internal citation omitted). Based on the documents produced, it is clear that Ms. Achkouty generally acted as a secretary to the Clients, communicating with the sellers' agents, building surveyors and Dechert to collect and exchange non-privileged documents and information for the real estate transactions.[69] However, even if Ms. Achkouty had an understanding of the Clients' business affairs and was communicating that information to attorneys (or others), that would still be insufficient to establish

---

[69]     *See* Supp. Raedas Decl. at ¶¶ 21, 39.

that she, as a third-party to the transaction, was an indispensable agent. *See, e.g.*, *Giovan*, 37 V.I. at 181; *see generally Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 319 F.R.D. 100, 105 (S.D.N.Y. 2017) (noting that many documents and communications relating to real estate transactions were business related and not related to legal advice). That Dechert does not appear to have run a conflicts check on Ms. Achkouty as a related party further establishes that she was not a necessary intermediary to the engagement.[70] Accordingly, because Dechert and the Clients have failed to establish that Ms. Achkouty was a necessary intermediary, the communications with Ms. Achkouty are not privileged and must be produced.

Similarly, under English law, the Clients have not and cannot demonstrate that Ms. Achkouty was an agent for the purpose of communicating with Dechert to obtain *legal* advice or acting as a mere conduit for the Clients. Ms. Achkouty was generally involved in routine business communications associated with the real estate transaction. As detailed *infra* in Section II.B, it is implausible that she was obtaining *legal* advice as opposed to *business* advice from Dechert. As such, the Clients have failed to meet the first prong of the English law standard. *See* Supp. Bunting Decl. at ¶ 8. Moreover, the Clients have failed to meet the second prong—demonstrating that she was acting as a mere conduit or simply passing along requests for legal advice from the Clients to Dechert. *See id.*

(b)    Other ZR Group Personnel

Dechert and the Clients also fail to show that the other individuals associated with the ZR Group, Mr. Zaouk, Mr. Rahmeh and Ms. Khater (collectively, the "**ZR Group Personnel**"), were necessary intermediaries (under U.S. law) or that they were mere conduits for communicating about legal advice (under English law). At most, the Clients will be able to establish that the ZR

---

[70]    *See id.* at ¶¶ 18, 36.

23

Group Personnel were business associates of the Clients.  It is clear, however, that privilege does not extend to business associates whom clients include on conversations with attorneys merely for "non-essential [ ] convenience." *See Advanced Tech. Assocs.,* 1996 WL 711018 at *8.

With respect to Mr. Zaouk, the owner and CEO of ZR Energy DMCC, it strains all credulity that a CEO of a global energy company would be necessary for the facilitation of legal advice to an individual buying a residential real estate property or used as a conduit to obtain legal advice. With respect to Mr. Rahmeh, the Clients do not even go so far as to suggest he was an agent, but instead state he just "participated in confidential communications as part of the attorney-client relationship."[71] That is not how privilege works. *SmithKline*, 232 F.R.D. at 476–77; *see* Supp. Bunting Decl. at ¶¶ 6-7. Indeed, communications with third parties cannot be concealed simply by stating that these third parties "participated" in communications. Without meeting this high bar of necessity under U.S. law or agency under English law, privilege may not stand, irrespective of how desperately one may wish for the communications not to see the day of light. Similarly, with respect to Ms. Khater, who Iraq Telecom understands was formerly an assistant for ZR Group, the Clients do not and cannot set forth *any* justification for why communications with her are privileged.

Accordingly, all documents involving Mr. Zaouk, Mr. Rahmeh and Ms. Khater must be produced.[72]

(c)     Riham Rabee

The Clients and Dechert assert that communications that include Riham Rabee, the daughter of Dr. Rabee, are privileged. Not so. Indeed, there is no justifiable basis to withhold

---

[71]     *See* Supp. Tahler Decl. at Ex. 1, p. 32.

[72]     *See id.* at Ex. 2 (documents listed under Category B for Ibrahim Zaouk, Raymond Rahmeh and Rita Khater).

communications involving Ms. Rabee, which is revealed by the failure to even offer *any explanation* for why communications with Ms. Rabee, the daughter of the government official, could possibly be privileged. *See, e.g., Midwest Athletics*, 2020 WL 5554361, at *4 (rejecting the assertion of privilege for documents disclosed to employees of certain entities where the privilege log "offer[ed] no explanation about what role any of them served, who hired them, or why disclosure to them preserved the privilege"). Accordingly, all documents involving Ms. Rabee are plainly not privileged and must be produced.[73]

(d)      Other Third-Parties

The Clients also assert privilege over communications including (1) Nicholas Hapgood and Matthew Darlington of Hamptons International, the seller's agents for the Higher Drive Property; (2) David Graham and Bruce Spenser of Spenser Associates, surveyors for the Barn Hill Property; (3) Rachel Turner, seller's counsel for the Barn Hill Property; (4) Richard Chesterman of Grey & Co., Mr. Youssef's real estate agent; and (5) Andrew Siefers and his assistant "Liz" of Siefers Harrison Limited Chartered Surveyors, the surveyors of the Higher Drive Property. Here as well, there is no justifiable basis to withhold communications involving these individuals. Agents in a real estate transaction, seller's counsel and surveyors are plainly not privileged persons. *See, e.g.*, *Sec. Inv'r Prot. Corp.*, 319 F.R.D. at 105 (listing the seller and "seller's counsel" as non-privileged third parties to whom "business-oriented communications" were meant to be conveyed). Accordingly, all documents involving these individuals are plainly not privileged and must be produced.[74]

---

[73]      *See id*. (documents listed under Category B for Riham Rabee).

[74]      *See id*. (documents listed under Category B for Nicholas Hapgood, Matthew Darlington, David Graham, Rachel Turner, Richard Chesterman, Andrew Siefers, and "Liz").

2.   The Clients Waived Privilege on Certain Logged Documents by Copying
Third-Parties

If this Court finds that Ms. Achkouty was an agent of the Clients and certain communications between her and Dechert are thus privileged (which Iraq Telecom disputes), the Clients waived privilege over the majority of the Logged Documents involving Ms. Achkouty resulting from copies to other third-parties because "under traditional waiver doctrine a voluntary disclosure to a third party waives the attorney-client privilege even if the third party agrees not to disclose the communications to anyone else." *Westinghouse*, 951 F.2d at 1427; *see In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 361 (3d Cir. 2007) ("[I]f a client subsequently shares a privileged communication with a third party, then it is no longer confidential, and the privilege ceases to protect it."). The Clients have failed to demonstrate why or how there was any legal bar on these third-parties from disclosing these documents; under English law, if challenged, they would need to provide such an explanation in order to shield the documents from production here. *See* Supp. Bunting Decl. at ¶ 9. As such, the Clients waived privilege over any communications where these third-parties are copied.

**B.   Dechert and the Clients Have Failed to Establish that the Logged Documents Provide Legal Advice, as Opposed to Real Estate Business Advice**

Returning to first principals of privilege, it is important to keep in sight that it is not only the participants in the communication that make it privileged. Communications directly between an attorney and her or his client are only privileged if the content and intent of the subject communication meets the legal advice standard. In addition, the communication must be necessary in obtaining legal advice, not business advice. *See In re Niaspan Antitrust Litig.*, No. 13-MD-2460, 2017 WL 3668907, at *1 (E.D. Pa. Aug. 24, 2017) ("[P]rivilege applies only where the communication was made for 'the express purpose of securing legal not business advice.'") (quoting *Fed. Trade Comm'n v. Abbvie, Inc.*, No. CV 14-5151, 2015 WL 8623076, at *10 (E.D.

26

Pa. Dec. 14, 2015)). The same approach applies under English law. *See* Supp. Bunting Decl. at ¶ 6.

Communications and documents relating to a real estate transaction are particularly susceptible of being purely business communications instead of communications relating to legal advice.[75] *See, e.g., Sec. Inv'r Prot. Corp.*, 319 F.R.D. at 105 (describing "documents relating to such routine business issues as the progress of the transaction, the procurement of flood insurance, the escrowing of funds, and the proposed closing date" as "business-oriented communications. . . not intended to be kept confidential" and finding that the documents were not privileged); *In re Grand Jury Subpoena No. 2013R00691-009*, 201 F. Supp. 3d 767, 775 (W.D.N.C. 2016) ("A client communication made for the purpose of effectuating a real estate closing inherently must be made in contemplation of ultimate public disclosure. Therefore, no intention of confidentiality, and thus no privilege, exists.") (citing *United States v. (Under Seal)*, 748 F.2d 871, 875 (4th Cir. 1984)); *In re Grand Jury Subpoena (Mr. S.)*, 662 F.3d at 72 (holding that "facilitating the consummation of a real estate transaction, passing title, and disbursing funds . . . are typically not privileged.").

At bottom, the Log fails to establish, as it must to sustain the privilege objection, that the withheld documents contain legal advice as opposed to business advice rendered by Dechert, which is not subject to attorney-client privilege. Merely incanting the words, "legal advice" will

---

[75]    While communications relating to real estate transactions "may satisfy all of the requirements of the attorney-client privilege," this is the unusual case, and, critically, it is "the responsibility of the individual who asserts the privilege to establish its existence with respect to specific documents." *See In Grand Jury Subpoena (Mr. S.)*, 662 F.3d 65, 72 n.3 (1st Cir. 2011); *see also Lady Liberty Transp. Co. v. Philadelphia Parking Auth.*, No. CIV.05-1322, 2007 WL 707372, at *2 (E.D. Pa. Mar. 1, 2007) (a party asserting attorney-client privilege "bears the burden of proving that [it] applies," and "has the burden of demonstrating . . . that each of [the elements of the privilege] is satisfied." ) (internal citations and quotation marks omitted).  Likewise, under English law the party asserting privilege bears the burden of proving that it exists in respect of each document in issue with particular specificity. *See* Supp. Bunting Decl. at ¶ 7.

not do, particularly where the very nature of Dechert's representation—residential real estate purchases—suggests that communications would have been straightforward and business related, rather than the privileged advising as to complicated transaction nuances. In any case, Dechert and the Clients have failed to adequately describe any purported privilege through descriptions such as "Confidential attorney-client communication regarding 25 Higher Drive property engagement and transaction in connection with providing or obtaining legal advice," which are too vague and not sufficiently detailed to establish that these are indeed privileged communications and not business communications. Accordingly, these documents must be produced. *See, e.g.*, *SmithKline*, 232 F.R.D. at 475 ("Failing [to sufficiently describe the documents being withheld on the basis of privilege], the documents must be produced.").

### C.    The Mere Sending of Non-Privileged Documents to Counsel Does Not Create a Valid Privilege Claim

The Clients improperly assert privilege over plainly non-privileged documents simply because they were forwarded to Dechert "for legal advice." For example, the description for Log Number 132 states:[76]

> Confidential attorney-client communication regarding 25 Higher Drive property engagement and transaction in connection with providing or obtaining legal advice. String includes emails between Andrew Siefers (Siefers Harrison Ltd.) and "Liz" (Mr. Siefers' secretary), including one or more emails on which David Gervais and on one of the emails, Matthew Darlington (Hamptons International), was copied, which were forwarded for legal advice.

This string includes "emails" (plural) between a land surveyor and his secretary with copies going to a real estate agent, "one or more" of which was simply copied to a Dechert attorney. And yet, the Clients assert that the entire email string is privileged. Specifically, the Clients claim that because email chains like this—many with numerous underlying emails—were ultimately sent to

---

[76]    *See* Supp. Tahler Decl. at Ex. 1.

Dechert, every email component in that chain is entitled, *ipso facto*, to privilege protection. Even putting aside that no client is anywhere to be found on this chain or virtually any of the other email chains in issue, the law does not support their assertion. Notably the Third Circuit, in reviewing privilege with respect to an email chain has looked at **each link** in the chain and made independent privilege determinations separately as to each. *See In re Grand Jury*, 705 F.3d at 160 ("The second email in the chain contains the only communication that is arguably privileged . . .").

Under both U.S. law and English law, "[p]re-existing, non-privileged documents do not become privileged merely because they were later sent to an attorney." *Fed. Trade Comm'n v. Abbvie Inc.*, No. CV 14-5151, 2016 WL 4478803, at *3 (E.D. Pa. Aug. 25, 2016); *SmithKline,* 232 F.R.D. at 478 ("In general, attorney-client privilege does not shield documents merely because they were transferred to or routed through an attorney.") (quoting *Resolution Tr. Corp. v. Diamond*, 773 F. Supp. 597, 600 (S.D.N.Y. 1991)); *Roberts Tech. Grp., Inc. v. Curwood, Inc.*, No. CIV.A. 14-5677, 2015 WL 4503547, at *2 (E.D. Pa. July 20, 2015) ("Not all data sent to counsel to inform legal advice is privileged. . . . Instead, the privilege must be asserted on a document by document basis. The communication must be confidential and with the goal of furthering counsel's provision of legal advice."); Supp. Bunting Decl. at ¶ 10. Importantly, "[t]o the extent that purely factual material can be extracted from privileged documents without divulging privileged communications, such information is obtainable. Only communications made for the express purpose of obtaining or giving legal advice are protected." *Andritz Sprout-Bauer, Inc. v. Beazer E., Inc.*, 174 F.R.D. 609, 633 (M.D. Pa. 1997).[77]

---

[77]     During pre-motion communications, the Clients previously cited *Rhoads Indus., Inc. v. Bldg. Materials Corp. of Am.*, 254 F.R.D. 238, 241 (E.D. Pa. 2008) to support their proposition that the whole chain is a single document and can be privileged if eventually sent to a lawyer. But *Rhoades* does not hold that. While the case does note that "[a] situation **may** arise where a number

Accordingly, for this reason as well, Dechert must produce the non-privileged documents and communications forwarded to Dechert.[78]

## III.   BECAUSE THE CLIENTS USED THEIR ATTORNEY-CLIENT RELATIONSHIP WITH DECHERT TO ADVANCE A FRAUD, THE CRIME-FRAUD EXCEPTION APPLIES

Under both U.S. law and English law, the attorney-client privilege does not apply if the attorney-client relationship or privileges are being used in furtherance of a crime or fraud. *See In re Grand Jury Subpoena*, 745 F.3d 681, 691 (3d Cir. 2014); *Inigo v. Giordano*, 925 F.2d 641, 656 (3d Cir. 1991) ("[W]hen the legal consultation is in furtherance of a crime or fraud, the statements exchanged will not be protected."); Supp. Bunting Decl. at ¶ 11; *see also Kiobel v. Royal Dutch Petroleum Co.*, No. 02CIV7618(KMW)(HBP), 2005 WL 1925656, at *5 (S.D.N.Y. Aug. 11, 2005) ("English law does recognize the so-called 'crime-fraud' exception to the privilege [and] both

---

of email messages, by themselves not privileged, but eventually sent to an attorney for the purpose of securing legal advice, become privileged," the holding of the case is limited to which documents need to be logged. 254 F.R.D at 241 (emphasis added). *Rhoades* does not support a blanket assertion of privilege over all email chains forwarded by a client to an attorney. Rather, the case expressly rejects any "broad, black-letter rule." *Id.*

Moreover, the proposition that email chains should be treated as a single document has been rejected by many courts. *See, e.g.*, *United States v. Davita, Inc.*, 301 F.R.D. 676, 685 (N.D. Ga. 2014), *on reconsideration in part,* No. 1:07-CV-2509-CAP-JSA, 2014 WL 11531065 (N.D. Ga. May 21, 2014) ("A string of emails, after all, is not just a single communication."); *Thompson v. Chertoff*, No. 3:06-CV-004-RLM, 2007 WL 4125770, at *2 (N.D. Ind. Nov. 15, 2007) ("Email strands can span over several days, and they may have many different recipients and authors. Finally, some emails in which counsel are involved may contain factual information, which is not protected by the privilege, while others are exclusively legal advice. . . .  Consequently, each individual email in a string must be analyzed separately."); *In re Universal Serv. Fund Tel. Billing Practices Litig.*, 232 F.R.D. 669, 672 (D. Kan. 2005) (rejecting the argument that an email chain is "akin to minutes of a meeting or a transcript of a conversation and, therefore, the individual e-mails within a strand should not be separated from one another when evaluating a privilege claim").

[78]   *See* Supp. Tahler Decl. at Ex. 2 (documents listed under Category C).

English law and American law place the burden of establishing the exception on the party asserting it.") (internal citation omitted).

Under U.S. federal law, to establish that the crime-fraud exception to the attorney-client and attorney work product privileges applies, the party opposing privilege must demonstrate that there is "a reasonable basis to suspect (1) that the privilege holder was committing or intending to commit a crime or fraud, and (2) that the attorney-client communications or attorney work product was used in furtherance of that alleged crime or fraud.'" *United States v. Hallinan*, 290 F. Supp. 3d 355, 364 (E.D. Pa. 2017), *aff'd sub nom. United States v. Neff*, 787 F. App'x 81 (3d Cir. 2019) (quoting *In re Grand Jury*, 705 F.3d at 155); *In re Grand Jury Subpoena*, 745 F.3d at 691. Under the reasonable basis standard,[79] "neither speculation nor evidence that shows only a distant likelihood of corruption is enough." *Hallinan*, 290 F. Supp. 3d at 364 (quoting *In re Grand Jury Subpoena*, 705 F.3d at 153). To satisfy its burden of proof to show that the crime-fraud exception applies, a party "is not required to introduce evidence sufficient to support a verdict of crime or fraud or even to show that it is more likely than not that the crime or fraud occurred," but instead, must make a "prima facie showing that there is 'some foundation in fact' for the applicability of

---

[79] Under English law the evidentiary burden to establish the application of the crime-fraud exception is different than in the United States. *See* Supp. Bunting Decl. at ¶ 11. This is of no moment here, however, as U.S. federal law governs the procedure by which the Court adjudicates privilege claims and as such, the "reasonable basis standard" applies here. *See, e.g., Kiobel*, 2005 WL 1925656, at *3 ("Although the parties agree that the substantive law of either Nigeria or England applies to this motion, the 'procedure by which the court would adjudicate privilege claims-including the allocation of the burden of production to the proponent of the privilege and the means by which that burden must be discharged-are governed by federal law' of the United States.") (quoting *Koehler v. Bank of Bermuda, Ltd.*, M18-302, 931745(MHD), 2003 WL 289640 at *10 n. 12 (S.D.N.Y. Feb. 11, 2003)); *see also Aerojet Rocketdyne, Inc. v. Glob. Aerospace, Inc.*, No. 2:17-CV-01515 KJM AC, 2019 WL 1178635, at *2 (E.D. Cal. Mar. 13, 2019), *reconsideration denied in part*, No. 2:17-CV-01515-KJM-AC, 2019 WL 4640513 (E.D. Cal. Sept. 24, 2019) ("Although the law of the forum state governs the substantive issue of attorney-client privilege in diversity cases, federal law governs procedure. . . The use of in camera review to determine whether attorney-client privilege is properly claimed is a procedural matter.").

the crime fraud exception." *See id*. (quoting *In re Grand Jury Subpoena*, 705 F.3d at 151–52)."A party meets this burden through the 'presentation of evidence which, if believed by the fact-finder, would be sufficient to support a finding that the elements of the crime-fraud exception were met.'" *Id.* (quoting *In re Grand Jury Subpoena*, 705 F.3d at 152).

In order to determine whether the crime-fraud exception applies to particular documents, a court may conduct an *in camera* hearing (i.e., a "*Zolin* hearing"). *Id*. at 365. To obtain an *in camera* hearing, the party seeking disclosure must first demonstrate "a factual basis adequate to support a good faith belief by a reasonable person . . . that *in camera* review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies." *United States v. Zolin*, 491 U.S. 554, 572 (1989) (internal citation omitted). Once the party makes that showing, the court may exercise its sound discretion to engage in *in camera* review. *Id*.

The facts and circumstances here are sufficient to support a finding that the crime-fraud exception applies under U.S. law and that the Logged Documents should be produced, or at the very least, that the Court should engage in *in camera* review of the Logged Documents.

### A.   There is Reasonable Basis to Believe the Clients Committed or Intended to Commit a Crime or Fraud

Under U.S. law, there is a reasonable basis to believe the Clients committed a crime or attempted to commit a crime by participating in a conspiracy, along with Mr. Rahmeh and others, to bribe Iraqi government officials. Specifically, and as described *supra* in Section I, there is significant evidence that the Clients served as nominee purchasers for the UK Properties intended as bribes for two Iraqi government officials.

Indeed, Iraq Telecom has uncovered evidence that the Clients ***never*** even lived in the UK Properties, but instead, the Iraqi government officials did. Moreover, the fact that Mr. Rahmeh, a notorious businessman implicated in a slew of corruption scandals, and three other ZR Group

personnel appear on communications relating to the real estate transactions further supports that this was a conspiracy, and not an ordinary real estate transaction.

Perhaps most telling, however, is the claims of privilege over documents involving Ms. Rabee, the daughter of Dr. Rabee. The *only* reasonable explanation for Ms. Rabee's involvement in a purchase of a personal home by Mr. Succar is that she and her family were the intended owners and/or occupiers of the home, not Mr. Succar. This is particularly the case given the absence of any evidence reflecting that Mr. Succar knew the Rabee family, let alone that there was a relationship that would warrant Ms. Rabee's participation in the purported legal advice.

At the very least, under U.S. law, there is a reasonable basis to believe that the Clients defrauded the respective sellers of the UK Properties by representing to the sellers that they were the only buyers, when in actuality, they purchased the properties for undisclosed third-parties— the Iraqi government officials. *See, e.g.*, *Sec. Inv'r Prot. Corp.*, 319 F.R.D. at 108–10 (applying crime-fraud exception to attorney-client privilege to any communications between law firm and its two clients concerning their efforts to restructure their house purchase so as to remove from title that client who was alleged to have committed a fraud on creditors of brokerage firm).

### B.     The Clients Used Dechert's Services in Furtherance of Their Crimes

It is indisputable that the Clients sought Dechert's services to purchase the UK Properties and that Dechert facilitated the UK Properties transactions.[80] The Clients apparently represented

---

[80]     Iraq Telecom does not assert, at this juncture, that Dechert was a knowing participant in the Clients' fraud. But knowledge by attorneys of the fraud is not necessary for the crime fraud exception to apply.  *See United States v. Doe*, 429 F.3d 450, 454 (3d Cir. 2005).  Instead, "the ***client's*** intention controls and the privilege may be denied even if the lawyer is altogether innocent." *Id.* at 454 (quoting *In re Grand Jury Proceedings*, 604 F.2d 798, 802 (3d Cir. 1979)) (emphasis added); *see also In re Neurontin Antitrust Litig.*, 801 F. Supp. 2d 304, 311 n.14 (D.N.J. 2011) (noting that while there had been "[n]o allegation . . . that the attorneys who made the representations at issue were aware that those representations were false[,] the crime-fraud exception applies even when an attorney is unaware that the client is engaged in or planning a

to Dechert that they were the true buyers and intended beneficial owners of the properties. Dechert then acted as the Clients' mouthpiece when communicating with the sellers' agents and counsel, including when Dechert communicated to third-parties (albeit unknowingly) the false identity of the buyers. As such, there is a reasonable basis, under U.S. law, to believe that the Clients used Dechert's services in furtherance of their fraudulent conduct. *See, e.g., Hallinan*, 290 F. Supp. 3d at 365–67 (finding a client's false representation to his attorney to secure legal advice served as a reasonable basis to believe the client used the attorney's advice in furtherance of his fraud).

Accordingly, Iraq Telecom has met its burden that the crime-fraud exception applies, and Dechert should be ordered to produce all of the Logged Documents. At the very least, Iraq Telecom has established a factual basis to support an *in camera* review of the Logged Documents. *See Zolin*, 491 U.S. at 572. Indeed, the majority of the Logged Documents involve third-parties such as Mr. Rahmeh, who has intricate relationships with the Iraqi Shareholders and government officials and has been implicated in a number of fraud and bribery scandals,[81] and other ZR Group Personnel, and therefore, the examination of these documents will likely further reveal additional evidence of the underlying conspiracy to bribe government officials as a larger conspiracy to defraud Iraq Telecom.

---

crime.") (quotation and citation omitted); *In re Grand Jury*, 705 F.3d at 157 ("For the crime-fraud exception to apply, the attorney does not have to be implicated in the crime or fraud or even have knowledge of the alleged criminal or fraudulent scheme[,] [a]ll that is necessary is that the client misuse or intend to misuse the attorney's advice in furtherance of an improper purpose.") (internal citation omitted).

[81]     *See supra* n. 4.

## <u>CONCLUSION</u>

Based on the foregoing, Iraq Telecom respectfully requests the Court to issue an Order compelling Dechert to produce all of the Logged Documents, or in the alternative, an *in camera* inspection of the Logged Documents.

Dated:    November 24, 2020

By: _____
SKARZYNSKI MARICK & BLACK, LLP

James Sandnes
PA Bar Number:  41721
One Battery Park Plaza
New York, New York, 10004
(212) 820-7700
*jsandnes@skarzynski.com*

-and –

QUINN EMANUEL URQUHART &
SULLIVAN, LLP

Kristin N. Tahler (*admitted pro hac vice*)
Lauren H. Dickie (*admitted pro hac vice*)
865 S Figueroa St., 10th Floor
Los Angeles, CA 90017
(213) 443-3000

*Counsel for Applicant, Iraq Telecom Limited*