# APPENDIX B

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE:<br><br>EX PARTE APPLICATION OF IRAQ TELECOM LIMITED FOR AN ORDER TO OBTAIN DISCOVERY FOR USE IN FOREIGN PROCEEDINGS PURSUANT TO 28 U.S.C. § 1782 | MISCELLANEOUS ACTION<br><br>Case No. 19-175 |

### SUPPLEMENTAL DECLARATION OF NICHOLAS BORTMAN

Pursuant to 28 U.S.C. § 1746, I, Nicholas Bortman, declare under penalty of perjury as follows:

1. I am the same Nicholas Bortman who submitted a declaration on October 30, 2019 ("**First Raedas Declaration**") (ECF 1-7), in support of the *ex parte* application submitted by Iraq Telecom Limited ("**Iraq Telecom**"), a joint venture between Agility Public Warehousing Company KSCP ("**Agility**") and Orange S.A., for an order to obtain discovery for use in foreign proceedings pursuant to 28 U.S.C. § 1782 from Dechert LLP ("**Dechert**") in the Eastern District of Pennsylvania (the "**Application**") (ECF 1-1).

2. As noted in the First Raedas Declaration, I am a director of Raedas Consulting Limited ("**Raedas**"), a London-based investigations firm, and conducted investigations on behalf of Agility relating to legal matters involving (i) Korek Telecom Company LLC ("**Korek**"); (ii) Mr. Sirwan Saber Mustafa Barzani ("**Mr. Barzani**"), the statutory manager of Korek (a specific legal position under Iraqi law); and (iii) Mr. Raymond Samir Zina Rahmeh ("**Mr. Rahmeh**"), a close associate of Mr. Barzani.

3. I submit this supplemental declaration in support of Iraq Telecom's motion to compel the production of documents withheld on the basis of privilege by Dechert (the "**Motion**").

4. Specifically, I understand that Iraq Telecom seeks the production of certain documents withheld by Dechert and its former clients, Pierre Gergi Boutros Youssef ("**Mr. Youssef**") and Mansour Farid Succar ("**Mr. Succar**", together with Mr. Youssef, the "**Clients**"), and logged in a privilege log produced by counsel for the Clients (the "**Log**"), attached as Exhibit 1 to the Certification and Supplemental Declaration of Kristin N. Tahler ("**Supp. Tahler Declaration**"), on the basis of privilege.

5. This declaration supplements and further supports Raedas's findings described in the First Raedas Declaration relating to (i) significant evidence that two residential properties in the United Kingdom (the "**UK Properties**") were purchased for certain Iraqi government officials in exchange for their adverse actions against Iraq Telecom to the benefit or Mr. Barzani and other shareholders of Korek (the "**Iraqi Shareholders**"); and (ii) the parties involved the purchases, including Messrs. Rahmeh, Youssef, Succar, certain Iraqi government officials, and Dechert. The evidence set forth below is based both on the documents produced to Iraq Telecom by Dechert and the Client's counsel to date ("**Dechert Production**"), the Log, and Raedas' investigation, which I previously described and which is continuing.[1]

6. I am familiar with the information set forth in this declaration either from personal knowledge, witness interviews or on the basis of documents I have prepared and/or reviewed. Because I submit this declaration specifically in support of the Motion, it does not contain each and every fact within my knowledge regarding the topics discussed herein.[2]

---

[1] *See generally* First Raedas Decl. at ¶ 14.

[2] I also certify that the exhibits attached hereto are true and correct copies of the original documents. The documents cited that begin with the bates number "ITL" are documents from the Dechert Production. The translations provided are courtesy and have not been certified.

2

**I.   OVERVIEW**

7.     As described herein, the Dechert Production and the Log further confirmed the significant involvement of Mr. Rahmeh – Mr. Barzani's close associate – in the purchases of the UK Properties, through nominee buyers and with the assistance of Dechert.

8.     Mr. Rahmeh's alleged conduct extends much beyond Korek, and includes allegations of: (1) the theft of Iraqi state funds in connection with a contract between a US defense contractor and the Iraqi Ministry of Defense;[3] (2) collusion with Iraqi defense ministry officials;[4] and (3) the supply of defective fuel by ZR Energy (a ZR Group Holding SAL ("**ZR Group**") company) to Lebanon's state electricity company during severe energy shortages, which involved alleged bribery of the "independent" agency that tested the fuel.[5]

**II.   BARN HILL PROPERTY**

  **A.  Overview**

9.     As described herein, the Dechert Production confirmed that Mr. Youssef was a nominee purchaser of a London property located at 59 Barn Hill, Wembley, London HA9 9LL (the "**Barn Hill Property**") and that he purchased the property, wholly in cash, on September 24, 2014 for £830,000.[6]

10.    Moreover, the Dechert Production supports the allegation that not only that the Barn Hill Property was for Dr. Ali Nasser Alwan Al-Khwildi ("**Dr. Al-Khwildi**"), the Director General of the Iraqi Communications and Media Commission ("**CMC**") and former President of the

---

[3]   *See* First Raedas Decl. at ¶ 14.

[4]   *See id*.

[5]   *See* Ex. 1, ZR Group Corporate Profile (April 12, 2012) at 8, 26 (identifying ZR Energy SAL Holding, ZR Energy SAL Offshore and ZR Energy DMCC as group companies); Ex. 2, Agence France Presse, Lebanon Charges Dozens Including Officials Over Tainted Fuel (July 10, 2020).

[6]   *See* First Raedas Decl. at ¶ 29 (describing the purchase of the Barn Hill Property).

3

CMC's Council of Trustees, but that the property was a bribe payment in exchange for taking actions adverse to Iraq Telecom.

11.     As detailed in the Application and the First Raedas Declaration, on July 2, 2014, the CMC issued an order ("**CMC Order**") that ultimately led to the loss of Iraq Telecom's investment of hundreds of millions of dollars in Korek.[7]  The CMC's actions also prevented Iraq Telecom from taking majority control of Korek by exercising its call option ("**Call Option**"), further damaging Iraq Telecom.[8]

12.     On or around August 12, 2014, Mr. Rahmeh contacted Camille Abousleiman ("**Mr. Abousleiman**"), formerly chairman and partner of Dechert's London office and currently Of Counsel and close and long-time adviser to Mr. Rahmeh and the Iraqi Shareholders,[9] regarding the Barn Hill Property transaction.[10]

13.     It appears that Mr. Youssef was not involved in the initial communications with Dechert.[11]  Instead, initial communications were among Dechert, Mr. Rahmeh and Sandy Achkouty ("**Ms. Achkouty**"), the office administrator of ZR Group[12]—which is Mr. Rahmeh's company.[13]  Throughout the course of the transaction, it appears that Mr. Rahmeh participated in communications with Dechert regarding the Barn Hill Property on no fewer than 22 occasions.[14]

---

[7]     *See* Application at 4-5, 14-15; First Raedas Decl. at ¶ 9.

[8]     *See* Application at 3-4, 13-15; First Raedas Decl. at ¶ 9.

[9]     *See* First Raedas Decl. ¶¶ 42-44 (describing Mr. Abousleiman's relationship with Mr. Rahmeh).

[10]    *See* Supp. Tahler Decl., Ex. 1 at Log Nos. 1-3.

[11]    *See* Supp. Tahler Decl., Ex. 1 at Log Nos. 1-3.

[12]    *See* Supp. Tahler Decl., Ex. 1 at p. 32 (describing Ms. Achkouty as "ZR Group Office administrator").

[13]    *See* First Raedas Decl. ¶ 17 (explaining that the ZR Group is owned by Mr. Rahmeh and his immediate family members).

[14]    *See* Supp. Tahler Decl., Ex. 1 & Ex. 2 (documents listed under Category B for Raymond Rahmeh).

4

14. Mr. Youssef, however, was virtually absent throughout the whole transaction. Indeed, Mr. Youssef appears on zero email communications with Dechert.[15]

**B. Dechert's Engagement**

15. Mr. Youssef was named as Dechert's client in the Dechert engagement letter, which was signed by Mr. Abousleiman.[16] Further evidencing Mr. Youssef's role as a nominee, the engagement letter to Mr. Youssef from Dechert cites client number reference 977903, which is understood to be the client number used by Mr. Rahmeh and ZR Group.

16. Dechert's internal records note that "[t]he client is known to Camille Abousleiman."[17] While there is no known relationship between Mr. Abousleiman and Mr. Youssef, as noted *supra*, Mr. Abousleiman had a long-standing relationship with Mr. Rahmeh—who appears to be the driver of the transaction.

17. In addition to Mr. Abousleiman, at least two other Dechert attorneys, David Gervais ("**Mr. Gervais**") and William Fryzer ("**Mr. Fryzer**"), and one paralegal, Lianne Endall ("**Ms. Endall**"), were involved in the matter.[18]

---

[15] Mr. Youssef is not the recipient or sender of any email communications produced in the Dechert Production or listed as a recipient or sender of any email communications on the Log. Only two log entries on the Log (*see* Log Nos. 227 284) are documents for which Mr. Youssef is the direct recipient (i.e., in the "To" field of the Log). Neither are email communications.

[16] *See* Ex. 3, ITLSUB000492, Engagement letter dated September 8, 2014 for Barn Hill Property Transaction between Mr. Youssef and Dechert ("**Barn Hill Property Engagement Letter**").

[17] *See* Ex. 4, ITLSUB000577, Dechert New Matter Number Request form for Barn Hill Property Transaction at 10.

[18] *See* Ex. 3, Barn Hill Property Engagement Letter at 2; *see also* Ex. 4, ITLSUB000577, Dechert New Matter Number Request form for Barn Hill Property Transaction.

5

18. Ms. Achkouty, Mr. Rahmeh's employee, was listed as a representative in the engagement letter.[19] Based on the review of the documents produced, it appears that Dechert did not conduct any conflicts or know-your-client ("**KYC**") checks on Ms. Achkouty.

19. Notably, Mr. Youssef and Ms. Achkouty have no known relationship. Their mutual connection is Mr. Rahmeh and ZR Group.[20] Notwithstanding having no relationship with Ms. Achkouty, Mr. Youssef appointed her to assist him purchase a residential property.[21]

20. Throughout the transaction, Dechert represented to the seller's representatives that the purchaser was Mr. Youssef.[22]

### C. ZR Group Employees and Other Associates of Mr. Rahmeh and the Iraqi Shareholders Were Involved in the Transaction

21. The Dechert Production makes clear that Ms. Achkouty substantively communicated with respect to the routine, business related aspects of the real estate transaction such as providing Dechert with the necessary paperwork, communicating about transfer of funds and coordinating with other third-parties involved in the transaction such as building surveyors.[23]

22. In addition to Mr. Rahmeh and Ms. Achkouty, another individual associated with the ZR Group who was involved in the Barn Hill Property transaction was Rita Khater ("**Ms.**

---

[19] *See* Ex. 3, Barn Hill Property Engagement Letter at 1.

[20] *See* First Raedas Decl. at ¶¶ 17-20 (describing Mr. Youssef's connections to the ZR Group); Supp. Tahler Decl., Ex. 1 at 31 (describing Ms. Achkouty's role as ZR Group Office administrator).

[21] *See* Ex. 3, Barn Hill Property Engagement Letter at 1.

[22] *See e.g.*, Ex. 5, ITLSUB000155, Email correspondence dated September 2, 2014 between Dechert and seller's counsel (Dechert confirming to seller's counsel that the client will be purchasing the property in Mr. Youssef's name).

[23] *See, e.g.*, Ex. 6, ITLSUB000213, Email dated September 8, 2014 from Ms. Achkouty to surveyor copying Dechert (Ms. Achkouty instructing surveyor to proceed with conducting a structural survey "ASAP"); Ex. 7, ITLSUB000276, Email correspondence dated September 9, 2014 between surveyor and Ms. Achkouty, copying Dechert.

6

**Khater**").[24]  Raedas understands that Ms. Khater served as an administrative assistant at the ZR Group from 2011 to 2015.[25]  Mr. Youssef and Ms. Khater have no known relationship.  Like with Ms. Achkouty, their only mutual connection is Mr. Rahmeh and the ZR Group.

23. In addition to the involvement of Mr. Rahmeh and the other ZR Group employees, a number of documents submitted by Mr. Youssef further demonstrate the involvement of Mr. Rahmeh and, by extension, Mr. Barzani.

24. *First*, Mr. Youssef's proof of funds was a single letter from IBL Bank S.A.L. ("**IBL Bank**").[26]  IBL Bank loaned Korek $150 million in 2011 ("**IBL Loan**") at an extraordinarily high interest rate of 13.25%.[27]  Mr. Rahmeh negotiated the terms of that loan on Korek's behalf.  Iraq Telecom obtained evidence indicating that the loan was secretly fully cash collateralized by Mr. Barzani, and that he has for the duration of the loan period been kicked back over 95% of Korek's interest payments to IBL Bank, purportedly as interest on his own collateral.[28]  This caused Iraq Telecom significant harm and Iraq Telecom has commenced an arbitration seeking damages from IBL and others.[29]  The proof of funds letter was submitted by Ghassan Rayes ("**Mr. Rayes**"), Mr.

---

[24]    *See* Supp. Tahler Decl., Ex. 1 at Log Nos. 75-77 & Ex. 2 (documents listed under Category B for Rita Khater).

[25]    *See* Ex. 8, Rita Tony Khater, LinkedIn Profile.

[26]    *See* Ex. 9, ITLSUB002601, Letter dated August 30, 2014 from IBL to Dechert (providing proof of funds for Barn Hill Property transaction).

[27]    *See* Ex. 10, Declaration of Ehab Fekri Aziz Bassilios, Ex. D (IBL Loan Agreement) at §§ 1.1, 2.1, *In re Iraq Telecom Limited*, No. 18-mc-00458-LGS-OTW (S.D.N.Y.), ECF 2-5 and 2-6.

[28]    *See generally* Ex. 11, Declaration of Nicholas Bortman at ¶¶ 8–12, *In re Iraq Telecom Limited*, No. 18-mc-00458-LGS-OTW (S.D.N.Y.), ECF No. 2-7.

[29]    *See generally* Ex. 12, Declaration of Nabil Abdel-Malek, Ex. A. (Request for Arbitration), *In re Iraq Telecom Limited*, No. 18-mc-00458-LGS-OTW (S.D.N.Y.), ECF No. 2-4.

Rahmeh's counterpart in the IBL Loan negotiations.[30] Korek maintains at least one operating account at IBL Bank while Mr. Barzani maintains at least one personal account at the bank.

25. *Second*, Mr. Youssef's identification was authenticated by Mr. Abousleiman's sister's law firm in Beirut, Abousleiman & Partners.[31] Her firm represents IBL Bank in the arbitration referred to above regarding the IBL Loan.

26. *Third*, the property was paid for in cash, and the funds were paid from an account at IBL Bank.[32]

### D. Connection to Dr. Al Khwildi

27. As detailed in the First Raedas Declaration, there is evidence demonstrating that Mr. Youssef never lived at the Barn Hill Property, but rather that it was occupied by Dr. Al Khwildi and his family.[33]

28. According to a receipt from the Dechert Production, on October 13, 2014, Adnan Al Silami ("**Mr. Silami**") collected the keys to the Barn Hill Property from Dechert.[34] Mr. Silami is an associate of Dr. Al Khwildi who has been seen in London alongside Dr. Al Khwildi's aide, Mortaza Nassar.

---

[30] *See* Ex. 9, ITLSUB002601, Letter dated August 30, 2014 from IBL to Dechert (providing proof of funds for Barn Hill Property transaction).

[31] *See* Ex. 13, Real Estate Attestation for Mr. Youssef dated August 27, 2014.

[32] *See* ITLSUB001379, Copy of SWIFT Receipts (demonstrating, among other things, cash transfer from Mr. Youssef's account at IBL Bank to Dechert and Dechert's transfer of Mr. Youssef's funds to the seller's counsel). The SWIFT Code INLELBBE is the SWIFT code for IBL Bank.

[33] *See* First Raedas Decl. at ¶ 30.

[34] *See* Ex. 14, ITLSUB002605, Receipt dated October 13, 2014 (acknowledging Mr. Silami's receipt of keys for the Barn Hill Property).

8

29. Raedas also learned that Dr. Al Khwildi asked an architect who worked on the Barn Hill Property to cite Mr. Silami as the applicant on certain planning documents rather than himself.[35]

## III. HIGHER DRIVE PROPERTY

### A. Overview

30. As detailed herein, the Dechert Production confirmed that Mr. Succar was a nominee purchaser of a London property located at 25 Higher Drive, Banstead, SM7 1PL (the "**Higher Drive Property**") and that he purchased the property, wholly in cash, in November 2016 for £1.5 million.[36]

31. Moreover, the Dechert Production supports the allegation that the Higher Drive Property was for Dr. Safa Aldin Rabee ("**Dr. Rabee**"), the CMC's former Director General (i.e., Chief Executive), as a bribe payment in exchange for taking actions adverse to Iraq Telecom.

32. Two weeks after the Iraqi Shareholders sent the CMC a letter asking the CMC to confirm that Iraq Telecom needed the CMC's approval to exercise the Call Option, Mr. Rahmeh and Ms. Achkouty reached out to Simon Briggs ("**Mr. Briggs**"), formerly a partner of Dechert's London office, regarding the Higher Drive Property.[37] Mr. Briggs previously represented the Iraqi Shareholders and advised Mr. Barzani personally in the negotiation of the IBL Loan.

33. Based on the review of the Dechert Production and the Log, Mr. Succar was not involved in the initial communications with Dechert.[38] Throughout the course of the transaction,

---

[35] *See* Ex. 15, Council Planning Application for the Barn Hill Property dated January 2015.
[36] *See* First Raedas Decl. at ¶ 32.
[37] *See* Supp. Tahler Decl., Ex. 1 at Log Nos. 93-95.
[38] *See id.*

9

it appears that Mr. Rahmeh participated in communications with Dechert regarding the Higher Drive Property on no fewer than 58 occasions.[39]

34. Mr. Succar appears on zero email communications with Dechert.[40]

**B. Dechert's Engagement**

35. Mr. Succar was named as Dechert's client in the Dechert engagement letter, which was signed by Mr. Briggs.[41] In addition to Mr. Briggs, at least 8 other Dechert attorneys, including Mr. Abousleiman, Mr. Fryzer, Mr. Gervais, Daniel Hawthorne, Nikolas Kokkinos, Leroy Bruno, Alexandra Chevalier, and Damien Fenard, and Ms. Endall, were involved in the matter.[42]

36. Ms. Achkouty was listed as an authorized representative.[43] It appears that here as well Dechert did not conduct any conflicts or KYC checks on Ms. Achkouty.

37. Mr. Succar and Ms. Achkouty have no known relationship. Their only mutual connection is Mr. Rahmeh and the ZR Group.[44] Notwithstanding having no relationship with Ms. Achkouty, Mr. Succar purportedly appointed her to assist him purchase a residential property.[45]

---

[39] *See* Supp. Tahler Decl., Ex. 1 & Ex. 2 (documents listed under Category B for Raymond Rahmeh).

[40] Mr. Succar is not the recipient or sender of any email communications produced in the Dechert Production or listed as a recipient or sender of any email communications on the Log. The only document on the Log where Mr. Succar is a direct recipient (i.e., the individual in the "To" field) is a draft formal client letter sent from Dechert to Mr. Succar. *See* Supp. Tahler Decl., Ex. 1 at Log No. 110.

[41] *See* Ex. 16, ITLSUB001531, Engagement letter dated September 27, 2016 for Higher Drive Property Transaction between Mr. Succar and Dechert ("**Higher Drive Property Engagement Letter**").

[42] *See id.*; Supp. Tahler Decl., Ex. 1 at p. 32 (listing Dechert attorneys).

[43] *See* Ex. 16, Higher Drive Property Engagement Letter.

[44] *See* First Raedas Decl. at ¶¶ 22, 24 (describing Mr. Succar's connections to the ZR Group); Supp. Tahler Decl., Ex. 1 at 31 (describing Ms. Achkouty's role as ZR Group Office administrator).

[45] *See* Ex. 16, Higher Drive Property Engagement Letter.

38. Throughout the transaction, Dechert represented to the seller's representatives that the purchaser was Mr. Succar.[46]

### C. ZR Group Employees and Other Associates of Mr. Rahmeh and the Iraqi Shareholders Were Involved in the Transaction

39. Like for the Barn Hill Property transaction, Ms. Achkouty was substantively involved in communications surrounding the routine, business related aspects of the Higher Drive Property transaction such as providing Dechert with the necessary paperwork, communicating about transfer of funds and coordinating with other third-parties involved in the transaction such as building surveyors.[47] On at least one occasion, Ms. Achkouty shipped transaction documents to Dechert in London from the ZR Group's offices in Beirut.[48]

40. In addition to Mr. Rahmeh and Ms. Achkouty, another individual associated with the ZR Group who was involved in the Higher Drive Property transaction was Ibrahim Zaouk ("**Mr. Zaouk**").[49] Mr. Zaouk is a longtime associate of Mr. Rahmeh and has been a director, shareholder and/or manager in ZR Group companies. Mr. Zaouk is the owner of ZR Energy DMCC, an independent energy trading company incorporated in Dubai, Arab Emirate.[50]

41. In the course of Raedas' investigation, no relationship between Mr. Succar and Mr. Zaouk has been identified other than their mutual connection to Mr. Rahmeh and the ZR Group.

---

[46] *See e.g.*, Ex. 17, ITLSUB001825, Email correspondence dated August 31, 2016-September 2, 2016 between Dechert, Matthew Darlington and Nicholas Hapgood, the seller's agents (Dechert confirms that the "purchaser will be Mr. Mansour Succar of Lebanon").

[47] *See, e.g.*, Ex. 18, ITLSUB002117, Email correspondence dated September 8-23, 2016 between Ms. Achkouty, Matthew Darlington, the seller's agent, and Dechert; Ex. 19, ITLSUB000972, Email correspondence dated October 11-13, 2016 between Ms. Achkouty, Dechert, and Andrew Siefers, surveyor.

[48] *See* Ex. 20, ITLSUB001262, DHL shipping confirmation receipt dated November 15, 2016.

[49] *See* Supp. Tahler Decl., Ex. 1 & Ex. 2 (documents listed under Category B for Ibrahim Zaouk).

[50] *See* Ex. 21, ZR Energy DMCC, Website Statement.

11

42. Moreover, a number of documents submitted by Mr. Succar further suggest the involvement of Mr. Rahmeh and Mr. Barzani.

43. *First*, Mr. Succar's proof of funds was a single letter from IBL Bank.[51] The letter was submitted by Mr. Rayes.[52]

44. *Second*, Mr. Rahmeh's personal lawyer, Michel Azar,[53] authenticated Mr. Succar's identification.[54]

45. *Third*, the property was paid for in cash, and the funds were paid from an account at IBL Bank.[55]

**D. Connection to Dr. Rabee**

46. As detailed in the First Raedas Declaration, there is evidence demonstrating that Mr. Succar never lived at the Higher Drive Property, but instead, it was occupied by Dr. Rabee and his family.[56]

47. The Dechert Production and the Log support the allegation that Dr. Rabee's family was involved in the transaction. Specifically, Dr. Rabee's daughter, Riham Rabee ("**Ms. Rabee**"), is copied on communications between the seller's agent, Nicholas Hapgood, and Ms. Achkouty.[57] Ms. Rabee has no known relationship with Mr. Succar or Ms. Achkouty.

---

[51] *See* Ex. 22, ITLSUB002124, Letter dated September 23, 2016 from IBL Bank to Mr. Gervais regarding proof of funds for Higher Drive Property transaction.

[52] *See id.*

[53] *See* First Raedas Decl. at ¶ 28.

[54] *See* ITLSUB000288, Authentication of Mr. Succar's passport dated September 5, 2016 (signed by Mr. Azar).

[55] *See* ITLSUB001379, Copy of SWIFT Receipts (demonstrating, among other things, cash transfer from Mr. Succar's account at IBL Bank to Dechert and Dechert's transfer of Mr. Succar's funds to the seller's counsel). The SWIFT Code INLELBBE is the SWIFT code for IBL.

[56] *See* First Raedas Decl. at ¶¶ 33-34.

[57] *See* Supp. Tahler Decl., Ex. 1 & Ex. 2 (documents listed under Category B for Riham Rabee).

48. Moreover, a draft sale contract identifies Mr. Succar's London address as 50 Quadrangle, W2, an apartment owned by Ms. Rabee's husband, Muhammad Najim.[58] Ms. Rabee executed a mortgage deed for the property, signing as a witness for her husband as borrower.[59]

49. Discussions regarding the Higher Drive Property commenced just two weeks after the CMC received a letter requesting guidance as to whether Iraq Telecom may exercise the Call Option, which Iraq Telecom wished to do, without approval from the CMC.  The CMC (in a letter signed by Dr. Rabee) issued a strong warning in response that Iraq Telecom should not be permitted to exercise the Call Option without such approval, resulting in yet further damage to Iraq Telecom.  The Higher Drive Property transaction was in substantial progress as of the date of the letter in October and closed in November.[60]

\* \* \*

---

[58]   *See* Ex. 23, ITLSUB000376, Draft Sale Contract for Higher Drive Property (listing the buyer as "Mansor Farid Succar of 50 The Quadrangle London W2 2RW").

[59]   *See* Ex. 24, Property Register for 50 The Quadrangle, London W2 2RW (listing Muhammad Najim as the proprietor); Ex. 25, Mortgage Deed for 50 The Quadrangle, London W2 2RW (listing Muhammad Najim as the borrower).

[60]   *See* Ex. 26, ITLSUB001106, Receipt from Dechert to Mr. Succar regarding Higher Drive Property (noting the Completion Date as November 23, 2016).

I declare under penalty of perjury under the laws of the United States and England and Wales that the foregoing is true and correct.  Executed in London, UK on 24/11/2020 .

Nicholas Bortman

14